IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS | : | NO. |
| P. O. Box 1210 | : | |
| Seaford, DE  19973 | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. WDQ 02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE | : | |
| 114 North West Street | : | |
| Easton, MD 21601 | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

## ORDER

And now this          day of          2003, upon review of the Plaintiff's Motion for Summary Judgment, and the Defendant's response thereto, it is hereby ORDERED and DECREED that the Motion is GRANTED. The Defendant's Fourth, Twelfth and Fourteenth Affirmative Defenses are hereby stricken.

J

IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS<br>P. O. Box 1210<br>Seaford, DE 19973 | : | NO. |
| | : | |
| | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. L02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE<br>114 North West Street<br>Easton, MD 21601 | : | |
| | : | |
| | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.  On or about March 1989 the Plaintiff met with T. Henley Graves, Esquire, a Delaware attorney practicing in Georgetown Delaware. [See pp. 71; 97-98 Dep. T.H. Graves][1]

2.  In March of 1989 T. Henley Graves was a candidate to become a Superior Court Judge for the State of Delaware and ultimately ascended to the bench on June 1, 1989 where he presently presides today. [See p. 6 of Exh. "A"]

3.  At the time that Plaintiff consulted Judge Graves in March 1989 Plaintiff was living with Lisa Wheatley and was contemplating marriage to her. [See pp. 14-15 of Exh. "A" See also Affidavit of Plaintiff Timothy Ayers attached hereto as Exh. "B"]

4.  The purpose of Plaintiff's consultation with Judge Graves in March 1989 was to have Judge Graves prepare a Pre-Nuptial Agreement in the event that Plaintiff were to marry Lisa Wheatley.

---

[1] The Deposition of T. Henley Graves, now Superior Court Judge T. Henley Graves is attached hereto and incorporated herein by reference as Exhibit "A".

1

IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS | : | NO. |
| P. O. Box 1210 | : | |
| Seaford, DE 19973 | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. WDQ 02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE | : | |
| 114 North West Street | : | |
| Easton, MD 21601 | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.  On or about March 1989 the Plaintiff met with T. Henley Graves, Esquire, a Delaware attorney practicing in Georgetown Delaware. [See pp. 71; 97-98 Dep. T.H. Graves][1]

2.  In March of 1989 T. Henley Graves was a candidate to become a Superior Court Judge for the State of Delaware and ultimately ascended to the bench on June 1, 1989 where he presently presides today. [See p. 6 of Exh. "A"]

3.  At the time that Plaintiff consulted Judge Graves in March 1989 Plaintiff was living with Lisa Wheatley and was contemplating marriage to her. [See pp. 14-15 of Exh. "A" See also Affidavit of Plaintiff Timothy Ayers attached hereto as Exh. "B"]

4.  The purpose of Plaintiff's consultation with Judge Graves in March 1989 was to have Judge Graves prepare a Pre-Nuptial Agreement in the event that Plaintiff were to marry Lisa Wheatley.

---

[1] The Deposition of T. Henley Graves, now Superior Court Judge T. Henley Graves is attached hereto and incorporated herein by reference as Exhibit "A".

1

5. In response to Plaintiff's advising Judge Ayers that Plaintiff was contemplating marriage to Lisa Wheatley and in light of Judge Grave's knowledge of the substantial age difference as between Plaintiff and Ms. Wheatley, Judge Graves suggested that since Plaintiff and Ms. Wheatley were cohabitating that it might be wiser to wait a period of time before rushing into a marriage. [See pp. 14-15 Exh. "A"]

6. Judge Graves met with Plaintiff on one occasion only for a half hour to discuss the creation of a Pre-Nuptial Agreement. [See pp. 24-25 Exh. "A"]

7. Plaintiff stated to Judge Graves that Plaintiff wanted a Pre-Nuptial Agreement because he had a concern the prospective marriage to Lisa Wheatley might be short lived and that Plaintiff had reservations that Ms. Wheatley was in this relationship to "gold dig". [See pp. 16; 28 of Exh. "A"]

8. Plaintiff advised Judge Graves that the presence of a Pre-Nuptial Agreement might also be a way of ascertaining whether Ms. Wheatley was serious about entering into a committed marriage. [See p. 28 of "Exh. "A"]

9. Plaintiff stated to Judge Graves that the Plaintiff anticipated a significant growth in Plaintiff's business interests and he therefore wanted a Pre-Nuptial Agreement to protect those business interests. [See p. 15-17 Exh. "A"]

