**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
– Northern Division –

TIMOTHY E. AYERS,                )
                                 )
        Plaintiff,            )
                                 )
     v.                       )     Civil Action No. WDQ 02-CV-0061
                                 )
                                 )
CHARLES T. CAPUTE,               )
                                 )
        Defendant.            )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       Defendant Charles T. Capute submits this Memorandum in support of his Motion
for Summary Judgment.

## I. INTRODUCTION

       In 1989 plaintiff Timothy Ayers, a Delaware businessman with substantial
income and assets, asked a Delaware lawyer named T. Henley Graves to draft a premarital
agreement.  When his marriage collapsed 12 years later, Mr. Ayers was disappointed that the
premarital agreement did not expressly waive alimony and did not protect certain jointly titled
assets. He settled his wife's property and alimony claims in April 2002, by agreeing to pay her
alimony in the amount of $6,000 per month for 59 months and disbursing to her $420,000 of
funds on deposit in the couple's jointly-held bank account. Even before he agreed to pay these
sums, however, plaintiff was searching for someone to sue.  But his problem – as the record in
this case amply illustrates – was a near-total lack of recollection of the pertinent facts.  First he
named Mr. Graves, who by then was a judge of the Delaware Superior Court, in a draft

Complaint. He later became convinced that Mr. Graves did not draft the premarital agreement, so he prepared and filed a revised Complaint naming Mr. Graves' former partner, a Delaware lawyer named James A. Yori. When the Delaware Court dismissed the Complaint, Mr. Ayers filed this action against Charles T. Capute, a Maryland estate planning lawyer who practices on the Eastern Shore, claiming that Mr. Capute actually drafted the premarital agreement in 1991, not Mr. Graves or Mr. Yori.

During discovery, however, Mr. Ayers eventually conceded that Mr. Graves had drafted a premarital agreement for him in 1989. He also claimed that he expressly told Mr. Graves to include in the agreement a provision waiving his prospective wife's right to seek alimony. After Judge Graves testified that he deliberately did not include a waiver of alimony provision because Mr. Ayers told him he was not concerned about alimony, Mr. Ayers changed his testimony, through Answers to Interrogatories served after Judge Graves' deposition, stating that he *agreed with the Judge*.

Notwithstanding this recent admission, Mr. Ayers apparently still claims that Mr. Capute should have inserted a waiver of alimony when he reviewed and revised the premarital agreement in 1991. To lend support for his claim that he did not want a provision waiving alimony in 1989 but that Mr. Capute knew, or should have known, he wanted one in 1991, Mr. Ayers suggested that Mr. Capute, at Mr. Ayers' request, added what Mr. Ayers claims was a waiver of alimony provision in paragraph 7 of the agreement, which entitled Mrs. Ayers to a payment of $1000 per month for every year of marriage in the event the couple were divorced. But this claim, like many others that Mr. Ayers has made in this case, has been disproved by subsequent discovery establishing that the $1000/month provision was added not by Mr. Capute,

but by *Mrs.* Ayers' attorney before Mr. Capute even saw the agreement.

In short, Mr. Ayers is making up the facts as he goes along. He has no clue what he told his lawyers in 1989 or in 1991, or what they told him, or whether he followed their advice, or even what he wanted from the representation. All he "knows" is that a lawyer must be responsible if the premarital agreement he signed in 1991 did not afford him every conceivable advantage in his divorce proceedings ten years later.

As demonstrated below, defendant is entitled to summary judgment for several reasons. First, plaintiff's claims are clearly barred by the applicable statute of limitations. Second, even if plaintiff's claims are not time-barred, the admissible facts of record establish that the scope of defendant's representation of plaintiff was limited, and that Mr. Capute advised Mr. Ayers in 1991 that he would not and could not advise him on the validity or enforceability of the agreement's substantive provisions, which were drafted in 1989 by Mr. Ayers' family law counsel in Delaware, and revised by Mrs. Ayers' own counsel in August 1991. Finally, even if the scope of Mr. Capute's representation was not limited, the undisputed facts of record establish that defendant did not breach the applicable standard of care or cause plaintiff to incur any damages because (1) the signed Antenuptial Agreement dated September 19, 1991 did protect the property interests that Mr. Ayers wanted protected – his two businesses and real property that he acquired both before and after his marriage (all of which he retained in the property settlement that he reached with his wife in April 2002), and (2) Mr. Ayers' voluntary decision to pay his former wife alimony and a portion of the couple's joint bank account was not proximately caused by any negligence by Mr. Capute. Rather, the payment of these sums was solely attributable to the significant disparities in income and assets between Mr. and Mrs. Ayers

at the time they divorced in 2001, and Mr. and Mrs. Ayers' decision to establish and maintain joint bank accounts.   Accordingly, the Court should enter summary judgment in favor of defendant on all claims in this case.

## II. MATERIAL FACTS

The fundamental problem with this case is that the relevant events occurred so long ago that none of the participants – especially Mr. Ayers – remembers them with sufficient clarity to satisfy the evidentiary requirements of a court of law.  In addition, most of the files and other documentation that is critical to the defense of any case, especially one based on alleged acts of malpractice more than a decade ago, have long since been destroyed. To understand plaintiff's shifting allegations, it is necessary to review the evidence as it emerged during discovery, because each time some incontrovertible fact surfaced Mr. Ayers simply changed his recollection, and then altered his legal theories to account for the new evidence.

### A.  The Delaware Action

Plaintiff Timothy Ayers is a 58-year old sophisticated businessman. Ex. 1 (T. Ayers Dep.), at 4, 12-15.  He is the President of the Sussex Printing Corporation, a successful family-owned printing and publishing business in Seaford, Delaware, which publishes an advertising circular called "The Guide."  Sussex Printing employs over 50 people.  *Id*. at 12-13, 24.  Mr. Ayers' parents, Layton and Star Ayers, started the business in 1959, and Mr. Ayers has worked there since 1963. *Id*. at 13, 15.  He currently owns a 42% interest in Sussex Printing.  *Id*. at 24.

Mr. Ayers also owns and operates Tea Tyme Antiques, LLC, in Seaford, Delaware, through which he collects and sells fine antiques. Ex. 1 (T. Ayers Dep.) at 20-21.  He

owns several automobiles, including a Rolls Royce Corniche, and other property that is titled in his name alone.   Ex. 2 (Financial Report of Lisa Ayers).  During the last two tax years, Mr. Ayers has reported income of almost $900,000 for each year.  *See* Exs. 3, 4.  In 1993, Mr. Ayers reported that his net worth was $1.1 million.  By February 2000, his net worth had increased to almost $4 million. Ex. 5 (Ayers Financial Statements for 1993, 1999, and 2000).

In or about August 2001, plaintiff's counsel in the pending case prepared, on behalf of Mr. Ayers, a draft Complaint for malpractice against T. Henley Graves, now a Judge on the Superior Court for the State of Delaware, alleging that Judge Graves and his former law firm, Fuqua, Yori & Rogers, committed malpractice when Judge Graves prepared an Antenuptial Agreement for Mr. Ayers in or around 1991.   *See* Ex. 6 (Letter from Kevin William Gibson, Esquire, dated August 9, 2001, enclosing draft Complaint).  In the Complaint, Mr. Ayers alleged that Judge Graves had negligently prepared the Antenuptial Agreement dated September 19, 1991, because the Agreement failed to contain an express waiver of alimony provision that Mr. Ayers claims he requested at the time he consulted with Judge Graves.  *Id.* at ¶¶ 6-7.  Plaintiff also alleged that Judge Graves was negligent because he failed to make clear in the Agreement that Mr. Ayers' business interests, Sussex Printing and Tea Tyme Antiques, were separate property of Mr. Ayers and would not be considered marital property. *Id.* at ¶¶ 9-10.

Shortly after receiving Mr. Ayers' draft Complaint, Judge Graves advised plaintiff's counsel that Mr. Ayers was mistaken about Judge Graves' role in preparing the signed Antenuptial Agreement dated September 19, 1991.  Judge Graves pointed out to Mr. Gibson that he had left private practice to assume his position on the Delaware Superior Court Bench on June 1, 1989, and, therefore, he could not possibly have drafted an agreement for Mr. Ayers in or

around September 1991.  Ex. 7 (Graves Dep.), at 72-76.  On August 16, 2001, plaintiff's counsel wrote to James A. Fuqua, Jr., Judge Graves' former law partner, indicating that Judge Graves did not appear to be an appropriate party to Mr. Ayers' malpractice action. *See* Ex. 8; s*ee also* Ex. 7 (Graves Dep.) at 86.  In his letter of August 16, 2001, plaintiff's counsel stated that "Mr. Ayer's [sic] has no 'solid' recollection as to which lawyer at [Fuqua, Yori & Rogers] represented him with respect to the preparation of the subject matter Prenuptial Agreement. He [Mr. Ayers] thought it was Judge Graves . . . .   His second belief is, if it was not Judge Graves, the next logical choice would [be] James A. Yori, Esquire," a former partner of Judge Graves.  Ex. 8, at 2.

On September 7, 2001, Mr. Ayers filed his Complaint for malpractice against James A. Yori and his law firm, then known as Fuqua & Yori, in the Superior Court for New Castle County Delaware.  *See* Ex. 9.  The allegations of the filed Complaint are virtually identical to those contained in the original draft Complaint, except that Mr. Yori rather than Judge Graves is alleged to be the lawyer who negligently drafted the 1991 Antenuptial Agreement.