10. In his discussions with Plaintiff Judge Graves advised Plaintiff that in the event of a divorce that the period for alimony that Plaintiff would have to pay in the event of divorce would be "capped" at one half of the period of years the parties were married. [See p. 29 Exh. "A"]

2

11. Judge Graves advised Plaintiff that in order to avoid enforceability issues that a Pre-Nuptial Agreement should drafted in such a way as to not be viewed as to "overreach". [See p. 30 of Exh. "A"]

12. Judge Graves advised Plaintiff that in Judge Grave's opinion if Plaintiff wanted a waiver of alimony in the 1989 Agreement that Plaintiff risked having the Pre-Nuptial Agreement set aside for overreaching. [See p. 82 Exh. "A"]

13. Judge Graves testified that he believed his relationship with Plaintiff was a "personal" one as opposed to a strict business relationship and that Judge Graves sensed that Plaintiff trusted Judge's Graves advice as an attorney and counselor. [See pp. 100-101 Exh. "A"]

14. Judge Graves testified that he found Plaintiff to be truthful in all his dealings with Judge Graves. [See p. 105 Exh. "A"]

15. Although Judge Graves and Plaintiff discussed the issue of alimony in March of 1989, Plaintiff advised Judge Graves that since Plaintiff was only concerned that the contemplated marriage might last less than two years and since he didn't want to be perceived as overreaching that Judge Graves should refrain from addressing the issue of alimony in the Pre-Nuptial Agreement that Plaintiff was asking Judge Graves to prepare. [See pp. 30-31; 52 of Exh. "A"]

16. Attached hereto as Exhibit "C" and incorporated herein by reference is a true and correct copy of the Pre-Nuptial Agreement prepared by Judge Graves and tendered to Plaintiff in or about March 1989.

17. In response to questions from defense counsel as to why Judge Graves inserted a penalty clause into the Pre-Nuptial Agreement that would mandate payment of sanctions

3

for an unsuccessful challenge to the Agreement Judge Graves prophetically testified: "Because you know whether you are Donald Trump or whoever you are, these things get litigated afterwards. People don't... people forget about what they've signed and what they've done." [See p. 50 of Exh. "A"]

18. At the conclusion of Plaintiff's March 1989 meeting with Judge Graves, Plaintiff advised Judge Graves that Plaintiff was uncertain if he would in fact marry Ms. Wheatley. [See p. 64 of Exh. "A"]

19. At all times relevant Defendant Capute has never been licensed to practice law in the State of Delaware.

20. At all times relevant Plaintiff and Plaintiff's family were residents of the State of Delaware.

21. At all times relevant Plaintiff's businesses were located in the State of Delaware.

22. Defendant Capute came to be introduced to Plaintiff as a result of Defendant's Capute's representation of Plaintiff's parents for estate matters. [See p. 16 of the deposition transcript of Defendant Capute attached hereto as exhibit "D" and incorporated herein by reference]

23. Defendant Capute made continual visits to meet with Plaintiff's parents in the State of Delaware in connection with Defendant's representation of Plaintiff's parents. [See p. 13 of Exh. "D"]

24. Notwithstanding the fact that Defendant Capute is not a licensed Delaware attorney in 1991 Defendant Capute drafted a will for Plaintiff who is domiciled in the State of Delaware. [See p. 19 of Exh. "D"]

4

25. Notwithstanding Defendant Capute's deposition testimony that he practices no law outside the estate-planning field Defendant Capute testified to having prepared "five or six" Prenuptial Agreements. [See pp. 17-18 of Exh. "D"]

26. On or about August 29, 1991 as testified to by Defendant Capute, Plaintiff Ayers provided Defendant Capute with a copy of the Pre-Nuptial Agreement prepared by Judge Grave's office said Agreement being the same Agreement attached hereto as Exhibit "C". [See p. 25 Exh. "D"]

27. Lisa Ayers has given testimony that Plaintiff Ayers gave her the Pre-Nuptial Agreement prepared by Judge Graves for her to have reviewed by independent counsel.

28. Lisa Ayers testified that in or about July 1991, she took the Judge Grave's Pre Nuptial Agreement to be reviewed James Yori, Esquire Judge Graves former law partner.

29. Lisa Ayers testified that James Yori could not give her advice about the Agreement in that Yori felt to do so put Yori into a conflict of interest situation.