Mr. Yori and his law firm moved to dismiss the Complaint on grounds that the claims were time-barred by Delaware's statute of limitations or, in the alternative, that the claims were not ripe because Mr. Ayers and his former wife had not yet resolved their property dispute in the divorce case.  *See* Ex. 10 (Defendants' Motion to Dismiss).  On December 4, 2001, the Delaware Superior Court dismissed Mr. Ayers' Complaint, without prejudice, on grounds that he had not yet suffered any damages and, therefore, the claims for malpractice were premature.  Ex. 11 (Transcript of motions hearing held on Dec. 4, 2001).  Later that same day, defense counsel

6

representing Mr. Yori and his law firm in the Delaware action advised Mr. Gibson that the letters "CTC" on the computer code at the bottom of the signed 1991 Antenuptial Agreement were actually the initials of an estate lawyer in Easton, Maryland, named Charles T. Capute. Ex. 12.

## B.  Mr. Ayers' Deposition Testimony

Mr. Ayers was deposed in this case on February 6, 2003.  He testified that he has been married and divorced twice.  His first marriage to Diane Lord in 1963 ended in divorce in the mid-80s. Ex. 1 (T. Ayers Dep.) at 5-6.  Judge Graves represented Mr. Ayers and his wife, Ms. Lord, in their first divorce.  *Id.* at 29.  Mr. Ayers met Lisa Wheatley while his first divorce was being finalized.  *Id.* at 26.

Once his first divorce was finalized, Mr. Ayers approached Judge Graves to request that he prepare a form antenuptial agreement that Mr. Ayers could use in the event he decided to remarry. Ex. 1 (T. Ayers Dep.) at 46-48, 50.  Mr. Ayers testified that he consulted with Judge Graves about an antenuptial agreement because he wanted "to protect everything [he] had." *Id.* at 56.  But Mr. Ayers was unable to recall any discussions he had with Judge Graves or Judge Graves' partner, Mr. Yori, about the agreement.  *Id.* at 58-62.  According to Mr. Ayers, Judge Graves' law firm prepared and sent to him a "form" antenuptial agreement without "dates on it or anything else because it was just a form with no dates, no names, nothing." *Id.* at 62. Mr. Ayers testified that he did not know who at the Fuqua firm had prepared the "form" agreement.  *Id.* at 63. According to Mr. Ayers, Judge Graves' firm never revised the agreement after he received the initial "form." *Id.* at 64. When pressed to say whether he had any substantive discussions with Judge Graves and could not recall them now, or that he clearly recalled that he had no such discussions with Judge Graves beyond asking him to prepare a form

agreement, Mr. Ayers testified,

> A   That is correct. The last.
>
> Q.   The last? Okay.
>
> A.   Only that I would like one prepared.
>
> Q.   And what was your understanding, if anything, as to how the antenuptial agreement form that you received was prepared?
>
> A.   Here is what I expected it to be. Is that what you would like to hear?
>
> Q.   Sure. Tell me.
>
> A.   Okay. *What I expected it to be was that after marriage, that whatever I had, such as my home and whatever else it may be, was mine. There absolutely was no alimony whatsoever. That's basically what I assumed it would be. I assumed I would be protected 100 percent, and the agreement would be that whoever I would be married to would understand this, they walk into the marriage with whatever they have or zero, and if I did not wish to do anything else, they leave with zero if its goes bad. That's exactly what I understood.*

*Id*. at 65-66 (emphasis added).  After Mr. Ayers received the "form" antenuptial agreement from someone at Judge Graves' law firm, he placed the unsigned original agreement in his safe and did not discuss it with anyone until sometime later. *Id*. at 69-70.

Mr. Ayers' recollection of Mr. Capute's role was not much better.   He testified that Mr. Capute was an estate lawyer who did estate planning work for the Ayers family.  Ex. 1 (T. Ayers Dep.) at 76.   Although Mr. Ayers recalled that Mr. Capute prepared his will and performed other estate planning services for the Ayers family, he could not recall when he first discussed with Mr. Capute the subject of the form antenuptial agreement prepared by the Fuqua firm, what events, if any, triggered any such discussion, or who initiated them. *Id*. at 74-75.  Mr.

Ayers testified that he had only one discussion with Mr. Capute regarding the antenuptial agreement, *id.* at 79, but he had virtually no recollection of its substance:

> Q. Can you recall as you sit here today the substance of any discussions that you had with Mr. Capute some more than a decade ago as it relates to the subject of the antenuptial agreement?
>
> A. You mean what I wanted as far as?
>
> Q. No. The actual words that you said to him, the words he said to you, the substance of your discussions as it relates to that topic.[1]
>
> A. Okay. I told him at that particular time, as I recall, that I had thought of marrying Lisa and I wanted a prenuptial that is as tight as it can possibly be.  I felt as though with him knowing, in my mind him knowing and being involved in a family and everything else with the family trusts and the stocks, which he did all the stock work for the corporation, everything, he issued stock, he transferred the stock, I wanted him to take care or making sure that everything was as tight as it could be in a prenuptial.  I mean there's no question about that's what I wanted.
>
> ****
>
> Q. Can you remember anything else about the substance of our discussions with Mr. Capute as it relates to, at this meeting at your home as it relates to the prenuptial agreement?
>
> A.  No, I cannot.

Ex. 1 (T. Ayers Dep.) at 78-79, 81.

The Fuqua draft of the Antenuptial Agreement contained no provision of support for Mrs. Ayers in the event of a divorce, but the final version includes a paragraph stating that Mrs. Ayers would receive $1,000 per year of marriage within 30 days of a final decree of dissolution of the marriage.  Mr. Ayers claimed that it was "his idea" to add this paragraph to the Agreement, and that he discussed his idea with Mr. Capute.  Ex. 1 (T. Ayers Dep.) at 162.  He

---

[1]There appears to be a typographical error in the transcript.  The question should have read "Not the actual words you said to him, the words he said to you, the substance of the discussions as it relates to that topic."

emphasized that Lisa Ayers understood "[t]hat everything was absolutely mine and was going to be and there was no alimony, there was no nothing. She understood that there was a clause in there of giving her a thousand dollars a year for each year that she was with me, and she didn't ask for that. I just put that in there for the purpose of her having something to rely upon and deal with." *Id.* at 108.

According to Mr. Ayers, Mr. Capute mailed an antenuptial agreement to Mr. Ayers' home and he placed it in his safe with the agreement prepared by Judge Graves' firm in 1989. *Id*. at 95-96.

B.  **Mr. Capute's Testimony**

Charles T. Capute was deposed one week after Mr. Ayers.  Mr. Capute is admitted to practice in Ohio (1976), Pennsylvania (1980), and Maryland (1988).  Ex. 13 (Capute Dep.) at 10.  After graduating from law school in 1976, Mr. Capute worked for the Internal Revenue Service for three years as an attorney examiner focusing on estate and gift tax matters. *Id.* at 6.  Since leaving the IRS, Mr. Capute's practice has been devoted entirely to federal tax and estate planning.  *Id.* at 7-8. Mr. Capute is not admitted to practice in Delaware, he has never practiced in the area of family law, and he has not held himself out to Mr. Ayers or any other client as an expert in family law matters. *Id.* at 92-93.

In 1991, Mr. Capute was a partner in the Easton office of Miles & Stockbridge, P.C.  Mr. Capute had performed estate planning services for Mr. Ayers' parents in 1989 or 1990, and the family knew him as an estate-planning lawyer.  Ex. 13 (Capute Dep.) at 13.  Billing records revealed that on August 29, 1991, Mr. Capute billed two-tenths of an hour reviewing an antenuptial agreement for Mr. Ayers, and on August 30, 1991, he spent an additional 1.1 hours

on that project.  *See* Ex. 14 (billing history record).  Mr. Capute's third and last time entry

occurred on September 9, 1991, when he spent three-tenths of an hour drafting a letter to Mr.

Ayers and proofreading the agreement.  The total time Mr. Capute devoted to this matter was 1.6

hours.[2]

        Not surprisingly, Mr. Capute had an imperfect recollection of those 1.6 hours when he

was asked about them twelve years later at his deposition.  He did recall that he was not retained

to provide domestic relations advice to Mr. Ayers; rather, his function was to review the

Agreement to ensure that the stock interests held by the Ayers family in Sussex Printing would

be protected in the event Mr. and Mrs. Ayers later divorced.  Ex. 13 (Capute Dep.) at 39-40.  As

Mr. Capute put it, "I told Tim I was, A, not a Delaware lawyer and, B, not a domestic lawyer."

*Id*. at 92; *see id*. at 95.  Mr. Ayers responded that he "had a domestic lawyer," *id*. at 93, and Mr.

Capute understood that Mr. Ayers would have the Antenuptial Agreement reviewed by his

domestic lawyers in Delaware (the Fuqua & Yori firm) before he executed it.  *Id*. at 40, 93-94.

This is not just Mr. Capute's recollection – the final version of the Antenuptial Agreement

expressly states that "Fuqua, Yori & Rogers has represented Timothy E. Ayers in this matter."  It

does not state that Mr. Capute or his firm represented Mr. Ayers.

        At the time of his deposition, Mr. Capute believed that only two versions of the

Antenuptial Agreement were available – the one drafted by the Fuqua firm in 1989, which Mr.

Capute obtained through discovery, and the one signed by the parties in 1991.  For that reason,

--------

[2] Because these events occurred so long ago, Mr. Capute has been unable to locate
any file relating to this matter.  Mr. Capute left Miles & Stockbridge in 1996, Ex. 13 (Capute Dep.)
at 7-8, but his former law firm was able to retrieve from an old computer disk a copy of the
agreement Mr. Capute retyped and revised in late August and early September 1991.  The firm also
was able to reproduce from its computers a billing history for Mr. Capute's work on the Ayers
antenuptial matter.