30. Lisa Ayers testified that Yori advised her to meet with someone at the law firm of Hudson Jones also located in Georgetown Delaware to have the Agreement reviewed.

31. Lisa Ayers could not remember the name of the lawyer with whom she consulted at Hudson Jones.

32. Discovery in this case revealed that it was attorney Richard Berl of the Hudson Jones firm that Lisa Ayers consulted with.

33. When Richard Berl was deposed he had no independent recollection of ever meeting Lisa Ayers/Wheatley or reviewing or preparing a Pre Nuptial Agreement for Lisa Ayers/Wheatley. [See pp. 16-17 Exh. "E"]

5

34. The business records of Hudson Jones disclose that Richard Berl was in fact retained by Lisa Ayers/Wheatley.

35. Lisa Ayers has testified that the form of Pre Nuptial Agreement that she received back from Richard Berl is the document attached hereto as Exhibit "F".

36. Lisa Ayers has testified that she gave Exhibit "F" to Plaintiff Ayers representing that it was the document that her lawyer said she could sign.

37. Although neither the Defendant Capute nor Plaintiff Ayers have so testified and in fact have testified to the opposite, logic would dictate that in addition to the Judge Graves form of Agreement [Exh. "C"] it could have been that Exhibit "F" that was also given by Plaintiff Ayers to Defendant Capute for review.

38. According to the deposition testimony of Defendant Capute, Plaintiff provided Capute with Exhibit "C" for Capute to review and make changes that Capute deemed necessary. [See p. 25 Exh. "D"]

39. As testified to by Defendant Capute, at the time Plaintiff provided Defendant with the Agreement attached hereto as Exhibit "C" Plaintiff advised Defendant that Plaintiff wanted Capute to review Exhibit "C" in that Plaintiff was contemplating marriage to Lisa Wheatley. [See p. 49 Exh. "D"]

40. According to the billing records of Defendant Capute attached hereto as Exhibit "G", on August 29, 1991, Defendant Capute billed Plaintiff $30.00 for spending 20 minutes to "Study/Review Antenuptial Agreement".

41. According to the billing records of Defendant Capute attached hereto as Exhibit "G", on August 30, 1991, Defendant Capute billed Plaintiff $165.00 for spending 70 minutes to "Draft Antenuptial Agreement".

6

42. According to the billing records of Defendant Capute attached hereto as Exhibit "G", on September 9, 1991, Defendant Capute billed Plaintiff $45.00 for spending 30 minutes to prepare "Letter to client re antenuptial changes, proofread agreement".

43. Attached hereto as Exhibit "H" is a true and correct copy of Defendants letter of that date to Plaintiff herein.

44. In Exhibit "H" Defendant Capute purports to enclose "a redrafted Antenuptial Agreement between you and Lisa.".

45. In Exhibit "H" Defendant Capute purports to have made "substantive changes" to the antenuptial agreement provided to him by Plaintiff Ayers.

46. In Exhibit "H" Defendant Capute invites Plaintiff "Please let me know if you have any questions about any aspect of this Agreement.".

47. In Exhibit "H" Defendant Capute advises Plaintiff he "would be happy to consult Lisa's attorneys if you wish.".

48. Defendant Capute testified that he is cognizant of the fact that prospective spouses can contractually waive the right to statutory alimony in a Prenuptial Agreement so long as the waiver is done so in express fashion. [See p. 59-60 of Exh. "D"]

49. Attached hereto as Exhibit "I" is a true and correct copy of the Prenuptial Agreement signed by Plaintiff and Lisa Wheatley.

50. The computer code "A90:CTCTEA02.AGT" as it appears on the bottom pages of Exhibit "I" was a computer code generated by Defendant Capute's word processing equipment in 1991. [See pp 22-24 Exh. "D"]

51. Exhibit "I" was a document generated by Defendant Capute.

7

52. The original of Exhibit "I" was the document enclosed in Defendant Capute's letter of September 9, 1991 to Plaintiff Ayers.