Mr. Capute (like Mr. Ayers) assumed that his firm retyped the 1989 agreement prepared by Mr. Ayers' Delaware counsel and then made further changes to the document on his office computer. Subsequent discovery demonstrated that Mrs. Ayers' attorneys (the Hudson Jones firm) had revised the Fuqua firm's version of the agreement in August 1991, and that Mr. Capute must have received that version of the antenuptial, not the version prepared in 1989 by Judge Graves. *See infra* at 15 ("Lisa Wheatley Ayers' Testimony'"). Comparison of the Hudson Jones version with the final version conclusively establishes that Mr. Capute made only minor changes to the document. *See* Exs. 15, 16, and 17. All of Mr. Capute's changes were directed to estate-planning issues, with the exception of a few trivial "wordsmithing" edits.

C. **Judge Graves' Deposition**

Judge Graves was deposed on March 25, 2003, after both Mr. Ayers and Mr. Capute. He testified that in or around March 1989, Timothy Ayers retained him to draft a premarital agreement in contemplation of marriage to Lisa Wheatley. The two grew up in the same county in Delaware and are roughly the same age. Ex. 7 (Graves Dep.) at 9. Judge Graves explained that he met with Mr. Ayers on one occasion in his office in or around March 1989, approximately three months before he was nominated to sit on the Superior Court Bench. *Id*. at 6. When Judge Graves met with Mr. Ayers in 1989 regarding the antenuptial agreement, Mr. Ayers was principally interested in having Judge Graves protect his businesses, Sussex Printing and Tea Tyme Antiques, and a home that he owned at the time. Ex. 7 (Graves Dep.) at 15-19. In order to maximize the likelihood that the agreement would be enforceable, Judge Graves advised Mr. Ayers that: (1) Ms. Wheatley must be afforded an opportunity to review the agreement with independent counsel; (2) Mr. Ayers had to make a full disclosure of all his assets to Mrs. Ayers

before she signed the agreement; and (3) Mr. Ayers had to be reasonable and realistic about what could be protected through an antenuptial agreement because if the agreement was too one-sided, his wife could challenge the agreement later and an equity judge on the Delaware Family Court could "tear it up" and "start all over again." *Id.* at 30-34, 38-39. (Ms. Wheatley had no assets at the time of the marriage except her "motor vehicle and personal effects." Ex. 15, at ¶ 11.) To drive home his point, Judge Graves reminded Mr. Ayers that he should be careful not to lose the golden goose (his substantial assets) by trying to protect the golden egg (alimony). Ex. 7 (Graves Dep.) at 38-39.

Judge Graves also recalled that he specifically discussed alimony with Mr. Ayers. He said that a spouse ordinarily would be entitled to alimony in an amount proportionate to the "half-life of the marriage"; *i.e.* "[I]f the marriage is four years, you get two years of potential alimony." Ex. 7 (Graves Dep.) at 28. Ayers told Judge Graves that he was "not concerned" about paying alimony if the marriage ended. *Id.* at 27-29. "He was concerned with preserving the golden goose and not the golden egg." *Id.* at 28. As Judge Graves explained:

> His worry was – I don't know what the word is – the old phrase is, that he was going to get married in the springtime and be divorced in the summer. He was very concerned that he was going to have – that she was going to gold dig. She was just going to marry him and wait around for a short period of time and attempt to get something out of him. And I think the prenuptial agreement was to see whether she was really serious. In other words . . . she wasn't going to get the business and that kind of thing.

*Id.* at 28-29.

Judge Graves testified that after he met with Mr. Ayers, he prepared a draft antenuptial agreement by editing in his own handwriting a form agreement that he had used at the first law firm where he worked in the 1970s, Tunnell and Raysor, in Georgetown, Delaware.

Ex. 7 (Graves Dep.) at 37.[3]  It was the same form that all domestic practitioners in Georgetown

used at the time, *id.* at 20-21, but Judge Graves tailored the form to Mr. Ayers' stated needs; *viz.*,

to prevent his prospective wife, Lisa Wheatley, from making a claim to his two businesses, Tea

Tyme Antiques and Sussex Printing, in the event the marriage ended in divorce.  After a further

round of edits, Judge Graves gave the Agreement to Mr. Ayers.  *Id.* at 60-61.  The agreement

was printed on engraved, red-line stationery with the "Fuqua and Graves" name on the left-hand

margin, and sent to Ayers in a blue "jacket" typically used for wills and other formal documents.

(A copy of the antenuptial agreement prepared by the Fuqua firm is attached hereto as Exhibit

16.)[4]

### D. __Mr. Ayers' Interrogatory Answers__

> After Judge Graves testified, Mr. Ayers filed sworn interrogatory answers that

flatly contradicted his deposition testimony.  Mr. Ayers stated:

> After review of the deposition testimony of the Honorable
> Henley T. Graves given in this matter, Plaintiff concurs in part
> with that testimony that he met with Judge Graves in the Spring of
> 1989.  Plaintiff believes that this meeting was in March of 1989.
> Plaintiff concurs that in this March [meeting] Plaintiff advised
> Judge Graves that Plaintiff was living with Lisa Wheatley and was
> contemplating marriage with her.  Plaintiff also concurs with Judge
> Graves['] recollection that Plaintiff advised that Plaintiff's biggest
> concern was that given the difference in the age between Plaintiff
> and Lisa, Plaintiff was concerned that the marriage might be short
> lived in that Plaintiff had a concern that Lisa's agreement to get
> married may have been motivated for financial reasons given
> Plaintiff's then financial holdings.  After reading Judge Graves[']
> testimony Plaintiff does recall Judge Graves suggesting that there

---

[3] The firm's file relating to the Ayers antenuptial matter had been subpoenaed prior to Judge Graves' deposition. Unfortunately, because of the passage of time, the firm was unable to locate its file.

[4] The Fuqua firm changed its name after Judge Graves took the Bench. On July 1, 1990, the firm's name changed to "Fuqua, Yori & Rogers".  Ex. 19 (Massey Dep.) at 11.

was no immediate need to marry Lisa and that Plaintiff should consider just waiting.  Plaintiff recalls that he still requested that Judge Graves prepare a Prenuptial Agreement.  Plaintiff has no specific recollection as to what advi[c]e Judge Graves gave him regarding his obligation to pay alimony.  Having said this, Plaintiff has no independent factual basis to dispute that portion of Judge [Graves'] testimony that since the Prenuptial Agreement was prepared initially to protect against the possibility of a short lived marriage that Judge Graves recommended that the agreement stay silent on the issue of marriage [*sic*; presumably "alimony"].  Plaintiff vaguely recalls Judge Graves['] advice that in order to be fair that the Prenuptial Agreement should provide something for Lisa to take from the agreement in order for the agreement to withstand a court challenge.  *It is Plaintiff's belief that Judge Graves['] advice in this regard is what prompted to[sic] Plaintiff to suggest to Defendant Capute that the agreement prepared by Capute provide that Lisa would receive under the agreement $1000 for each year that the parties remained married.*

Ex. 20 (Plaintiff's Answers to Interrogatories, No. 3) at 6-7 (emphasis added).

### E.  Lisa Wheatley Ayers' Testimony

Mr. Ayers' former wife, Lisa Wheatley Ayers, was deposed after both Judge Graves and Mr. Ayers, and her testimony, combined with the incontrovertible documents she produced at her deposition, revealed even more inaccuracies in the testimony and interrogatory responses of Mr. Ayers.  Mrs. Ayers testified that she had initially become engaged to marry Mr. Ayers in March of 1989 (which would correspond with Mr. Ayers' retention of Judge Graves to draft a premarital agreement).  Ex. 21 (Lisa Ayers Dep.) at 16.  Mr. Ayers broke off the engagement in May of 1990, but the couple continued to live together and they became re-engaged in the summer of 1991.  *Id.* at 17.  At about that time Mr. Ayers first informed Lisa Wheatley that he wanted her to sign a premarital agreement.  *Id.* at 19.

In July of 1991, Ms. Wheatley met with James Yori of the Fuqua firm to discuss the proposed Antenuptial Agreement prepared by the Fuqua firm.  Ex. 21 (L. Ayers Dep.) at 40-

15

41. (Mr. Ayers had not attached the financial disclosure form to the draft he gave to her, *id.* at 36, and Ms. Wheatley believed that Mr. Ayers never provided her with a copy of his financial disclosure form. *Id.* at 67-68.) Ms. Wheatley knew at the time that Mr. Yori's firm had prepared the Antenuptial Agreement for Mr. Ayers, but she met with Mr. Yori anyway because his firm also had represented her in the past. Mr. Yori discussed the Agreement with Ms. Wheatley and told her that he could not represent her; he recommended that she retain the firm of Hudson, Jones, Jaywork Williams & Liguori instead. *Id.* at 32-34.