53. In paragraph 5 of Defendant Capute's answer to Plaintiff's Amended Complaint Capute states "In response to paragraph 10 of the First Amended Complaint, Defendant admits that in or around 1991, at plaintiff's request he or his staff retyped an unsigned Antenuptial Agreement (the "1989 Antenuptial Agreement") that the law firm of Fuqua and Graves (which later changed its name to Fuqua, Yori & Rogers), Mr. Ayers Delaware counsel, had prepared in or around 1989; that defendant made certain editorial changes and other minor changes to the 1989 requested by plaintiff, and advised plaintiff to return to his Delaware counsel for any final advice on the sufficiency of the Agreement under Delaware law, which Mr. Ayers agreed to do; and what purports to be an executed copy of the Antenuptial Agreement that defendant retyped (the "1991 Antenuptial Agreement") is attached to the First Amended Complaint as Exhibit A.

54. Nothing in Defendants billing records attached hereto as Exhibit "G" indicate that Plaintiff was invoiced for a "retyped" Antenuptial Agreement.

55. The Defendant has no evidence to support his contention in paragraph 6 of his Answer to the First Amended Complaint that "upon information and belief" Plaintiff sought out advice from Plaintiff's "Delaware Counsel" regarding the Antenuptial Agreement after the Agreement was "retyped" by Defendant.

56. Defendant Capute has no evidence that another lawyer reviewed Exhibit "I" after it was sent by Capute to Plaintiff on September 9, 1991.

57. Other than Defendant Capute's testimony, Defendant Capute has no other evidence that he advised Plaintiff to consult "Delaware counsel" as referenced in paragraph 6 of his Answer to the First Amended Complaint.

58. Other than Defendant Capute's testimony, Defendant has no evidence to refute the statements of Plaintiff in his Affidavit attached hereto as Exhibit "B" and incorporated herein by reference that at all times relevant, Plaintiff specifically advised Defendant that as part of the Prenuptial Agreement, Defendant Capute should include language in the Agreement that would preclude Plaintiff from having to pay alimony in the event of divorce.

59. Defendant Capute's testimony as to whether Plaintiff advised Capute that the Agreement should waive entitlement to alimony was that Capute could not recall whether he and Plaintiff discussed the issue of alimony. See pp 60 –61 Exh. "D".

60. Attached hereto as Exhibit J are true and correct copies of the estate documents that Defendant prepared for Plaintiff in May 1991 and modified from time to time.

61. Defendant Capute has no evidence that Plaintiff was consulting with other lawyers in 1991.

62. In Defendant's Fourth Affirmative defense to the Complaint Defendant alleges "Any and all relief sought by the plaintiff is barred to the extent that essential provisions of the 1991 Antenuptial Agreement that plaintiff alleges were ineffective to carry out his alleged intentions with respect to the ownership and division of assets in the event of a dissolution of his marriage to Lisa Wheatley, were provisions drafted by plaintiff's Delaware attorneys, the law firm of Fuqua and Graves, and agreed to by plaintiff and his prospective wife, Ms. Wheatley."

63. Plaintiff is entitled to summary judgment as a matter of law that the Defendant's Fourth Affirmative Defense is not a bar to his causes of action and as such the defense should be stricken.

64. In his Twelfth Affirmative Defense Defendant contends that the injuries suffered by Plaintiff were caused by the Law Firm of Fuqua and Graves.

65. Defendant has no evidence that any lawyer from Fuqua and Graves committed any act of legal malpractice.

66. Plaintiff is entitled to summary judgment as a matter of law that the Defendant's Twelfth Affirmative Defense is not a bar to his causes of action and as such the defense should be stricken.

67. In his Fourteenth Affirmative Defense Defendant contends "Plaintiffs claims are barred because defendant, at all times relevant to the allegations in the First Amended Complaint, reasonably relied upon the instructions given to him by plaintiff and upon the advice and expertise provided to plaintiff by his Delaware counsel who drafted the 1989 Antenuptial Agreement.

68. Plaintiff is entitled to summary judgment as a matter of law that the Defendant's Fourteenth Affirmative Defense is not a bar to his causes of action and as such the defense should be stricken in that the 1989 Agreement was not the document executed by Plaintiff and his prospective bride.

69. Defendant's Fourteenth Affirmative Defense is an attempt by Defendant to claim his engagement was limited as allowed by Disciplinary Rule 1.2 c.

70. Plaintiff is entitled to summary judgment as a matter of law that the Defendant's Fourteenth Affirmative Defense is not a bar to his causes of action and as such the

defense should be stricken in that Defendant has no evidence that he consulted with Plaintiff about limiting the scope of representation.