Mrs. Ayers testified that she then met with a lawyer in the Georgetown, Delaware office of Hudson Jones whose name she could not recall. (Subsequent evidence established that Ms. Ayers' counsel was Richard Berl, Esquire.) Mr. Berl made changes to the Fuqua draft and sent Ms. Wheatley the revised version by mail on August 21, 1991, Ex. 21 (L. Ayers Dep.) at 38-39, 56, *before* Mr. Ayers first discussed the agreement with Mr. Capute. Amazingly, Mrs. Ayers retained the original envelope and the revised version of the Agreement that she had received from the Hudson Jones firm twelve years earlier, and she produced that draft after her deposition. Ex. 22 (Berl Agreement and envelope).[5] Neither Mr. Ayers nor Mr. Capute had a

---

[5] Richard Berl was deposed on April 30, 2003. In August 1991 he was an associate in the Georgetown Delaware office of Hudson Jones Jaywork Williams and Liguori. *See* Ex. 22 (Berl Dep.) at 9. Although Mr. Berl had no independent recollection of Ms. Ayers or the nature of his representation of her, he produced at his deposition a "client card" showing that he represented Lisa R. Wheatley (Mrs. Ayers' name at the time) in or around August 1991, and that the matter involved an antenuptial agreement. *See* Ex. 23 (client card); Ex. 22 (Berl Dep.) at 5, 8. He was unable to locate his client file for Ms. Ayers' antenuptial matter. *Id.* (Berl Dep.) at 5-6. According to his client card, the "opposing party" was Timothy Ayers and Mr. Berl's "opposing counsel" in connection with the antenuptial agreement was James A. Yori, Judge Graves' former law partner. *Id.* at 17-18. Mr. Berl had no reason to dispute Ms. Ayers' testimony that on August 21, 1991, he mailed to her an antenuptial agreement that he had prepared (or, more likely, revised based upon an earlier draft of the agreement by Judge Graves' firm). *Id.* at 28-29.

copy of the Hudson Jones version in their files.  A comparison of the three versions of the Agreement – the original one drafted by the Fuqua firm (Ex. 16), the revised version prepared by the Hudson Jones firm  (Ex. 17), and the final version signed by the parties (Ex. 15) – reveals obvious inaccuracies in Mr. Ayers' testimony and his subsequent interrogatory answers.  *See* Ex. 18 (redline comparison).[6]  The Hudson Jones firm had actually added all the material terms that the parties previously believed had been added by Mr. Capute.  In particular, paragraph 6 of the Hudson Jones version stated:

> Nothing in this Agreement is intended to prevent, nor shall it operate to prevent, the parties hereto from acquiring or receiving property jointly, or as husband and wife.  To that extent, the disposition of said property shall be governed by the laws of the State of Delaware, and not by this Agreement.  Moreover, nothing in this Agreement is intended to prevent, nor shall it operate to prevent, the parties hereto from conveying property to one another, either singularly, or so as to create joint property not subject to the effect of this Agreement.

Ex. 17 (Hudson Jones antenuptial), at ¶ 6.  And paragraph 7 of the Agreement revised by the Hudson Jones law firm provided that "In the event of a dissolution of the bonds of matrimony between the parties, Husband shall pay to Wife, within thirty (30) days of the entry of a final decree of divorce, $1,000.00 for each year of marriage, plus a pro rated amount for any period of time less than one year."  *Id.* at ¶ 7.

Mrs. Ayers gave the Hudson Jones version of the Agreement to Mr. Ayers shortly after August 21, 1991 (the postmark date on the Hudson Jones envelope). Ex. 21 ( L. Ayers Dep.) at 55, 149.  Mrs. Ayers testified that she specifically discussed the $1000-per-year provision with Mr. Ayers, and that he agreed to the change.  *Id*. at 55.  She recalled that Mr.

---

[6] Exhibit 18 is a redline comparison of the differences between the draft of the Antenuptial agreement prepared by Mr. Berl (Ex. 17) and the executed version (Ex. 15).

Ayers then asked Mr. Capute to review the revised Agreement, and she consulted with her own attorneys one more time before she and Mr. Ayers signed the document on September 19, 1991. *Id*. at 62, 66.  Mrs. Ayers testified that Mr. Ayers never told her that the Antenuptial Agreement was intended to waive her right to alimony, and that she did not believe it did so.  *Id*. at 76-77, 82-83.

The couple were married on October 3, 1991, two weeks after they executed the Antenuptial Agreement in Mr. Ayers' offices at Sussex Printing.  Ex. 21 (L. Ayers Dep.) at 63-65.

**F.  The Ayers Divorce Case**

Mr. and Mrs. Ayers separated in April 2001 (although Ms. Ayers continued to live in the marital home until several months thereafter).  Ex. 21 (L. Ayers Dep.)  at 83-84.  Mr. Ayers filed a petition for divorce in the Family Court of the State of Delaware on or about May 24, 2001.  On November 28, 2001, Mr. Ayers and Lisa Ayers were formally divorced by a Decree of the Family Court in Delaware.  Ex. 24 (Divorce Decree).

Early in their marriage, Mr. and Mrs. Ayers established a joint money market account at Mellon Bank.  Ex. 21 (L. Ayers Dep.) at 89-91.  They also maintained a joint checking account at Mellon Bank.  *Id*. at 96-97.  Mrs. Ayers also maintained a separate account in her own name.  *Id*. at 97.  At the time the couple separated in April 2001, their joint money market account had a balance of $503,903.92.  *Id*. at 93-94.  The joint checking account had a balance of more than $60,000 around the time of the separation.  *Id*. at 96.  On April 25, 2001, soon after the couple separated, Mr. Ayers transferred the balance of the funds on deposit in the couple's joint account, more than $500,000, to a new account at Mellon Bank in his name and

the name of his adult daughter from his first marriage, Amy Starr Ayers Higgins. *Id*. at 93.

On June 14, 2001, Mrs. Ayers filed a Verified Complaint For Injunctive Relief And Imposition Of Constructive Trust in the Court of Chancery of the State of Delaware, seeking to freeze the funds that Mr. Ayers had improperly transferred from the couple's joint money market account. Ex. 25 (Verified Complaint). The same day the Court entered a Temporary Restraining Order enjoining Mr. Ayers and his daughter from re-titling the account or withdrawing or transferring any funds from the account. Ex. 26 (Temporary Restraining Order). By agreement of the parties, Mr. Ayers later transferred funds then totaling $485,520.80 from original account into a new Mellon Bank account, with the understanding that the funds would be preserved pending the outcome of the parties' divorce and property dispute. *See* Ex.27, (Letter from Theresa Hayes to Thomas Gay, dated July 3, 2001), Ex. 28 (Letter from Theresa Hayes to Thomas Gay, dated July 10, 2001), Ex. 29 (Stipulation of Settlement).

During the divorce case, Mrs. Ayers' divorce counsel, Thomas Gay, took the position that the Antenuptial Agreement did not contain an express waiver of alimony and, therefore, Ms. Ayers was entitled to alimony under Delaware law. He also claimed that the Agreement did not protect certain property acquired or income earned by Mr. Ayers during the course of his marriage to Mrs. Ayers, including, in particular, funds on deposit in the couple's joint bank accounts at Mellon Bank.

Counsel for Mr. and Mrs. Ayers negotiated the terms of a resolution of Mrs. Ayers' property and alimony claims for almost a year. On April 19, 2002, Mr. and Mrs. Ayers entered into a property and alimony settlement agreement. Ex. 30 (Stipulation, Agreement and Order dated April 19, 2002). Pursuant to this Agreement, Mr. Ayers agreed to pay Ms. Ayers

alimony in the amount of $6,000 per month, for a period of 59 months after the date of the agreement, Ex. 30 ("Eighth" paragraph), and to disburse to Ms. Ayers approximately $420,000 of the funds on deposit in Mr. and Mrs. Ayers' joint money market account at Mellon Bank. *Id.* ("Sixth" paragraph).  Mr. Ayers was permitted to retain the home that he acquired prior to his marriage to Ms. Ayers as well as a second home (next to the main home) that he acquired during the marriage.  He also was permitted to retain his interest in his businesses, Sussex Printing and Tea Tyme Antiques. *Id.* ("Third" and "Fourth" paragraphs).

### III.  ARGUMENT

**A. The Complaint**

Mr. Ayers filed his action against Mr. Capute in this Court on January 7, 2002, and amended the Complaint on May 23, 2002.  According to the Amended Complaint, Mr. Ayers asked Mr. Capute to prepare an "Antenuptial Agreement on Plaintiff's behalf for the signature of his then-prospective wife Lisa Wheatley Ayers."  Compl. ¶ 5. Plaintiff alleges that Mr. Capute "knew, or should have known, that it was the Plaintiff's intention that the Antenuptial Agreement should contain a provision that would not obligate the Plaintiff herein to have to pay any alimony and/or spousal support in the event he subsequently became divorced." *Id.* at ¶ 6.  Plaintiff further alleged that the Antenuptial Agreement did not properly waive alimony under Delaware law. *Id.* ¶¶ 7-9.  During the divorce proceedings, Mrs. Ayers' counsel took the position that "since the [Agreement] was silent on the issue of alimony, [Mrs. Ayers] is entitled to alimony payments." *Id.* ¶ 8.

Plaintiff also claims that the Antenuptial Agreement did not "adequately address the Plaintiff's business interests, the increase in value of such interests over the course of the

marriage, or the income derived from such interests over the course of the marriage as separate property." Compl. ¶ 10.  Plaintiff further alleged that Mrs. Ayers took the position during the divorce case "that the Plaintiff's business interests, the increase in value of such interests over the course of the marriage, or the income derived from such interests over the course of the marriage was marital property."  *Id.*  ¶  12.   Finally, plaintiff claims that the Antenuptial Agreement should have barred his wife from obtaining an interest in property purchased with "other income derived during the marriage." *Id*. at ¶ 14.