71. Plaintiff is entitled to summary judgment as a matter of law that the Defendant's Fourteenth Affirmative Defense is not a bar to his causes of action and as such the defense should be stricken in that Defendant has no evidence that Plaintiff consented to a limited scope of representation.

72. Defendant should be estopped from asserting any defense to any of the claims asserted by Plaintiff in light of the fact that it is clear from the documents appended to the instant Motion that Defendant was repeatedly engaged in the unauthorized practice of law in the State of Delaware.

**GIBSON & PERKINS P.C.**

BY: KEVIN WILLIAM GIBSON
Suite 105
200 East State Street
Media PA 19063
610.565.1708
kevingibson@gibperk.com

IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS | : | NO. |
| P. O. Box 1210 | : | |
| Seaford, DE  19973 | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. WDQ 02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE | : | |
| 114 North West Street | : | |
| Easton, MD 21601 | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT

I.    FACTS:

On or about March 1989 the Plaintiff met with T. Henley Graves, Esquire, a

Delaware attorney practicing in Georgetown Delaware. [See pp. 71; 97-98 Dep. T.H.

Graves] In March of 1989 T. Henley Graves was a candidate to become a Superior Court

Judge for the State of Delaware and ultimately ascended to the bench on June 1, 1989

where he presently presides today. [See p. 6 of Exh. "A"] At the time that Plaintiff

consulted Judge Graves in March 1989 Plaintiff was living with Lisa Wheatley and was

contemplating marriage to her. [See pp. 14-15 of Exh. "A" See also Affidavit of Plaintiff

Timothy Ayers attached hereto as Exh. "B"] The purpose of Plaintiff's consultation with

Judge Graves in March 1989 was to have Judge Graves prepare a Pre-Nuptial Agreement

in the event that Plaintiff were to marry Lisa Wheatley.

In response to Plaintiff's advising Judge Ayers that Plaintiff was contemplating

marriage to Lisa Wheatley and in light of Judge Grave's knowledge of the substantial age

difference as between Plaintiff and Ms. Wheatley, Judge Graves suggested that since

1

Plaintiff and Ms. Wheatley were cohabitating that it might be wiser to wait a period of time before rushing into a marriage. [See pp. 14-15 Exh. "A"] Judge Graves met with Plaintiff on one occasion only for a half hour to discuss the creation of a Pre-Nuptial Agreement. [See pp. 24-25 Exh. "A"] Plaintiff stated to Judge Graves that Plaintiff wanted a Pre-Nuptial Agreement because he had a concern the prospective marriage to Lisa Wheatley might be short lived and that Plaintiff had reservations that Ms. Wheatley was in this relationship to "gold dig". [See pp. 16; 28 of Exh. "A"] Plaintiff advised Judge Graves that the presence of a Pre-Nuptial Agreement might also be a way of ascertaining whether Ms. Wheatley was serious about entering into a committed marriage. [See p. 28 of "Exh. "A"]

Plaintiff stated to Judge Graves that the Plaintiff anticipated a significant growth in Plaintiff's business interests and he therefore wanted a Pre-Nuptial Agreement to protect those business interests. [See p. 15-17 Exh. "A"] In his discussions with Plaintiff Judge Graves advised Plaintiff that in the event of a divorce that the period for alimony that Plaintiff would have to pay in the event of divorce would be "capped" at one half of the period of years the parties were married. [See p. 29 Exh. "A"] Judge Graves advised Plaintiff that in order to avoid enforceability issues that a Pre-Nuptial Agreement should drafted in such a way as to not be viewed as to "overreach". [See p. 30 of Exh. "A"] Judge Graves advised Plaintiff that in Judge Grave's opinion if Plaintiff wanted a waiver of alimony in the 1989 Agreement that Plaintiff risked having the Pre-Nuptial Agreement set aside for overreaching. [See p. 82 Exh. "A"] Although Judge Graves and Plaintiff discussed the issue of alimony in March of 1989, Plaintiff advised Judge Graves that since Plaintiff was only concerned that the contemplated marriage might last less than

2

two years and since he didn't want to be perceived as overreaching that Judge Graves

should refrain from addressing the issue of alimony in the Pre-Nuptial Agreement that

Plaintiff was asking Judge Graves to prepare. [See pp. 30-31; 52 of Exh. "A"] At the

conclusion of Plaintiff's March 1989 meeting with Judge Graves, Plaintiff advised Judge

Graves that Plaintiff was uncertain if he would in fact marry Ms. Wheatley. [See p. 64 of