**B.  Plaintiff's Claims Are Barred By The Statute Of Limitations.**

### 1. Whether Delaware Or Maryland Law Applies, Limitations Bars Plaintiffs' Claims.

Plaintiff's claim in this matter, if filed in Delaware, unquestionably would be barred by the statute of limitations.  The decision in *Dickerson* v. *Rich*, 2001 WL 34083816 (Del. Super. Oct. 17, 2001), *aff'd,* 2002 WL 392296 (Del. 2002), is squarely on point.  In that case, the plaintiff hired an attorney in 1988 to draft a prenuptial agreement in contemplation of marriage to his second wife.  When the parties divorced in 2000, the plaintiff (who was represented by Mr. Ayers' counsel in this case) alleged that his lawyer had "committed legal malpractice by failing to discuss the issue of alimony with him in 1988"; and he claimed that if that discussion had occurred, "a waiver of alimony provision would have been placed in the agreement, and [the plaintiff] would not have been obligated to pay alimony to his second wife." *Id.* at *1.  The Superior Court of Delaware granted the defendant's motion for summary judgment on limitations grounds.  When Mr. Ayers filed the first version of this action in Delaware against the Fuqua firm, the defendants cited the *Dickerson* case in support of a motion to dismiss on limitations (and other) grounds.  In opposition, plaintiff argued that *Dickerson* was

on appeal and therefore should not control.  But after plaintiff's claim was dismissed in Delaware (on other grounds), Mr. Ayers filed this action against Mr. Capute in Maryland, apparently seeking a more favorable limitations period.  The Delaware Supreme Court affirmed *Dickerson* on March 6, 2002.

Federal courts in diversity actions generally apply the choice of law rules of the forum state, and Maryland courts "have followed the general rule that the statute of limitations of the forum state applies even when that state's choice of law rules require that another state's substantive law be applied."  *Sherwin-Williams Co.* v. *ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 756 (D. Md. 2001).  But the limitations period for legal malpractice actions is the same in Maryland and Delaware:  three years.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101; 10 Del. C. § 8106.  The conduct at issue in this case occurred in 1991, more than ten years before plaintiff filed suit, so the statute of limitations bars plaintiff's claim unless an exception applies.

Maryland generally follows the "discovery rule"; *i.e.*, a cause of action accrues when a plaintiff knew or reasonably should have known of the wrong.  *See Hecht* v. *Resolution Trust Corp.*, 333 Md. 324, 635 A.2d 394 (1994).  In *Dickerson*, the Delaware court concluded that the discovery rule probably did not apply.  But the Court *also* concluded that if the discovery rule did apply, the claim was still barred by limitations because the plaintiff was not "blamelessly ignorant" of his cause of action.  As the Court observed, the plaintiff in *Dickerson*, like Mr. Ayers in this case, had been married previously, so he was "on notice from his first divorce that alimony is a possibility in a divorce."  *Id.* at *2.  The *Dickerson* plaintiff also "admit[ted] to reading and understanding the agreement that did not contain a waiver of alimony provision."  At his deposition in this case, Mr. Ayers claimed that he had difficulty reading

(although he never informed his lawyers – Judge Graves or Mr. Capute – of this alleged difficulty), but it is undisputed that Mr. Ayers was well aware that the Antenuptial Agreement did not contain an express waiver of alimony.  Judge Graves had explained that point to him in 1989, and Mr. Ayers agreed that he was not interested in a waiver of alimony.  Moreover, Mr. Ayers never claimed that he was incapable of reading the Antenuptial Agreement. And, like the plaintiff in *Dickerson*, Mr. Ayers "did not ask defendant any questions or suggest any modifications regarding the agreement."  Indeed, the Agreement he signed expressly stated that his rights and the legal effect of the Agreement had been "fully explained to [him]," and that he "under[stood] the terms, provisions, and legal effect of this Agreement." Ex. 15, ¶ 9.

Under those undisputed facts, Mr. Ayers was on notice of his claim when he signed the agreement, under either Maryland or Delaware law.  Although *Dickerson* is not controlling in Maryland, no Maryland case is factually as similar as *Dickerson*, and the underlying law in the alternative holding in *Dickerson* is the same as the applicable law in Maryland.  As *Dickerson* shows, even when the discovery rule applies, the facts of this case warrant summary judgment for the defendant.  Because Mr. Ayers clearly was on inquiry notice (at minimum) as early as 1991 that the Antenuptial Agreement might not waive alimony, defendant is entitled to summary judgment on all claims in the Complaint.

**2. Plaintiff's Claim "Accrued" More Than Three Years Before He Filed This Action.**

Plaintiff may also contend that his claim did not "accrue" for limitations purposes until his divorce ended and he knew precisely what damages he allegedly incurred as a result of the imagined deficiencies in the Antenuptial Agreement.  That contention (if tendered) would

not comport with Maryland authority interpreting the statute of limitations in the context of legal malpractice actions.  As the Court of Special Appeals recently explained:

> Under the discovery rule, a cause of action accrues when a claimant knows or should have known of the wrong. The discovery rule, as applied in Maryland, is clearly distinguishable from the maturation of harm rule applied in some jurisdictions. *A legal wrong must be sustained, but a precise amount of damages need not be known.*  A cause of action accrues when knowledge of facts and circumstances are sufficient to put a claimant on notice to make inquiry.  Once on inquiry notice, a claimant has a duty to seek out facts supporting a cause of action. When there is no genuine issue as to a material fact relative to the accrual of a cause of action, the date of accrual may be determined as a matter of law.

*Edwards* v. *Demedis*, 118 Md. App. 541, 553, 703 A.2d 240, 246 (1997) (emphasis added), *cert. denied*, 349 Md. 234, 707 A.2d 1328 (1998).

Indeed, under Maryland law, a cause of action in legal malpractice accrues "even if plaintiff has suffered only 'trivial injuries.'"  *Fairfax Savings, F.S.B.* v. *Weinberg and Green*, 112 Md. App. 587, 685 A.2d 1189, 1202 (1996).

A long line of Maryland cases have held that clients may *not* await the outcome of some future event to determine whether the attorney's alleged malpractice created specific damages. Thus, in *Edwards*, the Court held that a claim by pension fund participants against their attorney for negligent tax advice accrued when the IRS notified the participants that a distribution was taxable, not when the refund action was concluded and the amount of harm became certain.  *See also Feldman* v. *Granger*, 255 Md. 288, 257 A.2d 421 (1969) (in malpractice action against accountants , limitations began running at least by the time IRS sent notice of deficiency, not when the tax court  later sustained the deficiency); *Leonhart* v. *Atkinson*, 265 Md. 219, 289 A.2d 1 (1972) (same).  In *Berringer* v. *Steele*, 133 Md. App. 442,

24

758 A.2d 574 (2000), the Court held that a criminal defendant's claim for malpractice can accrue *before* the outcome of post-conviction proceedings challenging the client's conviction, even though success on the post-conviction proceeding is a necessary element in the claim for malpractice in a criminal case.

In this case, plaintiff clearly was "damaged" – accepting his own view of the case – long before he settled his wife's property claims in the divorce case. The larger of plaintiff's two damages claims is predicated on the alleged failure of the Antenuptial Agreement to separate and protect "his" assets acquired during the marriage. As Mr. Ayers stated in his interrogatory responses, "The prenuptial agreement prepared by Defendant Capute did not even attempt to protect the income Mr. Ayers received during marriage or the property purchased with said income. Under Delaware law, any property purchased or acquired during the course of the marriage is marital." (Interrogatory Ans. No. 9) at 10. As plaintiff sees it, Mr. Capute should have warned him that he was losing sole ownership of his funds when he deposited them in a joint account. Although Mr. Capute denies that he was retained to provide advice on that subject, it is clear under Mr. Ayers' own theory that he suffered injury when the funds were deposited into the joint account at the inception of the marriage, not when he agreed to share a portion of the account with his wife many years later. From that point forward, Mrs. Ayers had an interest in the funds. And Mr. Ayers' injury was far more than the "trivial" amount required under Maryland law; by the time of the divorce, the balance in the joint account was more than $500,000. Accordingly, Mr. Ayers' claim clearly accrued under Maryland law outside the limitations period.

In many respects, this case has been a comedy of errors, all of which were prompted by plaintiff's inability to remember the key events that occurred more than a decade ago. Within the last two years, plaintiff Timothy Ayers has sued or threatened to sue three different lawyers, accusing each of them of negligently preparing the *same* antenuptial agreement. Mr. Capute's role in connection with the Antenuptial Agreement was so attenuated (or Mr. Ayers' recollection of it so poor) that Mr. Ayers initially forgot that Mr. Capute ever had any involvement whatsoever. He then repeatedly changed his testimony as the incontrovertible facts emerged through discovery.

It would be difficult to imagine a better application of the statute of limitations than the facts of this case. "Statutes of limitations are designed primarily to assure fairness to defendants on the theory that claims, asserted after evidence is gone, memories have faded, and witnesses disappeared, are so stale as to be unjust." *Bertonazzi* v. *Hillman*, 241 Md. 361, 367, 216 A.2d 723, 726 (1966); *see also Berringer* v. *Steele*, 133 Md. App. 442, 492, 758 A.2d 574, 601 (2000). To permit plaintiff to maintain an action based on his obviously faded memory would be highly unjust. Accordingly, the Court should enter summary judgment as to all claims in this case on behalf of defendant.

### C. Plaintiff Cannot Establish That Mr. Capute Breached The Applicable Standard Of Care Or That Plaintiff Suffered Any Damages As a Result Of Any Such Breach.