Exh. "A"]

In July of 1991 Lisa and Tim decided to wed. Lisa Ayers has given testimony that

Plaintiff Ayers gave her the Pre-Nuptial Agreement prepared by Judge Graves for her to

have reviewed by independent counsel. Lisa Ayers further testified that in or about July

1991, she took the Judge Grave's Pre Nuptial Agreement to be reviewed James Yori,

Esquire Judge Graves former law partner. Lisa Ayers testified that James Yori could not

give her advice about the Agreement in that Yori felt to do so put Yori into a conflict of

interest situation.[1] Lisa Ayers testified that Yori advised her to meet with someone at the

law firm of Hudson Jones also located in Georgetown Delaware to have the Agreement

reviewed. Although Lisa Ayers could not remember the name of the lawyer with whom

she consulted at Hudson Jones, discovery in this case revealed that it was attorney

Richard Berl of the Hudson Jones firm that Lisa Ayers consulted with.

When Richard Berl was deposed he had no independent recollection of ever meeting

Lisa Ayers/Wheatley or reviewing or preparing a Pre Nuptial Agreement for Lisa

Ayers/Wheatley. [See pp. 16-17 Exh. "E"] The business records of Hudson Jones

disclose that Richard Berl was in fact retained by Lisa Ayers/Wheatley. Mr. Berl testified

that he could have prepared a Prenuptial Agreement for Lisa Wheatley.

---

[1] When Mr. Yori was deposed he testified that he never met with Lisa Wheatley.

Lisa Ayers has testified that the form of Pre Nuptial Agreement that she received back from Richard Berl is the document attached hereto as Exhibit "F". Lisa Ayers has testified that she gave Exhibit "F" to Plaintiff Ayers representing that it was the document that her lawyer said she could sign.

Although neither the Defendant Capute nor Plaintiff Ayers have so testified and in fact have testified to the opposite, logic would dictate that in addition to the Judge Graves form of Agreement [Exh. "C"] it could have been that Exhibit "F" that was also given by Plaintiff Ayers to Defendant Capute for review. However, for purposes of the instant Motion For Summary Judgment it is immaterial as to whether Capute reviewed one or both of these documents. All that is relevant is that According to the billing records of Defendant Capute attached hereto as Exhibit "G", on August 29, 1991, Defendant Capute billed Plaintiff $30.00 for spending 20 minutes to "Study/Review Antenuptial Agreement". According to the billing records of Defendant Capute attached hereto as Exhibit "G", on August 30, 1991, Defendant Capute billed Plaintiff $165.00 for spending 70 minutes to "Draft Antenuptial Agreement". According to the billing records of Defendant Capute attached hereto as Exhibit "G", on September 9, 1991, Defendant Capute billed Plaintiff $45.00 for spending 30 minutes to prepare "Letter to client re antenuptial changes, proofread agreement". Attached hereto as Exhibit "H" is a true and correct copy of Defendants letter of that date to Plaintiff herein. In Exhibit "H" Defendant Capute purports to enclose "a redrafted Antenuptial Agreement between you and Lisa.". In Exhibit "H" Defendant Capute purports to have made "substantive changes" to the antenuptial agreement provided to him by Plaintiff Ayers. In Exhibit "H" Defendant Capute invites Plaintiff "Please let me know if you have any questions about

4

any aspect of this Agreement.". In Exhibit "H" Defendant Capute advises Plaintiff he

"would be happy to consult Lisa's attorneys if you wish.". The document that Mr. Capute

transmitted to Plaintiff is attached hereto as Exhibit "I" and is the Prenuptial Agreement

signed by Plaintiff and Lisa Wheatley and is the documents that is the center of the

controversy in this litigation.

II.    ISSUES PRESENTED:

1. Can Defendant avoid liability by claiming that the subject matter Antenuptial

Agreement in this matter is the partial work product of other attorneys?

Suggested Answer:    No.

2. Can Defendant avoid liability by claiming that he limited the scope of his

representation to just provide estate-planning provisions into the subject matter

agreement?

Suggested Answer:    No.

III.    ARGUMENT

Summary Judgment Standard

It is well established that a motion for summary judgment will be

granted only if there exists no genuine issue as to any material fact and the moving party

is    entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Anderson v.