Under Delaware or Maryland law,[7] plaintiff's burden to prove malpractice is essentially the same. In Maryland, the elements of a legal malpractice action include: "(1) the

---

[7] On choice of law issues in tort cases, Maryland courts follow the rule of *lex loci delicti. See President & Directors of Georgetown College* v. *Madden*, 505 F. Supp. 557, 569 (D. Md. 1980), *aff'd in part and rev'd in part*, 660 F.2d 91 (4th Cir. 1981). At this stage of the case, however, it is unnecessary to determine whether Maryland or Delaware substantive law would apply.

employment of the lawyer, (2) the lawyer's neglect of a duty, and (3) loss to the client proximately caused by the neglect of duty." *Berringer* v. *Steele*, 133 Md. App. 442, 473, 758 A.2d 574, 591 (2000). To prevail on a claim for legal malpractice under Delaware law, "a plaintiff must prove the following elements: (1) employment of an attorney; (2) the attorney's neglect of a reasonable professional responsibility; and (3) a resultant loss." *Jackson* v. *Lobue*, 2001 W.L. 695540, at *2 (Del. Super. 2001), *aff'd*, 2001 W.L. 1751243 (Del. 2001), *cert. denied*, 535 U.S. 1001 (2002). In both jurisdictions, the plaintiff must introduce expert testimony to meet his burden. *Taylor* v. *Feissner*, 103 Md. App. 356, 377, 653 A.2d 947, 957, ("As a general rule, expert testimony is required to establish legal malpractice, except in those cases where the 'common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts'"), *cert. denied*, 339 Md. 355, 663 A.2d 73 (1995); *Jackson* v. *Lobue*, *supra*, at *2 ("As a general rule, the standard of care applicable to a professional can be established only through expert testimony.") Even if the statute of limitations does not bar plaintiff's claims, the record in this case demonstrates that plaintiff cannot meet his burden to prove one or more of these elements of his negligence claim.

**1. Mr. Capute Properly Limited The Scope Of His Representation Of Mr. Ayers.**

In Maryland and elsewhere, "a lawyer may limit the objectives of the representation if the client consents after consultation." Rule 1.2 (c), Md. R. Prof. Conduct. When Mr. Ayers approached Mr. Capute in late August 1991 to review a prenuptial agreement that had been prepared by Mr. Ayers' domestic relations counsel in Delaware, Mr. Capute had recently performed certain estate planning services for Mr. Ayers and his family. Ex. 13 (Capute Dep.) at 96-97. Mr. Ayers testified that he wanted Mr. Capute to review the

Agreement because he was familiar with the family's estate, having recently performed work in this area. Ex. 1 (T. Ayers Dep.) at 87-88.    Mr. Capute told Mr. Ayers that he was not a Delaware lawyer (the draft of the agreement at that time provided that it would be governed by the law of Delaware, where the couple intended to live after their marriage), and that he did not practice in the area of domestic or family law. Ex. 13 (Capute Dep.) at 92, 95.  Mr. Ayers, however, persisted, and he persuaded Mr. Capute to review and, if appropriate, revise the agreement, subject to the limitation set forth above.  Plaintiff led Mr. Capute to believe that he understood this limitation on his representation because he told Mr. Capute that he "had a domestic lawyer" in Delaware, *id.* at 93, and that he intended to have any changes made by Mr. Capute reviewed by his domestic lawyers in Delaware before he executed it.[8]  *Id.* at 93-94. Based upon this understanding, Mr. Capute agreed to review the agreement from an estate planning perspective only, and to make any changes that he considered appropriate from that perspective.  *Id.* at 92.  There is no evidence that Mr. Capute undertook or agreed to undertake to advise Mr. Ayers on the validity, meaning, or enforceability of the substantive provisions that had been drafted by Mr. Ayers' Delaware counsel. This contention is not only flatly inconsistent with Mr. Capute's testimony, it is contrary to Mr. Ayers' affirmative representations made in the agreement itself.  In the executed Antenuptial Agreement, Mr. Ayers acknowledged that he had only one counsel representing him in connection with the "preparation of [the] agreement" – the law firm of Fuqua, Yori & Rogers (the name of Judge

---

[8] Mr. Ayers believed that he may have had a meeting with Mr. Yori regarding the Antenuptial Agreement, Ex. 1 (T. Ayers Dep.) at 58, but he was uncertain when or what, if any, role Mr. Yori may have had in the preparation of the Agreement.  *Id.* at 69.  Mr. Yori did not recall having any such role, but it is undisputed that he was representing Mr. Ayers in a number of different legal matters around the same time that Mr. Ayers asked Mr. Capute to review the Agreement.  *See* Ex. 33 (Yori Dep.) at 5-7.

Graves' former law firm on September 19, 1991). Mr. Ayers also acknowledged that the Fuqua firm had fully explained his "rights and the property described in this Agreement" and the "legal effect of the Agreement," and that he "underst[ood] the terms, provisions, and legal effect of this Agreement" through consultation with his counsel, the firm of Fuqua, Yori & Rogers. Ex. 15, ¶ 9. This provision clearly indicates that plaintiff was not truly looking to Mr. Capute as his domestic relations counsel for the Antenuptial Agreement.

Moreover, Mr. Ayers cannot dispute Mr. Capute's testimony that he limited the scope of his representation. Mr. Ayers testified that he has no recollection of the substance of what he and Mr. Capute discussed during the only discussion they had regarding the agreement. *See* Ex. 1 (Ayers Dep.) at 94. Absent some admissible evidence disputing Mr. Capute's testimony that the scope of his representation of Mr. Ayers was in fact limited, and that Mr. Ayers consented to the limitation, the Court should find as a matter of law that Mr. Capute did not undertake to advise Mr. Ayers on the validity of the substantive provisions drafted by other counsel, and that Mr. Capute is not, therefore, liable for any deficiencies in those provisions of the agreement.

**2. Even Assuming The Scope Of Mr. Capute's Representation Was Not Limited, There Is No Admissible Evidence That Defendant Deviated From The Applicable Standard Of Care in 1991.**

In this case, plaintiff must establish through expert testimony what the standard of care was in 1991, when Mr. Capute revised the antenuptial agreement (as opposed to when the agreement was sought to be enforced), and how defendant's actions deviated from the standard of care at that time. *See Vande Kop v. McGill*, 528 N.W.2d 609, 613 (Iowa 1995) (lawyer not responsible for failing to predict changes in law applicable to premarital agreements). Plaintiff

cannot meet this burden for several reasons. First, plaintiff has not properly designated any expert witness who can testify regarding these matters. This Court's Scheduling Order required plaintiff to serve his Expert Disclosures, in accordance with Fed. R. Civ. P 26(a)(2), on or before December 9, 2002. *See* Scheduling Order dated October 11, 2002. Rule 26(a)(2)(B), in turn, required that plaintiff's Expert Disclosures "be accompanied by a written report prepared and signed by the expert." On December 10, 2002, plaintiff served "Rule 26 Disclosures" disclosing two experts – Theresa Hayes, a Delaware attorney who represented Mr. Ayers in his divorce case, and Leslie G. Billman, a Maryland practitioner.[9] *See* Ex. 31. The Disclosures, however, were not signed by plaintiff's experts nor have the experts produced a separate signed report regarding their expert opinions in this case. Indeed, plaintiff's only remaining expert, Theresa Hayes, never even saw the Disclosures before they were served. *See* Ex.32 (Hayes Dep. Vol. I) at 6. The Court should exercise its authority under Rule 37(b) to preclude plaintiff's expert from testifying in this matter. *See*, *e.g.*, *Ohime* v. *Foresman*, 186 F.R.D. 507 (N.D. Ind. 1999).[10]

Second, even if plaintiff's expert is permitted to testify, it is clear that her testimony will not generate an issue of material fact regarding either breach of duty or damages. Ms. Hayes' opinion, as set forth in Plaintiff's unsigned Rule 26 Disclosure, is relatively narrow: "defendant deviated from the applicable standard of care expected of a matrimonial lawyer when defendant prepared the subject ante nuptial agreement that did not specifically address the issue

---

[9] Defendant does not object to plaintiff's one-day delay in serving his Expert Disclosures. After serving his Disclosures, plaintiff withdrew Ms. Billman as an expert.

[10] Ms. Hayes was not admitted to the Delaware Bar until December 1995. Ex. 32 Hayes Dep., Vol. I) at 29. She has been an associate at the Law Offices of Edward C. Gill in Georgetown, Delaware since 1996. *Id.* at 31. It is unclear how plaintiff would ever qualify Ms. Hayes as an expert on the applicable standards of care in 1991, several years before she was admitted to practice.

of alimony being waived and did not specifically exclude the Plaintiff's business interests from being deemed to be exclusive of the subsequent marital estate that was created when Plaintiff married." Ex. 31 (Plaintiff's Expert Disclosures) at 1 (¶III).   As demonstrated below, however, it is undisputed that Mr. Ayers did not want the Antenuptial Agreement to include a provision waiving alimony and the Agreement as drafted *did* protect Mr. Ayers' business interests.

The Antenuptial Agreement includes two principal recitals that explain its essential purpose:

> WHEREAS, it is mutually desired and agreed by the said Prospective Husband and Prospective Wife that the present property and estate of each of the said parties (hereinafter "the Estate") shall remain separate and be subject to the sole control and use of its owner after as well as previous to the solemnization of the said marriage;

> WHEREAS, it is mutually desired and agreed that any property received by the said parties from members of their respective families whether by gift, inheritance, or through any stock purchase agreement shall be the sole property of the receiving party, part of his or her Estate, for purposes of this Agreement, and not subject to the claims of the other party even in the event the property is received during the marriage.