Liberty    Lobby, Inc., 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of

either party," then summary judgment is inappropriate. Anderson, 477 U.S. at 250; see

also Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987);

5

Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir.1979); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P.   56(c); Pulliam Inv. Co., 810 F.2d at 128, citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. Anderson, 477 U.S. at 256.

In Celotex Corp., the Supreme Court stated: In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. However, " 'a mere scintilla of evidence is not enough to create a

6

fact issue." ' <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 958-59 (4th Cir.1984), quoting

<u>Seago v. North Carolina Theaters, Inc.</u>, 42 F.R.D. 627, 632 (E.D.N.C.1966), aff'd, 388

F.2d 987 (4th Cir.1967). There must be "sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party. If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted." <u>Anderson,</u> 477 U.S. at

249-50 (citations omitted).

<u>Application Of The Standard To Plaintiff's Motion</u>

The can be no dispute of fact that the last attorney to make any changes to the

Prenuptial Agreement at issue in this case was the Defendant Capute. There can be no

factual dispute that Mr. Capute's transmittal letter of September 9, 1991, wherein he sent

the subject matter agreement to Plaintiff on it's face states: "Please let me know if you

have any questions <u>about any aspect of this Agreement</u>.". [emphasis added] He also

advises Plaintiff he "would be happy to consult Lisa's attorneys if you wish." Mr.

Capute's statement that Plaintiff was free to consult Defendant regarding "any aspect of

this Agreement" proves beyond the peradventure of a doubt, that Plaintiff was justified in

assuming that Mr. Capute was the final scrivener of the Agreement that is the center of

the instant controversy. Mr. Capute's position that all he was engaged for was to review

the document from an estate planning point of view is belied by the statement in his

September 9, 1991, letter that he was willing to consult with Lisa's lawyers regarding the

document. The obvious question being begged is why would there be a need to discuss

Plaintiff's Estate Plan with the attorneys of his prospective spouse? But most damaging

to the Defendant's contention that he assumed Plaintiff would have the Agreement

reviewed by Delaware matrimonial counsel is the fact that the September 9, 1991

7

transmittal letter is devoid of any language that Mr. Capute would equally be available to discuss the document with Mr. Ayer's supposed Delaware counsel. The fact that Defendant would offer to discuss the so called "estate planning" aspects of the agreement with Lisa's lawyers <u>but not</u> Plaintiff's Delaware matrimonial lawyers at the very least should have this Court scratching its head as to the validity of the affirmative defense that Mr. Capute is not liable for the work product of other lawyers.

Equally troubling is Defendant Capute's affirmative defense that he limited the scope of his representation to reviewing the subject matter agreement solely from an estate planning perspective. . In the context of an attorney-client relationship, Rule 1.2(c) of the Rules of Professional Conduct provides that "[a] lawyer may limit the objectives of the representation if the client consents after a full disclosure of the circumstances and consultation." The official comment accompanying Rule 1.2 further notes that "[t]he objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client." Unfortunately research fails to disclose any Delaware of Maryland cases that discuss what an attorney's duties are with respect to what constitutes adequate disclosure. However, in <u>Benet v. Schwartz</u>, 1995 WL 117884, (N.D. Ill. 1995) (Illinois Rule Prof. Resp. the United Staes District Court in Illinois noted that Rule 1.2(c) permits a lawyer to limit his responsibilities to a client "only after disclosure"); see also <u>Healy v. Axelrod Constr. Co.</u>, 155 F.R.D. 615, 620 (N.D. Ill. 1994) (finding that an attorney had not satisfied the disclosure requirements of Rule  1.2(c) as a prerequisite to limiting the objectives of representation).

In <u>Healy</u> the Court defined adequate disclosure as :

8

> Under Rule 1.2(c), a lawyer may properly limit the scope of his
> representation of a client. That Rule provides: A lawyer may limit the
> objectives of the representation if the client consents after disclosure.
> Exactly what type of "disclosure" is required is not clear from the Rule,
> but the definition section of the Rules ("Terminology") provides some
> guidance: Disclosure denotes communication of information reasonably
> sufficient to permit the client to appreciate the significance of the matter in
> question. Healy 155F.R.D at 620

In Healy, an attorney was attempting to avoid disqualification on a conflict of

interest theory by claiming his client was advised of the potential of a conflict through a

communication wherein the attorney attempted to limit the scope of his representation.