Ex. 15.  The first two numbered paragraphs of the Agreement state in essence that whatever property the parties have as of the date of the agreement will continue to be their separate property after the marriage, and that any appreciation in the value of that property after the marriage will also belong to the same party that owned it before the marriage:

> The Prospective Husband shall have full right and authority, in all respects the same as he would have if unmarried to use, enjoy, manage, convey, mortgage, and dispose of all his Estate, of every kind and character, including the right and power to dispose of the same by Last Will and Testament. *This shall include the continuing right to invest, reinvest, sell and manage the proceeds of said property.*

> That the Prospective Wife shall have full right and authority, in all respects, the same as she would have if unmarried to use, enjoy, manage, convey, mortgage, and dispose of all her Estate, of every kind and character, including the right and power to dispose of the same by Last Will and Testament. *This shall include the continuing right to invest, reinvest, sell and manage the proceeds of said property.*

*Id.* ¶¶ 1&2 (emphasis added). The third numbered paragraph states that Mrs. Ayers releases her husband from any and all claims she may have to Mr. Ayers' property, as well as the appreciation on that property:

> That Prospective Wife releases to the Prospective Husband, his heirs, legal representatives and assigns, every right, claim and estate, actual inchoate, or contingent, that she might have in respect to said property by reason of her marriage to Timothy E. Ayers including but not limited to spousal allowances, intestate succession rights under 12 Del. C. Chapter 5 and rights to elective shares under 12 Del. C. Chapter 9.

Ex. 15, ¶ 3. There is a reciprocal "release" by Mr. Ayers, in favor of Mrs. Ayers, in paragraph 4. *Id.* at ¶ 4. There is no dispute that the word "said property" in paragraph 3 refers to Mr. Ayers' property broadly described in paragraph 1 of the Agreement.

While paragraphs 1 and 2 deal with premarital assets, and the appreciation in value of such assets during the marriage, paragraph 5 deals with property acquired after the marriage. It states:

> It is further hereby mutually agreed between the parties hereto that in consideration of the said contemplated marriage that any property that either party may hereafter acquire or become entitled to, singularly or in his or her own name, by way of gift, inheritance, or any stock purchase agreement from the parties respective families shall be owned and shall be held by the respective party as though this respective party had acquired it before the solemnization of the said marriage, regardless of the manner in which this after acquired property is brought into the

possession and control of the referred to party in this Agreement.

Ex. 15, ¶ 5.

No antenuptial agreement could ever prevent a spouse from challenging or threatening to challenge the enforceability or interpretation of that agreement to gain some strategic advantage in a divorce case.  Not surprisingly, in light of the parties' profound disparity in assets at the time of the divorce, Mrs. Ayers' attorney advanced a number of arguments during negotiations in the divorce proceedings as to why he believed the Antenuptial Agreement was unenforceable or, even if enforceable, did not afford Mr. Ayers full protection from property claims by Mrs. Ayers in the divorce case.  *See* Ex. 32 (Hayes Dep., Vol. II) at 69-71.  Ms. Hayes testified that she dismissed most of these contentions as lawyer posturing, *id.* at 72-73, except two.  One of the arguments that apparently troubled Ms. Hayes was Mr. Gay's suggestion that the clause "by way of gift, inheritance, or any stock purchase agreement from the parties['] respective families" in paragraph 5 could be construed as a limiting clause – *i.e.*, as modifying or limiting the types of after-acquired property referenced in the preceding clause.  *See id.* (Hayes Dep., Vol. I) at 71, 93-94, 188-90.  Based in part upon this erroneous interpretation, Ms. Hayes expressed concern to Mr. Ayers that he should consider settling rather than risk the possibility that Mr. Gay's interpretation of paragraph 5 was correct and that Mrs. Ayers would be entitled to a share of this after-acquired property.

Defendant submits that, as a matter of contract law, Mr. Gay's interpretation was wholly without merit, and if Ms. Hayes relied upon it to advise Mr. Ayers to give up something he otherwise was not required to give up, her advice to Mr. Ayers and his alleged reliance on it was not well-founded.  The clause relied upon by Mrs. Ayers' counsel was not limiting

language.  Rather, the clause was clearly intended to supply a concrete but non-exhaustive list of the types of after-acquired property (*e.g.*, those obtained through gift, inheritance, or stock purchase) to which Mrs. Ayers would have no right or claim in the event of a divorce.  These words, properly viewed in the context of the overall purpose and intent of the Agreement, did not limit Mr. Ayers' separate after-acquired property to property obtained only through gift, inheritance, or stock purchase.  Indeed, despite Mr. Gay's posturing during settlement negotiations over the meaning of paragraph 5, plaintiffs' expert testified that she, too, believed the paragraph protected *all* after-acquired property, she would have argued this position to the Delaware court if Mr. Ayers had not decided to settle, and she does not hold a contrary view of the meaning or effect of paragraph 5 in her capacity as an expert in this case.  Ex. 32 (Hayes Dep., Vol I) at 88-90.

Ms. Hayes also expressed concern over how the Antenuptial Agreement addressed (or failed to address) the appreciation in value of Mr. Ayers' premarital property.  Ex. 32 (Hayes Dep., Vol. I) at 184-86.  Her concern apparently was based upon a decision by the Delaware Supreme Court in *Albanese* v. *Albanese*, 1996 WL 69824 (Del. 1995).  *Id*. (Hayes Dep., Vol. I) at 145-49.  In *Albanese*, the wife sought a share of the appreciated value of a home that was purchased by her husband six years prior to the marriage.  The property later became the "marital home" and it appreciated significantly during the couple's 12-year marriage.  The parties did not have a premarital agreement; the property claims were therefore governed by Delaware's statutory law at the time.  The trial court rejected the wife's claim in its entirety, based upon a Delaware statute that "excludes from 'marital property' any 'increase in value of property acquired prior to the marriage.'"  *Id*. at *1 (quoting 13 Del. C. § 1513(b)(4)).  The trial

court construed the term "acquired" in §1513(b)(4) to preclude any post-marriage interest on the part of the "non-titled" spouse (here, the wife), notwithstanding any appreciation in the value of that asset during the marriage. *Id*.

In a decision that established a new precedent in Delaware, the Delaware Supreme Court held that the Family Law Court had construed the statute incorrectly and should not have presumed that the wife had no right to claim an interest in premarital property that, through her efforts as a homemaker, had appreciated significantly in value during the marriage. The Court applied the reasoning in an earlier decision, *Frank G.W.* v. *Carol M.W*, 457 A.2d 715 (1983), which arose in an entirely different context, to permit the wife to make a claim (to be determined on remand) of a portion of the appreciation in value of the marital home. 1996 WL 69824, at *1-2.

Several other decisions of the Delaware courts issued after *Albanese* make clear that Mrs. Ayers never would have established a right to a share of the appreciation in value of Mr. Ayers' premarital business interests (or any other premarital asset), even without a prenuptial agreement. For instance, in *Joan M.G.* v. *Scott A.G.*, 1998 WL 420743 (Del. Fam. Ct. 1998), the Delaware Family Court held that *Albanese* did not apply to a case remarkably similar to the Ayers case. In *Joan M.G.* v. *Scott A.G.*, the wife asserted a claim for a share of the appreciated value of certain stock owned by her husband. Like Mr. Ayers (who acquired shares in his family's printing business, Sussex Printing, and also owned an antique business known as Tea Tyme Antiques), the husband acquired, prior to his marriage, stock in his family's business. The issue was whether the wife had a right to share in the appreciation in value of the stock, some $755,000 over the course of the marriage, based upon the reasoning in *Albanese*. The

Court agreed with the husband that *Albanese* was inapplicable because the wife could not demonstrate that she contributed to the increase in value of her husband's interest in his company stock. *Id.* at *3. Mrs. Ayers did not and could not demonstrate that she contributed in any meaningful way to an increase in the value of Mr. Ayers' businesses during their marriage.

In any event, whether Mrs. Ayers could have succeeded in making such a claim in 2001, based upon a decision issued by the Delaware Supreme Court in 1995, *is irrelevant to the question whether Mr. Capute breached the standard of care in 1991*. Mr. Capute's alleged acts and omissions can only be judged based upon the law as it existed in 1991, not the law as it developed many years later. *See Vande Kop v. McGill*, 528 N.W.2d 609 (Iowa 1995). Ms. Hayes acknowledged in her deposition that *Albanese* changed the law in Delaware regarding the appreciation of premarital property assets during marriage. Ex. 32 (Hayes Dep. Vol. I) at 147. Even if the Agreement as drafted did not expressly address the issue of property appreciation, which is not the case here, there is no evidence in this case that Mr. Capute deviated from the applicable standard of care at the relevant time.

### 3. Plaintiff Cannot Demonstrate That The Damages He Alleges Were Proximately Caused By Any Deficiency In The Agreement Attributable To Mr. Capute.

These interesting but esoteric issues of Delaware law ultimately have very little to do with the issues presented by defendant's motion for summary judgment. It is undisputed that Mr. Ayers, on the advice of his counsel, Ms. Hayes, and no doubt for other reasons wholly unrelated to any question about the validity or meaning of the agreement (e.g., the costs and risks of litigation, lost time, inconvenience, and potential embarrassment, just to name a few), chose to settle rather than litigate his wife's property and alimony claims. The record in this case demonstrates that the alleged weaknesses and ambiguities in the Antenuptial Agreement, even

assuming they influenced Mr. Ayers' decision to settle (or motivated his counsel to urge him to do so), had absolutely no impact on the ultimate disposition of Mr. Ayers' business or real property interests – the only interests that he told Judge Graves he ever wanted to protect. Indeed, under the parties' settlement in the divorce action, Mr. Ayers retained *all* interest he had in his business, including the appreciation in the value of those businesses over the course of the marriage. Ex. 30 (Property Settlement Agreement, "Fourth" Paragraph). In addition, he retained all property he owned before the marriage (i.e., the home that Mr. and Mrs. Ayers lived in for ten years on Tharp Road in Seaford, Delaware), as well as an adjoining property that he had acquired *after* his marriage but titled in his own name. *Id.* ("Third" Paragraph). In short, the Agreement accomplished exactly what Mr. Ayers now alleges it should have accomplished – to shield from his wife his business interests and real property, and the appreciation in value of those interests and property during the marriage. The undisputed evidence establishes that what plaintiff "gave up" in the property dispute – alimony and a portion of a joint bank account that he established after his marriage and that contained some $500,000 at the time of separation – had nothing whatsoever to do with Mr. Capute or how the Antenuptial Agreement was drafted.