The District Court noted:

> We cannot conclude that the disclosure provided Irwin regarding the scope
> of his representation by MMK met the standards required to limit the
> scope of representation. MMK's disclosure to Irwin fell short in several
> respects. The record reflects that MMK advised Irwin that it would file the
> motion to dismiss on his behalf, but that if the motion failed, it could no
> longer represent him due to a conflict. (Marks Affidavit, ¶ 3). The record
> does not reflect that it advised him of the nature of the conflict, that it
> advised him what rights he had against the Plan or other Axelrod co-
> defendants, or that it advised him that he could forego the conflict by
> waiving his right to indemnity. Nor was he advised to obtain independent
> counsel to represent him in this undescribed conflict. Irwin was simply
> told that if they lost the motion, he was on his own. This is not the kind of
> "disclosure" contemplated by Rule 1.2(c). Irwin was entitled to a full
> explanation from his attorneys (and that is what MMK was at that time)
> about the nature of the conflict and about his rights in the litigation. MMK
> was obligated to provide this explanation, and having failed to do this,
> they cannot now claim a limited representation of Irwin so as to establish
> the lack of a substantial relationship. Healy 155F.R.D at 620

In re Bancroft, 204 B.R. 548, 552 (C.D. Ill. 1997) the Court discussed the

disclosure required under Rule 1.2(c) in a bankruptcy setting to be:

> "Under Rule 1.2(c) of the RPC, an attorney can limit the scope of
> representation, but only if the client consents after disclosure.
> Disclosure involves the attorney explaining to a debtor the nature
> of the bankruptcy process, what problems could or will be
> encountered, how those problems should be addressed, and the
> risks or hazards, if any, associated with those problems. Consent

involves a clear understanding on the part of the debtor as to these factors...." <u>Bancroft</u>, 204 B.R. at 551.

In the case at bar all we know from Mr. Capute's testimony is that he never explained any of the aspects of the Antenuptial Agreement to Plaintiff but instead simply put the document into the mail with a letter that said call if you have any questions. [See p 88 of Exh. "D"] This Court can conclude as a matter of law that this is insufficient disclosure and therefore Defendant Capute's Fourth, Twelfth and Fourteenth Affirmative Defenses that contend that Capute's scope of representation was limited must be stricken.[2]

Finally, this Court should consider the fact the Defendant in this case repeatedly traveled to the State of Delaware to prepare documents for Delaware residents. The clients, who include Plaintiff and his father and mother, never traveled to Maryland to meet with the Defendant. With respect to the subject matter Antenuptial Agreement Defendant's last typed version of the document on its face said Delaware state law would govern the document. Cleary Mr. Capute engaged in the unauthorized practice of law and as such should be estopped from asserting any affirmative defense in this case. In <u>Burns v Ferro</u>, 1991 WL 53834 (De Super. 1991) the Delaware Superior Court concluded that a participant in an illegal scheme may not sue to recover for injuries arising out of that scheme.[3] Plaintiff believes that the converse of the ruling in <u>Burns</u>, applies to the factual matrix of this case. In other words, Defendant Capute should not be allowed to argue that he limited the scope of his representation under Disciplinary Rule 1.2 while at the same

---

[2] This Court in <u>Leading Edge v Sun Automation</u>, 1991 WL 398682 (D.Md.1991) 23 USPQ 2d 1161 (1991) held that summary judgment is a proper vehicle to dispose of a defendant's affirmative defenses.

[3] Plaintiff assumes that Delaware law controls this matter given the fact that other than the ministerial typing of the Antenuptial Agreement, all of the transactions and occurrences regarding this matter took place in the State of Delaware.

time violate the Unauthorized Practice of Law provisions of Rule 5.5 of the very same

rules.

IV.    CONCLUSION:

For the above reasons, Plaintiff is entitled to Summary Judgment.


**GIBSON & PERKINS P.C.**


BY: KEVIN WILLIAM GIBSON
Suite 105
200 East State Street
Media PA 19063
610.565.1708
kevingibson@gibperk.com

11

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June 2003, I served a true and correct copy of

the Plaintiff's Motion For Summary Judgment upon the following by U.S Mail, first class,

postage prepaid:

Robert T. Shaffer, III, Esquire
Suite 1400, 36 S. Charles Street
Baltimore, MD   21201-3109

**GIBSON & PERKINS P.C.**

BY: KEVIN WILLIAM GIBSON
Suite 105
200 East State Street
Media PA 19063
610.565.1708
kevingibson@gibperk.com