### a. Waiver of Alimony

As set forth above, Mr. Ayers now agrees that Judge Graves explicitly told him that it would be unwise to draft a premarital agreement that forced his future spouse to waive alimony, because such a waiver would create a risk that an equity judge would decline to enforce the agreement. Judge Graves' advice was prudent: under Delaware law at the time, courts were required to review prenuptial agreements for "both procedural and substantive fairness." *E.R.D.* v. *M.L.D.*, 2001 W.L. 493105 (Del. Fam. Ct., Mar. 7, 2001). Agreements were deemed

inequitable unless the dominant spouse could establish, among other things, that the "substantive provisions of the agreement dividing the property upon divorce are fair to each spouse at the time of the execution of the agreement and, if circumstances significantly changed since the agreement, then also at the time of the divorce." *Id.* at *3.

Mr. Ayers also concedes that he followed Judge Graves' advice. *A fortiori*, it is undisputed that Mr. Ayers knew that the initial version of the agreement did not include a waiver of alimony. Mr. Ayers also knew from his discussions with Judge Graves that his wife would need separate counsel, and that her counsel would have to review and approve the agreement before it could be enforceable.

Mr. Ayers subsequently delivered the agreement – knowing it did not contain a waiver of alimony – to his wife for review by *her* counsel. She returned the document to him with certain revisions made by her attorney, including a clause that would entitle her to a lump sum payment, upon the parties' divorce, of $1000 per year of marriage. Mr. Ayers cannot credibly allege that he believed that this provision, or any other provision added by Mrs. Ayers' attorneys, would *limit* Mrs. Ayers' rights upon a divorce. Thus, it is undisputed that on or about August 21, 1991, when Mr. Ayers received from Mrs. Ayers the agreement as revised by Mrs. Ayers' counsel (Mr. Berl), he *knew* that the agreement contained no waiver of alimony.

Mr. Ayers then took the revised agreement to Mr. Capute. A comparison of the before-and-after versions of the agreement demonstrates that Mr. Capute made no significant changes, and he certainly did not address alimony in any way. Any person (like Mr. Ayers) who knew that the agreement did not waive alimony when it went to Mr. Capute, also knew that it did not waive alimony when it came back from him.

Mr. Ayers now claims, of course, that he thought the Antenuptial Agreement was supposed to waive alimony, but his current allegations simply cannot be squared with the admissible facts of record.  Mr. Ayers has *not* testified that he told Mr. Capute to ensure that his wife waived alimony.  In general, he cannot recollect his conversations with Mr. Capute about the Antenuptial Agreement.  The only detail Mr. Ayers claimed to remember was a request that Mr. Capute "tighten [the agreement] up as tight as it could be because I was thinking about getting married."  Ex.1   (T. Ayers Dep.) at 49.   Again, however, Mr. Ayers had already concluded, based upon the advice of his Delaware counsel, that a waiver of alimony was not a good idea and not what he intended to accomplish through the Antenuptial Agreement. Mr. Capute testified that Mr. Ayers never asked him to consider including a provision waiving alimony.  Ex. 13 (Capute Dep.) at 61.

Lawyers are not liable for everything that goes wrong in a client's life. Apparently Mr. Ayers wishes in hindsight that he did not have to pay alimony to his wife of 10 years, a woman almost twenty years younger who had no assets when she married and precious little more when she separated 10 years later.  But that is not Mr. Capute's fault.  No evidence in this case indicates that Mr. Ayers ever asked Mr. Capute to draft a waiver of alimony and all evidence suggests rather strongly that Mr. Ayers did not want one.  Moreover, the amount of alimony that Mr. Ayers agreed to pay, $6,000 per month, was on the low end of the range that Ms. Hayes believed Mrs. Ayers would have been awarded absent a settlement.  Ex. 32 (Hayes Dep., Vol. II) at 248-49 (testifying that she expected and would have advised Mrs. Ayers, if she were her client, to demand alimony in an amount between $6,000 and $10,000 per month). Because uncontroverted evidence establishes that Mr. Ayers did not intend to waive alimony by

virtue of the Antenuptial Agreement, that Mr. Capute had no duty to include such a provision in the agreement, and that the absence of a waiver provision did not cause plaintiff to incur any damages, defendant is entitled to summary judgment on plaintiff's claim for reimbursement of his alimony payments.[11]

### b. The Joint Bank Accounts

The other element of plaintiff's "damages" concerns his joint money market account at Mellon Bank.  Mr. Ayers alleges that Mr. Capute was negligent because he failed to advise him that if he titled this bank account (or any property, for that matter) in his wife's name, she may have had an entitlement to that property in the event the marriage were to end in divorce.  In other words, if the property were titled as "joint" property, it would not be treated as "separate" property under the terms of the Antenuptial Agreement.   The argument is so preposterous that it warrants little response.

Even assuming Mr. Capute failed to tell Mr. Ayers that *joint* property is not *separate* property (recognizing that Mr. Ayers is hardly in a position to support this assumption, since he has admitted to having no recollection of what he and Mr. Capute discussed), Mr. Capute could not possibly have breached any duty he may have owed to Mr. Ayers by neglecting to tell him what he already knew or should have known if he bothered to read the agreement:

> Nothing in this Agreement is intended to prevent, nor shall it operate to prevent, the parties hereto from acquiring or receiving property jointly, or as husband and wife.  To that extent, the disposition of said property shall be governed by the laws of the State of Delaware, and not by this Agreement. Moreover, nothing

---

[11] Plaintiff's alleged damages include alimony in the amount of $324,000 (54, not 59, monthly payments of $6000).  *See* Ex. 20 (Answer to Interrogatory No. 15) at 13.  By defendant's calculation, Mr. Ayers would have made only 12 alimony payments ($72,000) through May 2003, a portion of which he apparently deducted from his income on his tax returns.

> in this Agreement is intended to prevent, nor shall it operate to
> prevent, the parties hereto from conveying property to one another,
> either singularly, or so as to create joint property not subject to the
> effect of this Agreement.

Ex. 15, ¶ 6.  There is no dispute that paragraph 6 of the antenuptial agreement was added by Mrs.

Ayers' counsel, Mr. Berl, not by Mr. Capute.  As Mr. Berl pointed out in his deposition, such

provisions are common in Delaware antenuptial agreements.  Ex. 22 (Berl Dep.) at 35-37.   Since

it is clear that Mrs. Ayers (or her counsel) wanted paragraph six in the agreement, and Mr. Ayers

never objected to or expressed any concerns about the inclusion of such a provision, Mr. Capute

could not possibly have breached his duty to Mr. Ayers by failing to tell him in 1991 that a joint

bank account would not be treated as his separate property, free and clear of any claim by its co-

owner, Mrs. Ayers, if the couple were to become divorced 10 years later.

      Most importantly, whether the agreement contained a provision like paragraph six

or not, the outcome would have been the same.  Under Delaware law, property acquired either

before or during a marriage and titled in the name of both spouses is by definition marital

property, not separate property.  *See Husband T.N.S.* v. *Wife A.M.S.*, 407 A.2d 1045, 1047 (Del.

Sup. 1979). Mr. Ayers knew this provision was in the Agreement when he signed it, and yet he

voluntarily deposited substantial funds into a joint account throughout the course of his

marriage. The problem is not what the lawyers drafted, but what Mr. Ayers did with his money.

By depositing it into a joint account, he willingly gave his wife an interest in that money, as do

most other husbands who earn substantially more than their wives (and vice-versa).[12]   In short,

---

[12]The fact that Mrs. Ayers received a disproportionate share of the joint money market
account can be explained by the fact that Mr. Ayers was permitted to retain other assets that Mrs.
Ayers claimed should have been treated as "marital" property under Delaware law because they
were purchased with funds deposited in the parties' joint accounts.  For instance, Mr. Ayers retained
the balance of the couple's joint checking account at Mellon Bank.  He also was allowed to retain

plaintiff has not identified any defect in the Antenuptial Agreement that caused him damage by allowing Mrs. Ayers to recover funds from a jointly titled account, and for that reason defendant is entitled to summary judgment as to all claims related to those alleged damages.

## IV.  CONCLUSION

For all the reasons stated herein, Defendant Charles T. Capute's Motion for Summary Judgment should be granted.

Respectfully submitted,

MURPHY & SHAFFER, LLC

By:/s/ Robert T. Shaffer, III_____
    Robert T. Shaffer, III (#04074)

36 S. Charles Street, Suite 1400
Baltimore, Maryland 21202
(410) 783-7000

*Attorneys for Defendant*

---

his ownership interest in a second home (next to the "marital" home) that Mr. Ayers purchased for approximately $200,000 with money that Mrs. Ayers believed had been deposited in the Ayers' joint (i.e., marital) bank accounts, as well as the full benefit of improvements made to the couple's marital home using funds that Mr. Ayers deposited in the couple's joint bank accounts.  *See* Ex. 21 (L. Ayers Dep.) at 106-08; Ex. 2, at 5, section "K".  The value of all these assets more than offset Mrs. Ayers' receipt of a disproportionate share of the Mellon money market account.