IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS | : | NO. |
| P. O. Box 1210 | : | |
| Seaford, DE 19973 | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. WDQ 02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE | : | |
| 114 North West Street | : | |
| Easton, MD 21601 | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

## ORDER

And now this        day of        2003, upon review of the Defendant's Motion

for Summary Judgment, and the Plaintiff's response thereto, it is hereby ORDERED and

DECREED that the Motion is DENIED.

_____

J

IN THE UNITED STATES DISTRICT COURT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY E. AYERS | : | |
| P. O. Box 1210 | : | |
| Seaford, DE 19973 | : | |
| | : | NON-ARBITRATION |
| Plaintiff | : | |
| | : | JURY TRIAL DEMANDED |
| vs. | : | |
| | : | No. WDQ 02-CV-0061 |
| CHARLES T. CAPUTE, ESQUIRE | : | |
| 114 North West Street | : | |
| Easton, MD 21601 | : | |
| | : | CMAL Legal Malpractice |
| Defendant | : | |

PLAINTIFF'S ANSWERING MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court are Plaintiff's and Defendant's cross motions for summary judgment. In this response to Defendant's Motion For Summary Judgment, and where relevant, Plaintiff incorporates herein by reference the particulars of his Motion For Summary Judgment.

I.    Defendant's Innuendo That Plaintiff Has A Convenient Memory

Defendant's Motion For Summary Judgment is not filed with enumerated paragraphs, which would permit the Plaintiff to specifically admit or deny allegations so as to frame the issues. Instead, Defendant has filed a rambling factual and legal narrative most of which accuses the Plaintiff of having "changed his testimony" throughout these proceedings when in fact, all Plaintiff was doing in this regard was the exact same thing that Mr. Capute was doing. Simply stated, as discovery ensued in the case, the memories of both parties dimmed by events that happened 14 years ago became brighter as facts were uncovered. An example of this can be seen from the fact that when Mr. Capute was

2

first deposed he was steadfast in his testimony that he used the Draft Pre Nuptial

Agreement prepared by Judge Graves as a form for the Agreement he prepared.[1]  Now in

his Summary Judgment Motion Mr. Capute has taken the position that he must have used

the form prepared by Richard Berl Esquire.[2]  When Mr. Capute was deposed, he testified

that the provisions to pay Lisa Wheatley $1000 for each year of marriage was inserted

into the Agreement drafted by Capute at the insistence of Plaintiff.[3]  Now on page 2 of his

memorandum Mr. Capute claims that the $1000 provision was the added by Lisa

Wheatley's ["Mrs. Ayers'] attorney. Defense counsel on page 11 of his memorandum

suggests that this change in testimony is due to "an imperfect recollection". Why is it that

when Plaintiff remembered something differently after he testified that he gets a tall

pointy hat instead of the moniker of an imperfect memory? Other witnesses had difficulty

in remembering precisely what happened fourteen years ago. When Richard Berl was

deposed he had no independent recollection of ever meeting Lisa Ayers/Wheatley or

reviewing or preparing the Pre Nuptial Agreement for Lisa Ayers/Wheatley that Mr.

Capute now claims to have been the document Capute used in preparing the Agreement

that brings us to the bar of this Court.[4]  Judge Graves, who probably had the best memory

for what happened, initially advised instant counsel for Plaintiff that he did not recall ever

preparing a prenuptial agreement for Plaintiff.  However, after speaking with instant

counsel Judge Graves left his chambers and went to his old law firm and examined his

file from 1989 at which time he realized his memory was "imperfect" because in his file

was the very document continually referred to by the parties in this litigation as "the

---

[1] See p 25 of Exh. "D" to Plaintiff's Motion.
[2] See p 11 of Defs Memorandum.
[3] See p 57 of Exh. "B" hereto.
[4] See pp. 16-17 of Exh. "E" to Plaintiff's Motion.

Judge Graves version of the Prenuptial Agreement". Perhaps Judge Graves said it best we

he stated during his deposition why he put an in terrorem clause in his version:

> And I was trying to keep -- I was adding some kind of language to attempt
> to make it more painful for someone to consider, because -- you know,
> just because you've got a prenuptial agreement doesn't mean you're not
> going to end up in court later.
>
> Q    Why is that?
>
> A    Because, you know, whether you're Donald Trump or whoever you
> are, these things get litigated afterwards.  People don't -- people forget
> about what they've signed and what they've done. [emphasis added] [5]

The Defendant's Motion runs up and down the flagpole that by responding in the

negative to one question of counsel to the effect of whether Plaintiff "recalled the

substance" of a conversation referenced in one of Mr. Capute's invoices that this action

should terminate by way of summary judgment. However as set forth in Mr. Ayer's

previously filed affidavit and corroborated by his deposition testimony, Plaintiff talked to

Mr. Capute about what he wanted to accomplish by way of a prenuptial agreement. To

that end Plaintiff testified until defense counsel interrupted him:

> A.      And then that's when I sent them to Charlie Capute because Henley
> was no longer around, and I wanted them tightened up.  I wanted them
> redone.  When I say redone, I'm sorry.  I don't mean redone.  I mean it had
> been a period of time, so I wanted to make sure everything was as good as
> it could be.  I told him to go over it, and if there is anything at all that
> needs to be changed, done, to better it, tighten it up, I told him the issues
> that I wanted to protect.
> Q.      I'm going to get to that in a moment.  I'm not quite there yet. [6]

---

[5] See pp 50, 75 of Exh. "A" hereto.
[6] See pp 54-55 of Exh. "D" hereto.

Simply stated, and as recognized by Judge Graves, people do forget what they have put into writing. This doesn't mean that when they forget they have to don that tall pointy hat.

II.    Defendant's Summary Judgment Arguments

    A.    Plaintiff's Cause of Action Is Not Time Barred By The Dickerson Case

Defendant seizes upon the Delaware case Dickerson v Rich, 2001 WL 34083816 (Del. Super.) as the death knell to Plaintiff's legal malpractice action.[7] In Dickerson, the Court concluded that since the Plaintiff had given testimony that he read and understood the terms of his Prenuptial Agreement that he could not later contend that he did not understand the Agreement to contain a waiver of alimony provision. In thecae at bar, Mr. Ayers provided in his Affidavit in support of his Motion for Summary Judgment that he has had trouble reading since his formative years.[8] In fact, when defense counsel was setting Mr. Ayers up for the reading and understanding parameters of the Dickerson case counsel did not receive the answer he wanted when Mr. Ayers testified as follows:

> Q.  When you received in the mail the antenuptial agreement prepared by Mr. Capute, did you read it over?
>
> A.  To the best of my knowledge. I am not -- it might appear that I am because of my    position. I have a great deal of trouble reading. I have a great deal of problems understanding written material and especially legal material. I just simply do not understand it, and I never told anybody this, but that's the way it is.
>
> Q.  Is that something you have kept to yourself all these years?
>
> A.  Yes. Definitely.

---

[7] Plaintiff contends that it is Delaware substantive law that controls this controversy. The subject matter Agreement provides that Delaware law controls and the Agreement was written for the benefit of a Delaware resident. Just because Mr. Capute's practice of law in Delaware was "unauthorized" does not mean that Maryland has a more significant interest in the outcome of this proceeding.

[8] Lisa Ayers confirmed this fact. See p 145-146 of Exh. "C" hereto.

Q.  Is that something you haven't shared with your lawyers either?

A.  I think Charlie Capute knew that I did not understand legal documents well at all.

Q.  How did he know that?  Did you tell him that?

A.  Well, because of all the different -- yes, I have told him this before, that I don't  understand this, I don't understand that.  I had not gone out to him and said, well, I have   dyslexia, I have this, I have that, but I made it very clear that I did not understand a lot of the legal and contract type of things.

Q.  Mr. Ayers, don't take this the wrong way, but when you say you have difficulty   reading, are you suggesting that you have some disability that makes it harder for you --

A.  Absolutely.

Q.  -- than other people to read words?

A.  Most definitely.

Q.  Have you been diagnosed as having any such learning disability --

A.  Yes.

Q.  -- or reading disability?

MR. GIBSON:  You were both really talking over each other.

Q.  This happens all the time.  Don't worry about it.  Have you ever been diagnosed as having a learning or a reading disability?

A.  Yes.  In Fork Union Military Academy.  I attended a special class.

Q.  Who diagnosed you, and what was the diagnosis?

A.  I do not know what that was.  They did it theirselves because of my lack of ability to   be able to read.  I can understand and remember fairly well when if you read it to me, but as far as reading it and understanding it, bad problem.  As I stated, I just barely got out of school.

Q.  And when you say you have difficulty reading, are you saying that you have difficulty reading legal documents or you have difficulty reading, for example, the newspaper or any printed material?

A.  I have difficulty reading anything.

Q.  Have you done anything or have you received any treatment to correct that?

A.  No, I have not.  Excuse me just a minute.

Q.  Go ahead.

A.  I also went to, it was called the Sharp School of Speech for years when I was small for the same exact thing.

Q.  And what was that for?

A.  The same type of thing, reading.  I also had tutors at home for reading.

Q.  Is this when you were in school?

A.  Yes.

Q.  Primary school?

A.  Yes.[9]

Notwithstanding this rather remarkable testimony, on page 22 Defendant misrepresents the testimony of both Mr. Ayers and Judge Graves. In spite of Mr. Ayers' testimony that he told defendant of his reading difficulty without recitation to any evidence in the record it is stated that Mr. Ayers never advised "Mr. Capute of this difficulty". Judge Graves's testimony is also misrepresented. Contrary to what is stated on page 22 of Defendant's Memorandum, when Mr. Ayer's first met with Judge Graves Mr. Ayers did in fact want a waiver of alimony provision in the document. It was Judge Graves who talked Mr. Ayers out of a waiver of alimony provision if the object of the agreement was to protect against a short-lived marriage. The reason why alimony "was no problem" to Mr. Ayers in 1989 when Judge Graves was drafting the agreement was

---

[9] See pp 100-103 Exh. "D" hereto.

7

because Judge Graves told Mr. Ayers in a divorce shortly after marriage, Mr. Ayers'
alimony obligation would be less that a year.[10]

In addition to not having the "reading and understanding" component of the
Dickerson case at issue in these proceedings the more important reason the case is not
relevant to the issues in this case can be found in the fact that unlike the Agreement that
Mr. Dickerson reviewed, the Agreement at issue in this case in paragraph 3 contains
language that the prospective wife waived entitlement to "spousal allowances". In Mr.
Ayers' second Affidavit attached hereto as Exhibit "E", Mr. Ayers, as would be the case
for most laypeople, interpreted the phrase "spousal allowance" to mean another way to
say alimony. The Prenuptial Agreement that was at issue in Dickerson contained no
language that could remotely be construed to indicate to a layperson that alimony was
being addressed. Thus, the decision in Dickerson, which should be confined to its facts, is
no impediment to Plaintiff's Complaint.

After finishing up his flawed dissertation on the Dickerson case, Defendant then
goes on to quote a string of Maryland cases for the proposition that lack of immediate
harm does not toll the statute of limitations. In the first instance, Maryland law is simply
not applicable to a case regarding a Prenuptial Agreement drafted for a Delaware resident
by a lawyer engaged in the unauthorized practice of law in Delaware when said
Agreement provides on its face that Delaware substantive law controls.

B.    Plaintiff Has Established Defendant Deviated From The Standard of Care

In the first instance Defendant is wrong when he claims that an expert is always
needed to make out a prima facie case of legal malpractice. Delaware courts have
recognized that if the negligence is so obvious, that a layperson can find culpability

---

[10] See pp28-31 of Exh. "A" hereto.

8

without the need of resorting to expert testimony. The defense in this case is not that Mr.

Capute failed to include a waiver of alimony provision in the Agreement he prepared or

that he failed to draft an Agreement that properly protected all of the assets that Plaintiff

brought into his marriage. The defense in this case is that Mr. Capute was not retained to

prepare a Prenuptial Agreement. The defense in this case is that if there was a failure to

properly waive alimony or protect income, that mistake was the mistake of lawyers other

than Mr. Capute. The defense in this case is that if there was a failure to protect assets

from being deemed marital, that mistake was the mistake of lawyers other than Mr.

Capute. This is set forth clearly on page 28 of Defendant's Memorandum where it is

stated: "the Court should find as a matter of law that Mr. Capute did not undertake to

advise Mr. Ayers on the validity of the substantive provisions drafted by other counsel,

and that Mr. Capute is not, therefore, liable for any deficiencies in those provisions of the

agreement." Thus, on this summary judgment record, if it is concluded that Mr. Capute

was in fact retained to Prepare the subject agreement, Plaintiff's case could still go

forward without an expert in that Defendant himself testified that unless there is an

express waiver of alimony provision in a Pre Nuptial Agreement, any attempt to avoid

paying alimony would meet with defeat. He also testified that there was no express

waiver of alimony provision in the Agreement that is the subject matter of this

litigation.[11] Based on these admissions there would be no need for expert testimony.

Even without these admissions by Defendant, under Delaware Law there would

not be a need for expert testimony in that Defendant negligence is obvious. In Williams v

The Law Firm of Cooch Taylor, 1994 WL 234000 (Del. Super), and coincidental to the

---

[11] See pp 58-66 Exh. "B" hereto.

case at bar, it was <u>Judge </u>Graves' ruling in a case where a lawyer did not prepare and file

a Qualified Domestic Relations Order that:

> While expert testimony is usually required to prove the standard of care against which an attorney's actions are measured, expert testimony is not required when an ordinary person is equipped by common skill and knowledge to judge the issue.  *Ruthenberg et al. v. Kimmel & Spiller, P.A.,* Del.Super., C.A. No. 79C-DE-17, Bifferato, J. (March 17, 1981).  In the instant case, an expert witness' testimony would be necessary for most of plaintiff's claims. However, the Court has already disposed of those claims under the statute of limitations. However, expert testimony is not required where an ordinary and reasonable person would recognize error upon discovering that there was no preparation or filing of a QDRO. Plaintiff's QDRO malpractice claim is within the common knowledge of laymen. Accordingly, plaintiff is not required to produce expert testimony. See Williams 1994 WL 234000 at p.3[12]

Just as it was in <u>Williams</u> it would seem that "an ordinary and reasonable person

would recognize error upon discovering that there was no preparation" of a waiver of

alimony provision after being instructed by Plaintiff to provide such a contractual

provision in the Prenuptial Agreement.

However, all of this is moot in that Plaintiff has an expert. Theresa Hayes has

given her opinion that Mr. Capute deviated from the applicable standard of care. On

pages 78-79 of her deposition Ms. Hayes testified Defendant breached the Standard of

Care by practicing matrimonial law if he has no expertise in this area of the law. It was

her testimony that a Pre Nuptial Agreement is the most difficult matrimonial agreement

to prepare and that a lawyer who self admittedly restricts his practice to estate work has

---

[12] A QRDO is the Order a Delaware matrimonial lawyer prepares to make effective divorcing parties Property Settlement Agreement. The coincidences of this opinion continue to mount in that the divorcing couples in the matter that gave rise to the legal malpractice action over which Judge Graves presided was <u>Wheatley v Wheatley</u>, Lisa Wheatley Ayers first marriage and a divorce in which Judge Graves represented Lisa Wheatley Ayers.

10

no business preparing such an agreement.[13] On page 80 Ms. Hayes expresses her opinion

that the Standard was breached by Defendant's failing to expressly waive alimony. On

page 81-85 Ms. Hayes expresses her opinion that the Standard was breached by failing to

exclude the income Plaintiff earned during the marriage as well as items of property

purchased with that income from being a part of the marital estate. On pages 86-96 of her

opinion Ms. Hayes advises that the Standard was breached by failing to specifically

define just was included in the word "property" as that word appeared in the agreement.

On page 98 of her deposition Ms. Hayes expresses her opinion that the Standard was

breached by failure to have a complete inventory of assets attached to the Agreement. On

pages 99-107 Ms. Hayes testified that the Standard is breached if a practitioner fails to

fully inquire what goals are being intended too be achieved by a client before preparing

the legal document that is the vehicle to effect those goals.[14]

      C.    <u>Defendant Capute Did Not Limit The Scope Of His Engagement</u>

      On pages 27-28, Defendant Capute would have this Court rule as a matter of law

that Defendant Capute limited the scope of his representation as allowed by Rule 1.2 of

the Rules of Professional Conduct. Defendant cites to no case law or point of authority to

---

[13] The opinions of Ms. Hayes' deposition are set forth on pp 78-118 of her deposition transcript which is attached hereto Exh. "F".

[14] Defendant has alleged that Ms. Hayes cannot give an opinion since she was not admitted to the bar in 1991. Although the argument is intriguing, it is also silly. If the negligence was whether Mr. Capute missed a Statute of Limitation in 1991 would this mean that only lawyers practicing in 1991 could give an opinion that a blown statute is a deviation from the standard of care? Of course not. It is also alleged that Ms. Hayes should be precluded as an expert because she did not sign or was aware of the Rule 26 Disclosures. This is a distortion of what Ms. Hayes' involvement was with respect to the Disclosures. Plaintiff attaches hereto as Exhibit "G" Ms. Hayes' letter of June 27, 2003 to instant counsel wherein she outlines her total involvement in the preparation of the disclosures as well as her statement that she was fully aware of what the disclosures consisted of. Attached to Ms. Hayes's letter of June 27, 2003 is her June 25, 2001 report of the deficiencies of Mr. Capute's representation. Contrary to what is alleged by Defendant, this report was provided to the Defendant during discovery. As a member of the bar who is cognizant of her duty not to mislead a tribunal, Ms. Hayes' letters should be considered to be a part of the instant summary judgment record. The defendant in this case has more than adequate notice of what Ms. Hayes' opinions are. The defense deposed Ms. Hayes for 2 days resulting in a transcript of more the 480 pages.

11

support his contention. Plaintiff agrees with one aspect of Defendant's argument in this regard and that is Plaintiff agrees that this Court, as opposed to a jury, is the final and only arbiter of this issue. Thus in response to Defendant's argument, Plaintiff would incorporate herein by reference, that part of the Plaintiff's Motion for Summary Judgment, including the case law an points of authority set forth therein, where Plaintiff asks the Court to rule as a matter of law that Defendant's twelfth and fourteenth affirmative defenses that Mr. Capute limited the scope of his representation should be stricken.[15]

> D.    In Light Of The Negligently Drafted Agreement Plaintiff Did The Prudent Thing By Settling With His Wife And As Result  Mitigated His Damages

Plaintiff's matrimonial counsel advised him to settle with his ex wife in that to litigate the validity of the Prenuptial Agreement could expose Plaintiff to having to pay his wife substantially more that what was the agreed settlement amount. Now by way of a summary judgment pleading, he Defendant questions the wisdom of this advise. I am sure that had Plaintiff gone forward with equitable distribution and was socked with an ward well in excess of what was the settlement amount in this case, Plaintiff would be faced with a summary judgment motion accusing him of failing to mitigate damages by way of a proffered settlement. However, the total lack of merit of this contention can be seen from the Defendant's Memorandum wherein on page 39 of the memorandum Defendant accredits the expert opinion of Ms. Hayes that it was distinctly possible that through equitable distribution, alimony could have been set at $10,000 per month. Based on Delaware law that alimony can be awarded for half the life of the marriage [here 5 years which was what the parties agreed to] it was conceivable that Lisa Ayers could

---

[15] Plaintiff's argument that Defendant Capute did not limit his representation is contained on pages 8-12 of Plaintiff's Memorandum.

have obtained an award of alimony in the amount of $500,000. By settling to pay lump sum alimony in the amount of $354,000 Plaintiff effectively saved Defendant herein $146,000 in mitigated damages.

On pages 32-36 Defendant, according to the interpretation of Delaware divorce law by his present counsel, Defendant also suggests that Plaintiff's agreement to pay his ex wife $420,000 in settlement of all property claims was foolish in that according to counsel's interpretation of the law, if the validity of the agreement had been litigated, it would have been interpreted to shield Plaintiff's property as non-marital. Counsel's "interpretation" is completely at odds with the interpretation of Ms. Hayes which as discussed above, is set forth on pages 86-96 of her deposition. According to Ms. Hayes, and as set forth on page 32-33 of Defendant's memorandum, Ms. Hayes believed that the language in paragraph 5 of the Prenuptial Agreement that property was defined to be property received "by way of gift, inheritance, or any stock purchase agreement from the parties respective families" limited what would constitute "after acquired property" to only include property received from a family member. Her precise testimony as to how the phrase property should have been defined was:

> "it should say all property received during the course or before the marriage, any increase in the value of the property, and any income received by either party during the course of the marriage. It shouldn't just say said property. It doesn't include income issues, and it doesn't define income areas."[16]

Notwithstanding Ms. Hayes' clear testimony that in her opinion, the agreement was not drafted to protect after acquired property other than property received from a family member, on page 33 of his Memorandum Defendant would have this Court conclude that just because Ms. Hayes testified that she would have argued to the Court

---

[16] See p. 87-88 of Exh. "F".

defense counsel's interpretation of paragraph 5 means she has adopted it as her own. That

was not Ms. Hayes' testimony. The way the testimony was adduced was:

> A. I would have argued that in court, yes.
> Q. Well do you have a different opinion toady as a legal expert what you would have argued in court?
> A. There's ---
> Q. Would you have gotten up in court and argued something you didn't believe in?
> A. That – you can argue in court legitimate—legitimate interpretations of a document. Whether or not you go to court and you risk the consequences if your argument is not successful, those are different things.[17]

In a remarkably similar situation regarding the definition of "after acquired

property", in Harmon v Harmon Del. Fam. Ct. No. CN87 – 1153, in a slip opinion dated

March 13, 2003, Judge Tumas, noting that Prenuptial Agreements will be strictly

construed against the proponent of the agreement held that failure to adequately define

what constitutes "after acquired property" is grounds to declare a Prenuptial Agreement

invalid.[18] Thus, since Judge Tumas is the better arbiter of what Delaware law is than

instant defense counsel, this Court must conclude as a matter of law that contrary to the

defense contentions that Plaintiff never should have settled with his ex wife, that in light

of Defendant's failure to adequately define "property", Plaintiff acted prudently in paying

in settlement, $420,000 to resolve his wife's property claim as opposed to exposing his

adjusted gross income for 2002 of $849,000 and his 50% ownership interest in his family

printing business that is worth $5,000,000 to equitable distribution.

---

[17] See p. 89 of Exh. "F".
[18] Judge Tumas' opinion is attached hereto as Exh. "H".

III.    <u>CONCLUSION:</u>

With respect to whether or not Plaintiff told Mr. Capute he wanted an Agreement that contained a waiver of alimony provision, summary judgment must be denied in that facts are in dispute.

With respect to whether Mr. Capute limited the scope of his representation, the Defendants Motion must be denied and Plaintiff's Motion that he did not limit his scope, must be granted.

With respect to whether Plaintiff's claims are time barred under <u>Dickerson</u>, Defendant's Motion must be denied in that there is testimony that Plaintiff did not understand the Agreement and moreover Mr. Capute never explained the Agreement to him. Additionally whether or not it is reasonable for a layperson to understand the use of the phrase "spousal allowance" to mean alimony presents a jury question.

The Defendant's Motion that Plaintiff would have prevailed had he litigated the validity of the Prenuptial Agreement must be denied as unsupportable by the instant summary judgment record.

Defendant's Motion That there is no proof that he deviated from the Standard of Care must be denied. Both Defendant's admissions of record as well as the testimony and opinions of Theresa Hayes established that Defendant deviated from the Standard of Care.

Defendant's Motion that he was not the proximate cause of Plaintiff's damages must be denied. The Plaintiff's summary judgment record establishes that he had to resolve through settlement his wife's claims in that the Prenuptial Agreement prepared by Defendant Capute was woefully deficient.

15

Plaintiff is entitled to Summary Judgment that the Agreement at issue is Mr.

Capute's Agreement and not the Agreement of Plaintiff's attorneys from three years

earlier.

**GIBSON & PERKINS P.C.**

BY: KEVIN WILLIAM GIBSON
200 East State Street
Media PA 19063
610.565.1708

*EXHIBIT "A"*

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3                    - Northern Division -

 4

 5   TIMOTHY E. AYERS,              *

 6                                  *

 7                  Plaintiff,      *

 8          v.                      *   Civil Action No.

 9   CHARLES T. CAPUTE,            *   L 02-CV-0061

10                                  *

11                  Defendant.   *

12              *     *     *     *     *     *     *

13                   Georgetown, Delaware

14
                   Tuesday, March 25, 2003
15
     Deposition of:
16
                  THE HONORABLE T. HENLEY GRAVES
17
                   a witness, called for examination by
18   Counsel for Defendant, pursuant to notice, taken
     at the Law Offices of Fuqua & Yori, 28 The
19   Circle, Georgetown, Delaware, commencing at 4:35
     p.m., before Kathy A. Zeve, a Notary Public and
20   Registered Professional Reporter in and for the
     State of Delaware, when were present on behalf of
21   the respective parties:
```

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1   in divorce?

2        A    I recall discussion concerning alimony.

3        Q    What do you recall about that?

4        A    I recall telling him that the statute is

5   what I call the half-life of the marriage.  That the

6   alimony that can be obtained in a marriage would be

7   half the life of the marriage.  If the marriage is

8   four years, you get two years of potential alimony.

9   He was not concerned with alimony.  He was concerned

10  with preserving the golden goose and not the golden

11  egg.

12        His worry was -- I don't know what the word

13  is -- the old phrase is, that he was going to get

14  married in the springtime and be divorced in the

15  summer.  He was very concerned that he was going to

16  have -- that she was going to gold dig.  She was just

17  going to marry him and wait around for a short period

18  of time and attempt to get something out of him.  And

19  I think the prenuptial agreement was to see whether

20  she was really serious.  In other words, if she was --

21  if she was -- knew --

29

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1       Q    What --

2       A    -- she wasn't going to get the business and

3    that kind of thing.

4       Q    So -- but as it relates to the alimony

5    issue, you had a discussion with him about the

6    statute.  What statute were you referring to?  I'm not

7    asking to you recite the --

8       A    I don't domestic in my court anymore.  I did

9    domestic 14 years ago.  But it's Title 13 such and

10   such, and the statute is that you're capped at two

11   years -- excuse me -- you're capped at one half up to

12   a certain period of time, and I can't remember what

13   that is, and then you can get permanent alimony.  And

14   I don't recall what that is.

15      Q    And when you discussed this with him, what

16   was his reaction to whether he wanted you as a lawyer

17   to protect his obligation -- theoretical obligation to

18   pay alimony in the event that the marriage did not

19   succeed?

20      A    That was not a concern.

21      Q    Is it fair to say that your understanding

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1    was that he did not want to you draft an agreement in

2    such a way as to preclude his wife from making such a

3    claim in the event the marriage did not succeed, a

4    claim for alimony?

5        A    What was discussed with him also was -- I

6    guess you got to -- there's three things I discussed

7    with him.  And that is, in a prenuptial agreement, if

8    you do not have her have this reviewed by independent

9    counsel, and I mean reviewed by independent counsel,

10    you're going to have a headache.

11            If you do not put all your cards on the

12    table as far as your assets, you're going to have a

13    problem.

14            And if you try to overreach in a court of

15    equity, you may have a problem because Family Court is

16    a court of equity.  And, therefore, you take it all,

17    you have a bigger chance of some Judge saying, I'm

18    just tearing it up and starting over.  That was

19    discussed.

20            And the alimony was a matter -- his concern

21    was he was very worried that he was not going to -- if

31

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1    the marriage lasted like under two years, that's where

2    he would be with fighting all these other assets.  I

3    can deal with -- I don't know what he was making at

4    the time, but he said I can deal with that.

5        Q    Deal with that meaning what?

6        A    Meaning the alimony.

7        Q    Did you have any knowledge during this

8    meeting as to what interest Mr. Ayers had in the

9    Sussex Printing business?

10       A    I knew he had some interest, but I didn't

11   know what.  And I knew his father and mother, or his

12   father had the majority interest.  I don't know if

13   Starr had an interest.  I don't know what -- I never

14   knew what Starr and Layton's assets were, other than I

15   knew they had that property at the beach.  They had

16   the property which was the Seaford Inn.  But I was

17   under the impression that they had substantial assets,

18   and that's what he was concerned about.

19       Q    Did you understand in 1989 that there was a

20   future intention to make gifts to the children by the

21   parents?

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1      Q    It's handwritten in 2, but it's typed in 3.

2      A    It's eight.  It's got an eight next to it.

3   The purpose of that is similar to the language that

4   you see in wills.  If you contest this will, you

5   forfeit your interest in the will.  You pay and

6   forfeit.  And I was trying to keep -- I was adding

7   some kind of language to attempt to make it more

8   painful for someone to consider, because -- you know,

9   just because you've got a prenuptial agreement doesn't

10  mean you're not going to end up in court later.

11     Q    Why is that?

12     A    Because, you know, whether you're Donald

13  Trump or whoever you are, these things get litigated

14  afterwards.  People don't -- people forget about what

15  they've signed and what they've done.  They put up

16  with the old bastard, or whatever, and now they want

17  their piece.  It's not unusual to get litigated.  So

18  basically you're saying, hey, I want to try to make it

19  painful.

20     Q    Well, that's interesting you say that

21  because Mr. Ayers has testified that he told you he

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1    yourself.  Do you remember receiving this in or around

2    August 2001?

3        A    I remember seeing this.  I presume that the

4    date is in or around the date that it was mailed.

5        Q    Do you remember what you did when you got

6    this letter?

7        A    Well, at first I scratched my head because

8    at first I didn't -- I couldn't remember whether I had

9    done anything for Tim or for Lisa or for Mickey Mouse

10   because it had been so many years.  But I did know

11   that it said on or about September '91, I prepared an

12   agreement for signature which was attached to the

13   back, and I knew that I hadn't prepared that

14   agreement.  I knew it in several different ways.

15             One, that in 1991, I was on the bench and

16   not touched private practice.  And the other thing was

17   the coding on the document is -- I've never seen the

18   coding on the document.  That's not a coding that I've

19   seen that this firm Fuqua and Graves had ever used.

20       Q    What did you do when you got this document,

21   Your Honor?

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1    conversation?

2        A    I remember telling him that, you know, that

3    you can name me as a Defendant, but in September of

4    1991, I was on the bench and I wasn't doing any

5    drafting for anybody, and I think he may have been

6    mistaken.

7        Q    Had you recalled that in 1989 you had

8    prepared an agreement?

9        A    When I got this, I did not.  I did not

10   remember about that agreement until after I talked

11   with Mr. Gibson.  I came over here and asked Lisa,

12   pull anything and everything she could on Tim Ayers.

13   And what she found -- I know she found this.

14       Q    This being Exhibit 2 to Ms. Massey's

15   deposition?

16       A    Yeah.  I know she found that.  I know she

17   found this.  When I read this, then I started -- had

18   recollection.

19       Q    Did you have Lisa look for documents

20   relating to the antenuptial agreement before or after

21   you spoke to Mr. Gibson?

DEPOSITION OF THE HONORABLE T. HENLEY GRAVES
CONDUCTED ON TUESDAY, MARCH 25, 2003

1  A  I think I spoke to him first because when I

2  got it -- I even think I spoke to him fairly quickly

3  because, obviously, it was -- No. 1, I've never been

4  sued for malpractice.

5    No. 2, I was on the bench, and he's

6  basically telling me that we're going to have you

7  served if you don't want to accept service, which I

8  appreciate the courtesy, but I thought it would be

9  kind of embarrassing for a sheriff to walk in and say,

10  Your Honor, do you know -- and get me served.  And

11  basically I was saying, I wanted him to be aware, hey,

12  1991, you may have the wrong person in this.  And that

13  was the gist of the conversation.

14  Q  If you wouldn't mind just turning to

15  paragraph six that's on page two, there's an

16  allegation that you knew or should have known that it

17  was Mr. Ayers' intention that the antenuptial

18  agreement should contain a provision that would not

19  obligate the Plaintiff herein to have to pay any

20  alimony and/or spousal support in the event he

21  subsequently became divorced from Lisa Wheatley-Ayers.

*EXHIBIT "B"*

1    IN THE UNITED STATES DISTRICT COURT OF MARYLAND

2

3    TIMOTHY E. AYERS,            :

4              Plaintiff        :

5                               :

6       vs.                     : CASE NUMBER:

7                               :  L02-CV-0061

8    CHARLES T. CAPUTE,          :

9    ESQUIRE,                    :

10             Defendant        :

11

12              ---------------------

13              Deposition of CHARLES T. CAPUTE, taken

14    on Friday, February 13, 2003 at 10:20 a.m., at

15    the Law Offices of Murphy & Shaffer, Suite 1400,

16    36 South Charles Street, Baltimore, Maryland,

17    before Deborah C. D. Shumaker, Notary Public.

18              ---------------------

19

20    Reported by:

21    Deborah C. D. Shumaker

EVANS REPORTING SERVICE
2 North Charles Street, Suite 950
Baltimore, Maryland 21201 (410) 727-7100

57

1    to agree to this language.

2        Q.    And this language was to be in lieu of

3    alimony; is that correct?

4            MR. SHAFFER:  Objection.  That is not

5    what the witness said.

6        A.    That was never said.

7        Q.    So Mr. Ayers called you up and said I

8    want you to say, I want you to put in the

9    agreement that Lisa will get a thousand dollars

10   for each year of our marriage plus a prorated

11   amount for any period of time less than one year

12   is what he told you to put in there?

13       A.    Yes.  He said we will prorate an amount

14   for less than a year we are together.

15       Q.    And she would get $1,000 a year for

16   each year of the marriage?

17       A.    Correct.

18       Q.    And you understood that to be in lieu

19   of alimony; is that correct?

20            MR. SHAFFER:  Objection.

21       A.    I didn't understand it to be anything

EVANS REPORTING SERVICE
2 North Charles Street, Suite 950
Baltimore, Maryland 21201 (410) 727-7100

58

1    other than what he told me.

2            Q.    Is there anything in -- strike that.

3                  One of the purposes of a prenuptial

4    agreement can be, can it not, to waive the

5    payment of alimony?

6            A.    Yes, it can.

7            Q.    Was that an issue in any of the five or

8    six prenuptial agreements that you said you were

9    involved in?

10           A.    Not in the ones that I drafted.

11           Q.    Was that an issue in any of the ones

12   that you participated in the drafting of?

13           A.    Yes.

14           Q.    So you were working with another

15   lawyer; is that a fair statement?

16           A.    Yes.

17           Q.    Drafting a prenuptial agreement wherein

18   there was a waiver of alimony issue?

19           A.    Yes.

20           Q.    So you understand what the concept of

21   waiver of alimony is in the context of a

59

1    prenuptial agreement?

2            MR. SHAFFER:  Objection.  Does he

3    understand that today?  Is that what you're

4    asking, or did he understand that at the time

5    that he was drafting, revising Mr. Ayers'

6    antenuptial agreement prepared by his domestic

7    counsel?

8            MR. GIBSON:  Are we done testifying?

9            MR. SHAFFER:  No.  I want to clarify

10   the record.  You know, I like to think that I

11   have some role in this deposition, and one of

12   them is to make sure that the questions are clear

13   and that when the client answers a question, he

14   understands it in the same way that you intended.

15           MR. GIBSON:  Can we go off the record a

16   second.

17           (Discussion off the record.)

18           BY MR. GIBSON:

19   Q.   Mr. Capute, do you understand what a

20   waiver of alimony provision is within the context

21   of a prenuptial agreement?

60

1          A.    Yes, I do.

2          Q.    And what is your understanding of what

3     that is?

4          A.    I understand that parties can agree to

5     waive alimony, can contractually within the

6     context of an antenuptial agreement.

7          Q.    And is it your understanding of the law

8     of the State of Maryland that that waiver has to

9     be express?

10         A.    Yes, it is.

11         Q.    It's true, is it not, that Mr. Ayers

12    told you that one of the purposes he was trying

13    to accomplish with this prenuptial agreement was

14    to not have to pay his wife alimony?

15              MR. SHAFFER:  Objection.  Asked and

16    answered.

17         A.    I don't know.

18              MR. GIBSON:  That has never been asked.

19              MR. SHAFFER:  Yes, it has.

20              MR. GIBSON:  Sorry.

21         A.    I don't remember that he did tell me

60

1        A.    Yes, I do.

2        Q.    And what is your understanding of what

3    that is?

4        A.    I understand that parties can agree to

5    waive alimony, can contractually within the

6    context of an antenuptial agreement.

7        Q.    And is it your understanding of the law

8    of the State of Maryland that that waiver has to

9    be express?

10       A.    Yes, it is.

11       Q.    It's true, is it not, that Mr. Ayers

12   told you that one of the purposes he was trying

13   to accomplish with this prenuptial agreement was

14   to not have to pay his wife alimony?

15            MR. SHAFFER:   Objection.   Asked and

16   answered.

17       A.    I don't know.

18            MR. GIBSON:   That has never been asked.

19            MR. SHAFFER:   Yes, it has.

20            MR. GIBSON:   Sorry.

21       A.    I don't remember that he did tell me

61

1    that.

2         Q.   So in your discussions with Mr. Ayers

3    regarding this prenuptial agreement, is it your

4    testimony that the subject of alimony never came

5    up?

6         A.   Not that I recall.

7         Q.   Is there anything in your reading of

8    Capute 2 that would suggest to you that there was

9    a contractual waiver of alimony?

10             MR. SHAFFER:  Objection.  You're asking

11   the witness to speculate about the meeting.

12             MR. GIBSON:  No.  I am asking him to

13   review a document that he made changes in, and he

14   is a lawyer.  I am asking him if there is

15   anything in there which he would believe to be an

16   express waiver of alimony.

17             MR. SHAFFER:  And I am going to object

18   to that question.

19             MR. GIBSON:  You can object, but he can

20   either say yes or no.

21             MR. SHAFFER:  I am going to instruct

62

1    him not to answer.  He is not here to testify

2    about what his beliefs are.  He is here to answer

3    your questions.

4              MR. GIBSON:  That is my question,

5    whether there is anything in Capute 2 that you

6    view to be a waiver of alimony.  It is an easy

7    question.

8              MR. SHAFFER:  But he is not qualified

9    to answer the question.

10             MR. GIBSON:  How can he not be

11   qualified?  He drafted five or six prenuptial

12   agreements in which some of them there was a

13   waiver of alimony issue being negotiated between

14   the lawyers.

15             MR. SHAFFER:  That wasn't his role.

16   His role --

17             MR. GIBSON:  I am not asking him what

18   his role was.

19             MR. SHAFFER:  He is not a domestic

20   practitioner.

21             MR. GIBSON:  That's fine.  I am asking

63

1    him to view this document right now, Exhibit 2,

2    Capute 2 in the context of what he has learned or

3    what he knows about prenuptial agreements, and I

4    am asking him if there is anything in Capute 2

5    that he would view to be a waiver of alimony.  I

6    am not asking him if he knew it was a waiver of

7    alimony in 1991.  I am asking him if there's

8    anything in here today that he would review and

9    believe to be a waiver of alimony.

10          MR. SHAFFER:  And I am objecting to

11    that question because I think it is an ultimate

12    issue that the Court has to decide.  It is a

13    legal question, and it's not a question that this

14    witness is competent to answer.

15          MR. GIBSON:  Mr. Shaffer, this is a

16    trained lawyer that is your client who has

17    testified that he has been involved in the

18    preparation of five to six prenuptial

19    agreements.  He is eminently qualified to state

20    whether or not there is anything in Exhibit 2

21    that he views to be a waiver of alimony

64

1    provision.

2              If we have to get a judge on the phone

3    to answer that question, then I will do that.

4              MR. SHAFFER:  He is not a domestic

5    practitioner.  He is an estate planner, and you

6    didn't ask him about what his role was in these

7    other subsequent antenuptial agreements, and I

8    will tell you that an antenuptial agreement can,

9    and often does, have nothing whatsoever to do

10   with the waiver of alimony.  He is merely an

11   estate planner.

12             MR. GIBSON:  He has testified that he

13   was involved in participating in the drafting of

14   prenuptial agreements wherein there was an issue

15   of waiver of alimony.  He testified to that.

16             MR. SHAFFER:  That doesn't mean --

17             MR. GIBSON:  He also testified that he

18   understands it has to be an express waiver under

19   Maryland law.  How can you sit there and tell me

20   that he is not versed in what it takes to draft a

21   prenuptial agreement regarding the issue of

1  alimony?  He has testified that he has done it,

2  he understands it has to be express, and you are

3  sitting here telling me that he can't answer this

4  question?

5          MR. SHAFFER:  No.  What I'm saying is

6  that is not an issue appropriately put to this

7  witness.  If you want to, ask him whether he has

8  an opinion.  About whether this agreement

9  accomplishes that purpose, I'm going to object to

10  the question, but you can ask him if he has an

11  opinion.

12          MR. GIBSON:  That is what I am asking

13  him.

14          MR. SHAFFER:  I thought it was

15  different.  I thought you were trying to get him

16  to interpret the agreement.

17          MR. GIBSON:  No.  I am asking him if he

18  has an opinion as to whether or not there is

19  anything in what we have marked as Capute 2

20  wherein alimony is waived by the prospective

21  wife.

66

1          MR. SHAFFER:  Just for the record, I

2     don't know whether he does or doesn't, but I am

3     objecting for the record because I don't think

4     that that is an appropriate question for this

5     witness to answer.

6          But having said that, you can go ahead,

7     Mr. Capute, if you have an opinion.

8     A.    I am not aware of any express waiver in

9     this agreement.

10    Q.    Are you familiar with the concept of

11    unauthorized practice of law?

12    A.    Yes.

13    Q.    And what is your understanding of what

14    the unauthorized practice of law is?

15    A.    Appearing in a judicial forum in a

16    court where you are not licensed to practice in

17    the state.

18    Q.    Do you view traveling to a state in

19    which you are not licensed to practice law to

20    prepare estate planning documents for residents

21    of that state to be the unauthorized practice of

*EXHIBIT "C"*

1

1           IN THE UNITED STATES DISTRICT COURT

2                DISTRICT OF DELAWARE

3        -   -   -

4    TIMOTHY E. AYERS,              :
                                    :
5         Plaintiff,          : C.A. No. WDQ 02-CV-0061
                                    :
6              Vs.            : FOR THE DISTRICT OF MARYLAND
                                    :
7    CHARLES T. CAPUTE,             :
                                    :
8         Defendant.               :

9

10       -   -   -

11              Deposition of LISA R. AYERS, taken
     pursuant to subpoena before Gail Inghram Verbano,
12   Registered Professional Reporter and Certified Shorthand
     Reporter No. 8635, in the law offices of Cooch and
13   Taylor, 824 Market Street Mall, Suite 1000, Wilmington,
     Delaware, on Wednesday, April  2, 2003, beginning at
14   approximately 10:20 a.m., there being present:

15
     APPEARANCES:
16
                    KEVIN WILLIAM GIBSON, ESQUIRE
17                  GIBSON & PERKINS
                     200 East State Street, Suite 105
18                  Media, Pennsylvania 19063
                    Attorney for Mr. Ayers
19

20                  CORBETT & ASSOCIATES
                   Registered Professional Reporters
21         1400 French Street     Wilmington, DE 19801
                       (302) 571-0510
22                 www.corbettreporting.com

23

24


                    CORBETT & ASSOCIATES

LISA R. AYERS

145

```
 1        Q.    What was the reason that Mr. Yori said he
 2   couldn't represent you?
 3        A.    Conflict of interest.
 4        Q.    Did he explain what the basis of that conflict
 5   was?
 6        A.    I don't recall.
 7        Q.    Did he say the basis of the conflict was that
 8   the office had previously represented Tim?
 9        A.    I don't remember.
10        Q.    Did he -- you handed him Exhibit 2?
11        A.    Yes.
12        Q.    Did he happen to notice that it was a document
13   prepared by his office?
14        A.    I don't remember.
15        Q.    Did it come up in conversation in any way?
16        A.    I believe it did.
17        Q.    Did he say, "Lisa, I can't represent you
18   because we prepared this document"?
19        A.    I don't remember.  I can't remember his exact
20   words, but I believe that's why, yes.
21        Q.    Ms. Ayers, Tim has confided in me a certain
22   thing about his personal life, and that is that he says
23   he has difficulty reading a written word and that's an
24   embarrassment to him.  Is he being honest with me?
```

LISA R. AYERS

146

1       A.   Yes.

2       Q.   Is it something about his life that he tries

3   to keep away from other people, to hide it?

4       A.   Yes.

5       Q.   But you've known he's always had a problem

6   reading written documents?

7       A.   No.

8       Q.   When did you first learn?

9       A.   It was well into our marriage.

10      Q.   It was something he hid from you as well?

11      A.   Yes.

12      Q.   And how did it come up that he finally

13   disclosed to you that he had difficulty reading written

14   words?

15      A.   I don't recall exactly how it came up.

16      Q.   And did he also tell you that he had a

17   difficult time with spelling things?

18      A.   No.

19      Q.   But I just want to be clear.  His difficulty

20   in reading written words is something he did try to not

21   let other people know about?

22      A.   As far as I know, since I didn't know about

23   it.

24      Q.   In your divorce proceedings, Tim took the

CORBETT & ASSOCIATES

*EXHIBIT "D"*

1    IN THE UNITED STATES DISTRICT COURT OF MARYLAND

2

3    TIMOTHY E. AYERS,              :

4              Plaintiff           :

5                                  :

6       vs.                        : CASE NUMBER:

7                                  :  L02-CV-0061

8    CHARLES T. CAPUTE,            :

9    ESQUIRE,                      :

10             Defendant           :

11

12              --------------------

13             Deposition of TIMOTHY E. AYERS, taken

14    on Thursday, February 6, 2003 at 11:30 a.m., at

15    the Law Offices of Murphy & Shaffer, Suite 1400,

16    36 South Charles Street, Baltimore, Maryland,

17    before Deborah C. D. Shumaker, Notary Public.

18              --------------------

19

20    Reported by:

21    Deborah C. D. Shumaker


                    EVANS REPORTING SERVICE
                2 North Charles Street, Suite 950
              Baltimore, Maryland 21201 (410) 727-7100

54

1        A.    The day the papers were signed, I

2    believe it was on a Friday of whenever that was.

3        Q.    "The papers", again, just so the record

4    is clear, what papers are you referring to?

5        A.    The divorce documents.

6        Q.    The divorce between you and Ms. Lord?

7        A.    Lord.   The agreement, divorce papers,

8    whatever you call it.  I don't know the right

9    name for them.  And then the very next Monday he

10   was sworn in as Superior Court judge, so I was

11   trying to get them done by him.  And the basic

12   thing that it was was just one of their standard

13   forms I think that they did, and I just went

14   somewhere to start, and I said that if I had made

15   any ideas or notions to turn around and get

16   married again ever, that I wanted this locked in

17   as tight as I could.

18        And then that's when I sent them to

19   Charlie Capute because Henley was no longer

20   around, and I wanted them tightened up.  I wanted

21   them redone.  When I say redone, I'm sorry.  I

1   don't mean redone.  I mean it had been a period

2   of time, so I wanted to make sure everything was

3   as good as it could be.  I told him to go over

4   it, and if there is anything at all that needs to

5   be changed, done, to better it, tighten it up, I

6   told him the issues that I wanted to protect.

7        Q.    I'm going to get to that in a moment.

8   I'm not quite there yet.

9        A.    I'm sorry.  I do this.

10        Q.    That's okay.  I understand.  I

11   understand.

12             When do you recall first discussing

13   with Mr. Graves, if he was the first person with

14   whom you discussed this topic, the idea of having

15   an antenuptial agreement in the event you were to

16   become married to someone in the future?  If you

17   can relate it to an event, for example, his

18   swearing in, or you can relate it to a birthday

19   or some other thing of significance in your life,

20   feel free.  I'm not asking you to remember the

21   precise date or the year or the month.

EVANS REPORTING SERVICE
2 North Charles Street, Suite 950
Baltimore, Maryland 21201 (410) 727-7100

100

```
 1        Q.   Do you remember having any other

 2   discussions with her about the antenuptial

 3   agreement?

 4        A.   No.

 5        Q.   When you received in the mail the

 6   antenuptial agreement prepared by Mr. Capute, did

 7   you read it over?

 8        A.   To the best of my knowledge.  I am

 9   not -- it might appear that I am because of my

10   position.  I have a great deal of trouble

11   reading.  I have a great deal of problems

12   understanding written material and especially

13   legal material.  I just simply do not understand

14   it, and I never told anybody this, but that's the

15   way it is.

16        Q.   Is that something you have kept to

17   yourself all these years?

18        A.   Yes.  Definitely.

19        Q.   Is that something you haven't shared

20   with your lawyers either?

21        A.   I think Charlie Capute knew that I did
```

101

```
 1    not understand legal documents well at all.
 2         Q.   How did he know that?  Did you tell him
 3    that?
 4         A.   Well, because of all the different --
 5    yes, I have told him this before, that I don't
 6    understand this, I don't understand that.  I had
 7    not gone out to him and said, well, I have
 8    dyslexia, I have this, I have that, but I made it
 9    very clear that I did not understand a lot of the
10    legal and contract type of things.
11         Q.   Mr. Ayers, don't take this the wrong
12    way, but when you say you have difficulty
13    reading, are you suggesting that you have some
14    disability that makes it harder for you --
15         A.   Absolutely.
16         Q.   -- than other people to read words?
17         A.   Most definitely.
18         Q.   Have you been diagnosed as having any
19    such learning disability --
20         A.   Yes.
21         Q.   -- or reading disability?
```

102

 1          MR. GIBSON:  You were both really

 2    talking over each other.

 3          Q.    This happens all the time.  Don't worry

 4    about it.

 5               Have you ever been diagnosed as having

 6    a learning or a reading disability?

 7          A.    Yes.  In Fork Union Military Academy.

 8    I attended a special class.

 9          Q.    Who diagnosed you, and what was the

10    diagnosis?

11          A.    I do not know what that was.  They did

12    it theirselves because of my lack of ability to

13    be able to read.  I can understand and remember

14    fairly well when if you read it to me, but as far

15    as reading it and understanding it, bad problem.

16    As I stated, I just barely got out of school.

17          Q.    And when you say you have difficulty

18    reading, are you saying that you have difficulty

19    reading legal documents or you have difficulty

20    reading, for example, the newspaper or any

21    printed material?

103

1     A.    I have difficulty reading anything.

2     Q.    Have you done anything or have you

3 received any treatment to correct that?

4     A.    No, I have not.  Excuse me just a

5 minute.

6     Q.    Go ahead.

7     A.    I also went to, it was called the Sharp

8 School of Speech for years when I was small for

9 the same exact thing.

10     Q.    And what was that for?

11     A.    The same type of thing, reading.  I

12 also had tutors at home for reading.

13     Q.    Is this when you were in school?

14     A.    Yes.

15     Q.    Primary school?

16     A.    Yes.

17     Q.    Have you had any tutorials since you

18 got out of high school?  Have you had anybody

19 helping you with your reading since then?

20     A.    No.

21     Q.    I assume that over the course of your

*EXHIBIT "E"*

# Timothy E. Ayers

*P.O. Box 1210*
*Seaford, DE 19973*
*(302) 629-9515*

After being duly sworn Timothy Ayers does state:

1. I am the Plaintiff in Ayers v Capute.

2. I understand that in his Motion For Summary Judgment Mr. Capute has alleged that I read and understood the Prenuptial Agreement Mr. Capute prepared for me in September of 1991.

3. I further understand that Mr. Capute has alleged that I was aware from reading the document that there was no waiver of alimony provision.

4. As I have stated earlier, I have difficulty reading and comprehending legal documents but this does not mean that I do not read them.

5. I read the document Mr. Capute prepared.

6. I am not a lawyer but I assumed from Mr. Capute's language in paragraph 3 of the document that when Capute provided that my future wife Lisa "releases..every right, claim...including but not limited to spousal allowances", that the term "spousal allowances" meant the same thing as alimony.


Timothy E. Ayers


Notarized: Karen Farnell, Notary
           State of Delaware
           Date: 6/30/03

*EXHIBIT "F"*

```
0001
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MARYLAND
 3                  Northern Division
 4
     TIMOTHY E. AYERS,              *
 5
                                 *
 6
                  Plaintiff,   *
 7
          v.                    *    Civil Action No.
 8
     CHARLES T. CAPUTE,           *    L 02-CV-0061
 9
                                 *
10
                  Defendant.   *
11
              *    *    *    *    *    *    *
12
                    Georgetown, Delaware
13
                    Wednesday, April 30, 2003
14
     Deposition of:
15
                  THERESA M. HAYES
16
            a witness, called for examination by
17   Counsel for Defendant, pursuant to notice, taken
     at the Law Offices of Edward C. Gill, 16 North
18   Bedford Street, Georgetown, Delaware, commencing
     at 12:45 p.m., before Kathy A. Zeve, a Notary
19   Public and Registered Professional Reporter in
     and for the State of Delaware, when were present
20   on behalf of the respective parties:
21
0002
 1   ON BEHALF OF THE PLAINTIFF:
 2            KEVIN W. GIBSON, ESQUIRE
 3            GIBSON AND PERKINS
 4            Suite 105
 5            200 East State Street
 6            Media, Pennsylvania  19063
 7            (610) 565-1708
 8
 9   ON BEHALF OF THE DEFENDANT:
10            ROBERT T. SHAFFER, III, ESQUIRE
11            MURPHY AND SHAFFER
12            Suite 1400
13            36 South Charles Street
14            Baltimore, Maryland  21201
15            (410) 783-7000
16
17
18
```

18    specifically -- I can't -- I mean, I know issues that
19    I looked into and I looked into on a regular basis
20    would include the growth of his business.  His two
21    businesses, Teatime Antiques and The Guide, grew
0067
 1    significantly in value over the course of the
 2    marriage, a lot.  There was an increase in his
 3    interest through the purchase share agreements.
 4            (Off the record.)
 5            THE WITNESS:  There were several other
 6        legal issues that I looked into.  Do I remember
 7        sitting down and typing it in, not exactly, but
 8        I remember addressing and looking at and
 9        thinking about several other issues.
10    BY MR. SHAFFER:
11        Q    What did your research tell you about the
12    last issue of increase in value of business as it
13    relates to Mr. Ayers's case?
14        A    There's a lot of information on that.  See
15    how I can summarize it best.  Under Delaware law, and
16    I would know this before I started, but under
17    Delaware law, if you have -- the increase of value of
18    a premarital asset is technically supposed to be
19    separate property and not necessarily considered
20    marital property.  I was fairly confident in that
21    position throughout my time representing Mr. Ayers
0068
 1    that if that were to go to court, that we would be
 2    okay in the increase of value of The Guide business
 3    itself, let's say for an example, and his share,
 4    because that was mentioned in the prenuptial
 5    agreement.
 6        Q    What was mentioned in the prenuptial
 7    business -- what was mentioned in the prenuptial
 8    agreement?
 9        A    That Mr. Ayers -- and I looked at it
10    exactly.  But in general terms, my recollection is
11    that anything that Mr. Ayers had from his premarital
12    property and any gifts from his family or any
13    increase in his interest in the property due to the
14    purchase share agreements or due to a gift or due to
15    inheritance -- if his brother, for example, were to
16    pass away, which he did, then that would be
17    protected, separate property.
18            It's a much more difficult issue in
19    Mr. Ayers's case if you look at something like
20    Teatime Antiques, for example, because Teatime
21    Antiques is a sole proprietorship.  Although it was
0069
 1    technically owned prior to the marriage, it sells
 2    antiques, and antiques that are accumulated during
 3    the course of the marriage, even if it's for the
 4    business, have a whole separate layer of interest
 5    that, in my opinion, wasn't properly protected under
 6    the prenuptial agreement because Mr. Ayers didn't
 7    necessarily only use the proceeds from Teatime
 8    Antiques to purchase those antiques.

```
 9       Q     What did he use?
10       A     He could use his regular income.  Sometimes
11  he could use the Teatime Antiques proceeds.  It's a
12  much more complicated question when antiques
13  themselves that Lisa, my understanding was, at least
14  the inventory, had done quite a bit of spying prior
15  to the actual divorce.  She had note cards writing
16  the statutes and what areas they were to attack.
17            She had been working in the business, so
18  her -- anything that could have been traced to income
19  that he received, either by his paycheck, and he
20  wasn't particularly careful with taking his paycheck
21  and putting it in a separate account and then using
0070
 1  only that -- you know, you can't commingle.  And if
 2  any of the income was attached to Teatime Antiques,
 3  then that would have been exposed as well.
 4            So issues regarding the income of his
 5  premarital assets and issues regarding the increase
 6  in value and whether the increase in value was solely
 7  attributed to the business itself, or whether it was
 8  attributed to Mr. Ayers's marital efforts, meaning
 9  his income and his -- the efforts in the marriage,
10  like he was -- he would refinish an item, for
11  example.  And if that's work during the marriage,
12  then that's marital property, if he's physically
13  doing the work.  Very complicated.  Am I confusing
14  you or am I helping you?  You look lost.
15       Q     It's sounds like a very esoteric issue; is
16  it not?  It's not an issue that's clearly defined or
17  settled by any decisional case law that you're
18  familiar with, is it, that issue as it relates to
19  Mr. Ayers's case?
20       A     It's a complicated legal issue, but I think
21  it's fairly well settled what does comes in or does
0071
 1  not, yes.
 2       Q     What did you determine as it relates to the
 3  increase in the value of his business as to whether
 4  or not it was marital or nonmarital property?
 5       A     The increase of value to his business would
 6  be generally nonmarital property as long as we could
 7  make sure there was no commingling of the marital
 8  aspects of the income.
 9       Q     Did you ever do that or attempt to do that?
10       A     I didn't hire an accountant to actually do
11  that.  I spoke to Mr. Ayers about the aspect of those
12  things and what parts were vulnerable and what issues
13  that they could attack and what would need to be done
14  in order to properly take that issue to trial.
15       Q     Okay.  Have we exhausted the issues that
16  you are aware of having dealt with, as you were
17  representing Mr. Ayers in connection with his case,
18  increase in value of the business, disclosure, waiver
19  of alimony?
20       A     Income.
21       Q     And income?
```

4    right?
5        A    They have the power to do that.  What I'm
6    saying is, I haven't seen them actually do that.
7        Q    That's fair enough.  Other than that issue,
8    have there been any other topics that you've
9    researched in connection with your representation of
10   Mr. Ayers or in connection with this case?
11       A    I can't think of any.  I'm not saying that
12   that's exhaustive, though.
13       Q    Have you had any discussions with anyone
14   else that has influenced your opinions in any way in
15   connection with this matter?  I mean, have you gone
16   to outside sources to talk with other experts in the
17   field to gather their views on particular subjects
18   for which you felt, for one reason or another, you
19   had weaknesses and that in turn somehow influenced
20   your outlook on the issues in this case?
21       A    I often rely on fellow members of the bar,
0078
1    people that practice on a regular basis to discuss
2    matters because family law being an equity court has
3    a lot of subtle nuisances on what particular judges
4    do and how do we look here.  And so I'm -- I don't
5    have specific recollections of discussions to form my
6    opinions in this case, but about the issues of
7    prenup.
8            And, yes, I've talked about the issues of
9    prenup on several occasions.  Other cases that I have
10   had with prenups, other attorneys, the necessity of
11   the disclosure to be specific, the necessity of the
12   other parties seeking counsel.  I've had multiple
13   that I couldn't even possibly go through each and
14   every one with you today, but I've had multiple
15   discussions on issues with other counsel.
16       Q    Can you tell me what your opinions are in
17   this case?
18       A    Yes.  In reviewing the prenuptial agreement
19   and understanding the facts as they were reported to
20   me from Mr. Ayers, I believe I have an opinion that
21   there's several breaches of the standard of care in
0079
1    regard to the preparation of this prenuptial
2    agreement.
3            One breach of the standard of care would be
4    an estate attorney handling or purporting in any way,
5    shape or form to draft a prenuptial agreement in the
6    first place.  In -- prenuptial agreements are
7    probably, in a domestic relations world, they're one
8    of the most difficult.  They're more difficult even
9    than separation agreements.  They are -- you need a
10   specialized, you need experience, you need to
11   practice domestic relations law on a regular basis
12   before you endeavor to undertake the drafting of a
13   prenuptial agreement.
14           So, the first summary, the first breach of
15   the standard of care is, unless you're going to do
16   what it takes to become competent in the area of

```
17    Delaware law and Delaware domestic relations law,
18    then you shouldn't undertake -- under our rules of
19    professional conduct, shouldn't undertake to draft a
20    prenuptial agreement.
21              Another breach of the standard of care in
0080
 1    my opinion is the waiver of alimony.  If the
 2    paragraph that purports to give a thousand dollars
 3    for every year was intended to waive alimony, then
 4    that's a breach of the normal standard of care of a
 5    practitioner.  Someone who practices family law in
 6    the State of Delaware should know that the waiver
 7    must be specific if it's going to waive a statutory
 8    right.
 9              If that paragraph was not intended to be a
10    specific waiver of alimony, then there's a breach of
11    the standard of care in understanding and explaining
12    to a client prior to preparing and presenting an
13    antenuptial agreement to make sure they understand it
14    and what impact it had.
15              I believe there's a duty for a Family Court
16    practitioner to go through each and every paragraph
17    of any agreement that they prepare for a client and
18    be sure that they understand what the implications of
19    that agreement are.  Do you want me to continue?
20    Q    Yes.  Please.
21    A    I believe that the document -- there's a
0081
 1    breach of the standard of care in preparing the
 2    document if it was to protect the income and the
 3    increase in value of his premarital assets.  There's
 4    some protection just in the law in general.
 5              If I were going to draft a prenuptial
 6    agreement, I would have taken more care in that
 7    regard to be more specific and to be clear that
 8    Mr. Ayers was free to invest his income in any way,
 9    shape or form and keep that as separate property.
10    There was -- the paragraph that dealt with that was
11    rather vague.  I would have to pull it and look at it
12    specifically.
13    Q    Why don't you do that so we can come back
14    to it.  It should be under tab one of your documents.
15              MR. GIBSON:  He didn't say this, Theresa.
16         If you feel you need a break --
17              THE WITNESS:  I'm fine.  Thank you.
18              (Off the record.)
19              THE WITNESS:  Paragraph three states, the
20         prospective wife releases to the prospective
21         husband, his heirs, legal representatives and
0082
 1         assigns every right, claim and estate, actual,
 2         inchoate or contingent, that she might have in
 3         respect to such property by reason of her
 4         marriage to Timothy Ayers.
 5              And then it says, included but not limited
 6         to spousal allowances, which spousal allowances
 7         aren't defined -- I mean, I hate to repeat
```

```
 8        things that you know -- aren't defined in the
 9        law to meet spousal support.  A spousal
10        allowance is specifically related to estates and
11        the elective share, at least under our
12        definition, and Blacks, I would assume.
13            In testate succession rate, and he cites 12
14        Delaware Code, Chapter 5 and 12 Delaware Code,
15        Chapter 9.  This paragraph could also not be
16        limited specifically to estate work.  If a
17        prenuptial's intended to protect income received
18        during the course of the marriage, then it could
19        include instead of said property, it could have
20        said, property and income received during the
21        course of the marriage, and been specific so
0083
 1        that there wasn't an issue in regard to
 2        interpretation.
 3            There certainly here isn't an argument that
 4        his income received during the course of the
 5        marriage is protected.  I would have included
 6        income.
 7    BY MR. SHAFFER:
 8        Q    So your opinion is that you could have been
 9    more clear in drafting this particular paragraph, and
10    it could have made it a better agreement in terms of
11    the income protection that you alluded to earlier if
12    the word income had been inserted in there?  Is that
13    essentially what you're saying?
14        A    No, not exactly.  My opinion is, this
15    doesn't protect income, and it gives no protection to
16    his income during the course of the marriage or the
17    items that he purchases with his income during the
18    course of the marriage.
19            And that Mr. Ayers, from his explanation to
20    me of his understanding of what this agreement
21    accomplished and what his explanation to me as of
0084
 1    what he intended by entering into a prenuptial
 2    agreement, was that he intended and hoped that this
 3    prenuptial agreement would protect his income
 4    received during the course of the marriage and give
 5    him the ability to take what he received on a weekly,
 6    monthly, annual basis and invest that the way he
 7    deemed proper, and it would be considered separate
 8    property.  And this agreement doesn't do that.  Or it
 9    would be a really hard argument to make in court that
10    this agreement would do that.
11            Paragraph six could also arguably have some
12    impact there with regard to income received.
13        Q    How so?
14        A    Nothing in this agreement is intended to
15    prevent nor shall it operate to prevent the parties
16    hereto from requiring or receiving property jointly
17    as husband or wife.  To that extent, the disposition
18    of said property shall be governed by the laws of the
19    State of Delaware.
20            That's where he's actually agreeing -- and
```

21   he didn't understand that according to his
0085
1    explanation to me either -- that anything titled
2    jointly in both of their names would be deemed
3    marital property and subject to the equitable rules
4    of our state and Title 13 and not by this agreement.
5           Moreover, nothing in this agreement is
6    intended to prevent nor shall operate to prevent the
7    parties hereto from conveying property to one
8    another, either singularly or so as to create joint
9    property not subject to the effect of this agreement.
10   Difficult to understand.  Should have been -- I don't
11   think that it was intended to protect income.
12          If we had taken this to court, I would have
13   argued that it was trying to here, but I don't think
14   that that would have worked.  And I think that if
15   that paragraph is intended to do that, then it
16   breaches the standard of care because it doesn't
17   accomplish that.
18       Q     Does this agreement limit the types of
19   claims that Mrs. Wheatley is giving up vis-a-vis her
20   prospective husband?  Does it limit the claim in any
21   way?
0086
1        A     Agreements always affect a person's claim
2    to the other.
3        Q     You don't understand my question.
4    Paragraph three says she's giving up her claims.
5    Isn't that what it says?
6        A     No.
7        Q     What does it say?
8        A     It says that she can give up her claims in
9    respect to said property.  That was -- that's my
10   issue there.  It doesn't -- and it doesn't limit just
11   specifically to the estate.  But it says here in
12   respect to said property.  It doesn't define what
13   said property is, and it doesn't include income.  And
14   alimony is never a property.  You'll get in trouble
15   with recapture laws if you do that.  Alimony is never
16   property.  It's always income.  And I understand --
17       Q     Alimony is never property.  It's always
18   income.
19       A     It's -- alimony is --
20       Q     I'm not sure I understand that statement.
21             MR. GIBSON:  You guys are walking over each
0087
1    other.
2    BY MR. SHAFFER:
3        Q     I didn't mean to.  Go ahead.  I'm sorry.
4    Finish your answer.  Go ahead.
5        A     Spousal support or alimony isn't -- is an
6    income issue, is a money flow issue.  It is a -- it's
7    based on income and the person's property, but it is
8    not -- he's specifically limiting the waiver of her
9    rights to said property defined above, I assume.  He
10   doesn't define what said property is.  Defined above
11   is their premarital property it appears, and he's not

12    waiving any and all right that she can get out of the
13    course of the marriage according to Delaware law.
14         Q    You read paragraph three to be limited to
15    premarital property only?
16         A    No.
17         Q    That's what you just said.
18         A    No, I didn't.  I didn't mean to say that if
19    that's how you interpreted or if I wasn't clear.
20    This isn't drafted in such a way that it would --
21    when you're drafting a prenup, it should say, all
0088
 1    property received during the course or before the
 2    marriage, any increase in the value of the property
 3    during the course of the marriage, and any income
 4    received by either party during the course of the
 5    marriage.  It just shouldn't say, said property.  It
 6    doesn't include income issues, and it doesn't define
 7    income areas.
 8         Q    Doesn't it say in paragraph five that
 9    whatever either party -- whatever property either
10    party may acquire or become entitled to after the
11    marriage will be that party's respective property?
12    Doesn't it say that in paragraph five?
13         A    Paragraph five says that any property that
14    either party may --
15         Q    I don't want to you read it.  I want you to
16    tell me, doesn't that mean that what's his is his and
17    what's hers is hers even with respect to property
18    acquired after the marriage?  Isn't that what that
19    means?  I don't need you to read it for me because I
20    can read it myself.  I'm asking you to tell me if, in
21    your opinion, what that means and fairly means is
0089
 1    that what's his is his and what's hers is hers after
 2    the marriage is consummated?
 3         A    I would have argued that in court, yes.
 4         Q    Well, do you have a different opinion today
 5    as a legal expert from what you would have argued in
 6    court?
 7         A    There's --
 8         Q    Would you have gotten up in court and
 9    argued something you didn't believe in?
10         A    That -- you can argue in court
11    legitimate -- legitimate interpretations of a
12    document.  Whether or not you go to court and you
13    risk the consequences if your argument is not
14    successful, those are two different things.
15              My opinion today isn't based on whether or
16    not -- I mean, it isn't the same analysis as going to
17    court.  I don't know how to describe the -- what
18    you're -- the difference in what you're asking me.
19         Q    I'm asking you today, do you have an
20    opinion as an expert with respect to what paragraph
21    five means that's different than what you would have
0090
 1    stood up in front of a judge and told him it meant?
 2         A    No.

```
 3         Q    Okay.  Now, you were in the midst, I think,
 4    of giving me sort of a list of things that you
 5    thought were your opinions, and you talked a little
 6    bit about breaches of the standard of care and things
 7    of that sort.  And we've gotten a little bit
 8    sidetracked, and I didn't want to stop you.  I want
 9    to permit you to continue to tell me the other
10    opinions that you intend to express in this case, if
11    you would.  Unless you were finished.
12         A    I believe in general that I'm finished.
13    That I've touched on all of the aspects.
14         Q    Would you agree with me or disagree as an
15    expert that the word property is a broad term?
16         A    Yes.
17         Q    Would you agree with me that the use of the
18    word property in the connection with this agreement
19    is not a term that is limited in any way?
20         A    No.
21         Q    There are no adjectives that precede or
0091
 1    come after the word property as it is used repeatedly
 2    throughout this agreement; can we agree with that?
 3         A    Could you repeat that question?
 4         Q    There are no adjectives that limit the
 5    scope of what property is in the context of this
 6    prenuptial agreement?
 7         A    There are, and I'm not sure that I
 8    understand, but -- your question exactly, but there
 9    are certain limits in this agreement in regard to the
10    property, definitions of property and what it is.
11    Like the second whereas clause defines that Mr. Ayers
12    is an owner of and it lists certain things.  And it
13    says, other personal property.  And in the next
14    whereas clause, it would say, it is mutually desired
15    and agreed by said prospective husband that the
16    present property in the estate of each of the parties
17    shall remain separate.
18              Then when you go over to the next -- see,
19    if you say said -- if you define property in one
20    paragraph and then in the next paragraph you say,
21    said property is going to continue with husband, then
0092
 1    you're defining what that property is because you're
 2    saying, said property, meaning property discussed
 3    above.  You're defining.
 4         Q    It's a reference to types of property, is
 5    it not?
 6         A    Correct, and that's defined.
 7         Q    In this agreement, it doesn't limit or
 8    delimit the types of property that this agreement
 9    governs, does it?  In other words, it doesn't say it
10    relates to pencils, but not pens, does it?
11         A    Well, it's --
12         Q    I mean, if someone owns something, that is
13    property, is it not?  That's what property means.
14              MR. GIBSON:  Mr. Shaffer, the witness is
15         getting ready to answer.  Can we like try --
```

```
16              MR. SHAFFER:  I'm sorry.  She was
17      hesitating.  I thought I was asking a different
18      question.
19              MR. GIBSON:  We're getting to the point
20      where there's -- it sounds like I'm sitting as a
21      judge and two lawyers are arguing a case
0093
 1      together, and I don't want the record to get
 2      that way.
 3              MR. SHAFFER:  No.  I'm not arguing.  I
 4      haven't raised my voice one time.
 5              MR. GIBSON:  Not arguing that way.  I'm
 6      talking about arguing if you were in court.
 7      BY MR. SHAFFER:
 8         Q    Let me ask the question again.  Disregard
 9      my earlier question.  Is there anything in that
10      agreement that limits the types of property that the
11      agreement touches on?
12         A    Yes.
13         Q    Tell me what types are included in the
14      agreement and what types are excluded, in your
15      opinion.
16         A    For example, and it's not a general
17      statement.  I have to look at the property every time
18      it's mentioned in this agreement.  I can't make a
19      general statement about every one.  But, for example,
20      in the fifth whereas clause, when property is listed
21      in that first sentence, it's limiting the property to
0094
 1      properties received from members of the respective
 2      families whether by gift, inheritance or any stock
 3      purchase agreement and limiting the type of property
 4      that is included.
 5              It's not saying -- in that particular
 6      reference to property is talking about this property
 7      of received, not whether it's a pencil, but property
 8      that's in this context.  It's not talking about
 9      property that you've had previously.  Other times
10      property is mentioned in this agreement, it's talking
11      about your premarital property.  Sometimes when it
12      says, said property, it's talking about the property
13      described in the paragraph above it.  So every time
14      the word property is in there, it doesn't mean all
15      types of property, whatever type, in my opinion.
16         Q    Sure.  Do you hold yourself out as an
17      expert in contract interpretation?
18         A    As I said, under Delaware law, holding
19      yourself out as an expert is a difficult question.
20      Do I feel that I'm qualified?  I've had courses.  Do
21      I interpret contracts on a regular basis?  Do I have
0095
 1      experience?  Do I have the knowledge to review the
 2      law and to interpret contracts?  Yes, I have that
 3      ability to render opinion as -- and I have -- I do
 4      have an opinion or the ability to render opinion as
 5      to the meanings of contracts.
 6         Q    What is the law in Delaware with respect to
```

```
 7   whether recitals are part of a contract between
 8   parties, that is, that they, the recitals themselves,
 9   can be relied upon for purposes of arriving at an
10   intent under an agreement or a meaning of an
11   agreement?
12        A    Before I would render an opinion on that
13   specific issue, I would have to look it up.
14        Q    So you don't know what the law in Delaware
15   is on that particular issue?
16        A    I wouldn't be comfortable reciting it until
17   I verified my impressions.
18        Q    In terms of this particular agreement, the
19   whereas paragraphs, do you consider them to be
20   recitals or part of the agreement to the parties?
21        A    Recitals.
0096
 1        Q    And do you -- I'm sorry.
 2        A    And it sets a basis for what the parties --
 3   what the situation is and what the intent wise -- it
 4   just sets a basis.  It sets the parameters of what
 5   the parties are about to do and why.
 6        Q    But does a recital in your judgment or in
 7   the context of this particular agreement, does it
 8   have any meaning, any interpretive meaning, when one
 9   tries to arrive at what the parties intended by a
10   particular agreement?
11        A    It can.
12             MR. SHAFFER:  Okay.  You earlier said
13        that --
14             (Off the record.)
15   BY MR. SHAFFER:
16        Q    Ms. Hayes, before we took a little break,
17   we were talking about your opinions, and I think the
18   last opinion we actually talked about was paragraph
19   five.  Do you have any opinions other than what
20   you've just told us over the last several minutes?
21   You said -- I think you said, I think I don't have
0097
 1   anything further.  I just want to make sure that's
 2   the case.
 3        A    I'm not sure if the record is clear about
 4   all my opinions.
 5        Q    I'm going to ask you some more about your
 6   opinions, but I want to make sure I had somewhat of
 7   an exhaustive list.  I'm not done on this.  I'm going
 8   to ask you specific questions.  So if you want to
 9   backfill, you can.
10        A    I have a few more opinions that I have at
11   this moment or that I've thought about in the break
12   that you may have asked about.
13        Q    Sure.  Go ahead.
14        A    In reading Mr. Capute's deposition, I have
15   an opinion as to a couple other breaches of standard
16   of care that I didn't necessarily have the factual
17   basis for completely.  I did have an opinion about
18   the disclosure statement before and that I believe
19   it's a breach of the standard of care to, if you
```

20    don't attach a full disclosure and have the parties
21    both initial it and be sure that your client is doing
0098
1     that with every prenuptial agreement.
2              I believe it's a breach of the standard of
3     care not to get an exhaustive inventory of all the
4     property involved from your client before doing a
5     prenuptial agreement.  And I believe it's a breach of
6     the standard of care not to make sure you have an
7     exhaustive list and understanding of what your client
8     intends to achieve through the prenuptial agreement,
9     and to fully address with the client what each and
10    every provision of the prenuptial agreement -- I
11    touched on this -- means or could be interpreted by,
12    and if it accomplishes the goals of your client in
13    putting that into the prenuptial agreement.
14             For example, I think you need to be sure --
15    that it's the standard of care in drafting a prenup
16    to be sure you understand what each of your client's
17    goals are and to specifically explain to the client
18    whether or not that can be achieved, what the chances
19    of that being achieved are, the risks in it, and to
20    do your best to achieve those goals through the
21    prenuptial agreement.
0099
1        Q    Was that Mr. Capute's job to make sure that
2     Mr. Ayers understood the disclosure?
3        A    I'm not sure --
4        Q    You have an opinion obviously that he
5     breached the standard of care.  What informs your
6     opinion as to whether that was Mr. Capute's job in
7     the first instance?
8        A    If you undertake to draft a prenuptial
9     agreement, it becomes the standard of care.  It
10    becomes your duty to be -- a competent attorney into
11    making sure that your client -- that you understand
12    the goals, the assets, what your client intends and
13    whether or not that can be accomplished.
14       Q    Does it make any difference in your opinion
15    that Mr. Capute was not consulted at the outset to
16    prepare an antenuptial agreement, but rather was
17    asked to review one that had been previously prepared
18    by Mr. Ayers's domestic counsel?
19             MR. GIBSON:  Objection.
20             THE WITNESS:  Do you want me to proceed and
21    answer?
0100
1     BY MR. SHAFFER:
2        Q    Please.  Unless you refuse.
3        A    No, not refusing.  Not really.  It does to
4     some extent.  For example, if I'm drafting a
5     prenuptial agreement and I have issues regarding
6     estate planning or taxes or tax implications, areas
7     that I'm not proficient in, areas that I don't
8     practice on a regular basis, it's not a breach of the
9     standard of care for a draft of a prenuptial
10    agreement to go to another attorney essentially like

11    a subcontractor -- that's not exactly what it is --
12    and to ask for an opinion as to specific provisions
13    regarding a prenuptial agreement.
14            It is a breach if that -- in my opinion of
15    what Mr. Capute did, I understand that he asserts in
16    his deposition that he was only there to consult
17    about the estate work, but there's not a clearly
18    defined understanding between him and his client or
19    working or subrelationship with domestic attorneys
20    and Mr. Capute.
21            It would have been fine for Mr. Capute to
0101
1    write to Mr. Fuqua, Yori and Graves and give an
2    opinion as to what parts of estate planning would be
3    helpful and what would be necessary in that area, but
4    not to redraft the whole agreement and to present it
5    as a complete document without talking specifically
6    to a domestic attorney and finding out what the
7    implications of those changes are on the whole
8    picture.
9        Q    So if Mr. Capute had simply sent a letter
10    to a domestic lawyer saying what his views were on
11    the agreement from an estate planning perspective,
12    that would not have deviated from the standard of
13    care; is that your opinion?
14        A    Essentially.  If that letter was clear.  I
15    have no understanding of general domestic relations
16    law in Delaware.  And if the letter said in regard to
17    estate work, that's a whole another issue of whether
18    he was qualified to talk about estate work in the
19    State of Delaware.  But if -- in general, an estate
20    planner can give an opinion as to a specific aspect
21    of a prenuptial agreement.  But to draft the whole
0102
1    thing and present it in a final -- or to redraft the
2    whole thing and present it in a final form instead
3    of, for example, having a draft and marking on it and
4    say, these are some of my suggested changes.  I don't
5    know how this affects domestic law, but estate work
6    wise, this would be good, so work with this to get a
7    domestic relations perspective on it, that wouldn't
8    necessarily have been a breach of the standard of
9    care.
10            But when you endeavor to change an
11    antenuptial agreement without inquiring as to if the
12    goals have changed from the client since 1989 when he
13    first approached a domestic relations lawyer about
14    it, whether the circumstances have changed, whether
15    the assets had changed, that's a breach of the
16    standard of care to present a complete agreement
17    without understanding the rest of the document -- the
18    rest of the provisions.
19        Q    Well, whose responsibility is it for --
20    strike that.  Does the client have any responsibility
21    to the lawyer in terms of defining what it is the
0103
1    lawyer -- the client wants the lawyer to do?

```
 2      A    To some degree, yes.
 3      Q    Does the client bear any responsibility to
 4  tell the lawyer whether his circumstances have
 5  changed from one point in time to another?
 6      A    Yes.  To some degree, yes.
 7      Q    Do you have an opinion as to whether or not
 8  Mr. Ayers fulfilled his obligations to Mr. Capute in
 9  that regard?
10      A    From what I've reviewed and what I've heard
11  from him, I believe that he did.  A client does not
12  have the legal acumens or knowledge to know what is
13  important to ask -- it's a lawyer's duty to make sure
14  they ask the right questions that they need to know,
15  and it's a client's duty to respond truthfully and to
16  communicate that to him.
17           But it is not a client's duty to initiate
18  certain -- like a client wouldn't know that a
19  complete disclosure of the prenuptial has to be made
20  and has to be attached.  Now, if an attorney says,
21  look, I need a complete disclosure.  It needs to be
0104
 1  attached here, and it needs to be clear, and it needs
 2  to be updated, and it needs to be initialed by the
 3  two of you, then the attorney has met their standard
 4  of care with regard to the disclosure, if they've
 5  asked for that and tried to achieve that.
 6           If the client never brings up what his
 7  assets are because the attorney never tells them,
 8  then the client -- they haven't done anything wrong
 9  because they don't understand the importance of
10  giving that disclosure.
11      Q    What is your understanding of what it is
12  that Mr. Ayers told Mr. Capute?
13      A    My -- and as you know, I haven't reviewed
14  that deposition.
15      Q    I know you haven't.
16      A    Okay.  My understanding is that he had
17  gotten a draft before when he had previously
18  contemplated a marriage, that the circumstances
19  changed from '89 to '91 between the parties, and they
20  didn't get married, and then things changed.
21           Then in '91, when Mr. Ayers's attorney was
0105
 1  on the bench, and since he had already had a previous
 2  agreement and having a family relationship to some
 3  extent with Mr. Capute, he was asking Mr. Capute to
 4  complete this and make it something that could be
 5  used for now and for the present, in general.  Here's
 6  something I had drafted a long time ago.  I'm getting
 7  ready -- I want to go through with the antenuptial
 8  now.  Can you make this right for me?  Can you
 9  protect me with this?  Can you make this right for
10  me?
11      Q    Is that something Mr. Ayers told you he
12  said to Mr. Capute?
13      A    Not the exact language.
14      Q    What did he say?  That was the question.
```

15   The question is, what is your understanding of what
16   Mr. Ayers said to Mr. Capute --
17        A    That's my understanding.
18        Q    -- if you have any?
19        A    My understanding is that Mr. Ayers relied
20   on Mr. Capute to make sure that there was a waiver of
21   alimony and that his property was protected.
0106
1         Q    Let me ask the question again.  What is
2    your understanding of what Mr. Ayers told Mr. Capute
3    when he asked him to represent him in connection with
4    the then existing Fuqua and Graves antenuptial
5    agreement?
6         A    I don't have an exact understanding of what
7    the precise words that came out of Mr. Ayers's mouth
8    were.  I have an understanding from Mr. Ayers that he
9    believed that this antenuptial agreement that's, I
10   guess, marked -- a copy of is marked Exhibit 4
11   protected him in regard to not having to pay alimony
12   and to be able to keep all of the property
13   accumulated during the course of the marriage that
14   was a result of his income achieved from his
15   premarital businesses or the increase in value of his
16   businesses, that that was all his separate property.
17   And that that prenuptial, number four, protected him
18   so there would be no issues regarding property
19   division or alimony if and when he and Lisa got a
20   divorce.
21             So when he came to me, he literally said to
0107
1    me, this is going to be one of the easiest cases
2    you've ever had because we've already got everything
3    worked out.  And I asked him what his understanding
4    was, and that's what was his understanding of what
5    this achieved.
6             Now, specifically, his exact words to
7    Mr. Capute I'm not aware of.  I can't recall if I
8    even asked his specific words, but I know what his
9    intent and goal was to accomplish out of this from
10   what he told me.
11        Q    Do you know whether he accomplished his
12   goal in the way he expressed himself to Mr. Capute?
13   If his intent was, if he went into a meeting with
14   Mr. Capute and he had a certain intent, how do you
15   know that he expressed his intent to Mr. Capute if
16   you don't know what he said?
17        A    I'm relying on Mr. Ayers's understanding.
18   If an agreement is done by an attorney, and they have
19   a duty and obligation to explain that agreement to
20   their client, and I'm relying on Mr. Ayers's
21   interpretation and to some degree Mr. Capute's, some
0108
1    of the things that Mr. Capute said to formulate that
2    opinion.
3         Q    Mr. Capute said in his deposition that he
4    never agreed and expressly told Mr. Ayers that he was
5    not agreeing to undertake writing the agreement to

```
 6    address any domestic law issues, that he was only
 7    doing it from an estate planning perspective, which
 8    he did have some expertise with.  Would you agree or
 9    disagree with that?
10         A    Do I disagree or agree that he said that in
11    his deposition?
12         Q    Do you dispute that he -- do you have any
13    knowledge as to whether he did or didn't say that?
14    Do you understand --
15         A    I feel like a judge.  But the reason that
16    that's difficult to believe is because provisions,
17    such as paragraph seven, that Mr. Capute said,
18    Mr. Ayers told me he wanted this in the agreement and
19    I put it in the agreement, has nothing to do with
20    estate planning.  And it's a nonestate planning issue
21    that's in this document.
```
0109
```
 1              So if there were -- if that were the case,
 2    and I were the one practicing formulating the
 3    agreement and it was something that I didn't have any
 4    knowledge of, I would say, I have -- I would say,
 5    Tim, what do you expect this paragraph to accomplish
 6    and why do you want it in there?
 7              I wouldn't just -- it's a breach of the
 8    standard of care to just put it in because a client
 9    says so without asking them what they hope to
10    accomplish by it and what their intent is.  If you
11    understand what their intent is, then you can word it
12    in a way that it works.  So that alone, in my
13    opinion, is a breach of the standard of care in
14    participating in this agreement.
15         Q    If Mr. Capute didn't put paragraph seven in
16    there, would you hold him responsible for breaching
17    the standard of care?
18         A    Even without that paragraph there, yes, for
19    the reasons that I explained before, is that --
20         Q    No.  I wasn't clear.  If Mr. Capute was not
21    the architect or the draftsman of provision seven, if
```
0110
```
 1    he didn't put that in the agreement, somebody else
 2    did, would you hold him responsible for that
 3    provision?
 4         A    If he presented a draft to his client that
 5    included paragraph seven, whether or not he drafted
 6    it, if he just copied it from somebody else, if he
 7    present -- if you present -- and that holds true for
 8    every paragraph, I think.  If you present a document
 9    to your client, then you're responsible for the whole
10    document unless you specifically and clearly itemize
11    why you're not, and you specify in writing to your
12    client and you're a hundred percent clear on the
13    matter because clients may believe -- clients don't
14    understand.
15              They come to me all the time, my domestic
16    relations ones, and think that I have some kind of
17    expertise in tax law.  They think you're a lawyer so
18    you must know every law in every state in every area.
```

```
19      And unless you make it a hundred percent clear to
20   your client that you take no responsibility for any
21   paragraph other than this one and this one, and it's
0111
 1   for estate planning, reason why I put those two
 2   paragraphs in, this is the reason, and I have no idea
 3   what the affect these two paragraphs will have on
 4   your domestic relations or when you get divorced.  I
 5   only know that if she predeceases you during the
 6   marriage, your estate can be controlled this way by
 7   the agreement.  I think it's that specific.  If you
 8   don't practice domestic law or even if you do, you
 9   need to be that specific.
10        Q    You have to do it in writing; is that your
11   judgment?
12        A    Something like that you would have to do in
13   writing.
14        Q    Is it a breach of the standard of care not
15   to do it in writing?
16        A    If you provide a client a document that has
17   been redrafted and looks to be in final form, then --
18   under the circumstances we're talking about, if
19   you -- to look at an agreement from an estate
20   perspective and to get a letter from a client -- I
21   mean, you get a letter from another attorney or from
0112
 1   a client that says, here's an antenuptial agreement
 2   that I drafted.  We would like to retain your
 3   services to understand the estate law implications of
 4   this.  To sit down and explain the estate law
 5   implications of this and what needs to be done from
 6   an estate law perspective doesn't have to be in
 7   writing and wouldn't be a breach of the standard of
 8   care to give that opinion.
 9             To separate yourself from it two or three
10   years later and to redraft an agreement without
11   confirming with a domestic relations lawyer the
12   implications of your opinions is a breach of the
13   standard of care in my opinion.
14        Q    What is that based on?  What is that based
15   on?
16        A    On practicing and understanding the very
17   technical nature of antenuptial agreements and how
18   easily clients misunderstand -- don't understand the
19   technical nature of all of this, and how easily that
20   can be misconstrued if you do it in that way.
21        Q    What does breach of standard of care mean
0113
 1   to you?
 2        A    It means to me the care that a competent
 3   attorney would take in providing adequate, competent
 4   representation to a client.
 5        Q    Would you agree that from lawyer to lawyer
 6   there are varying degrees of standards of care, and
 7   that lawyers employ some of which are less than what
 8   other lawyers might do but both of which nonetheless
 9   meet the standard of care?
```

```
10      A    Yes.
11      Q    Do you agree with me that some lawyers are
12 more careful lawyers than others, but even an
13 uncareful lawyer nonetheless can meet the standard of
14 care?
15      A    Yes.  An uncareful lawyer can sometimes
16 meet the standard of care.
17      Q    Do you have an understanding, as you sit
18 here today, as to what it is that Mr. Ayers discussed
19 with the Fuqua and Graves lawyers when he had them
20 prepare an antenuptial agreement in 1989?
21      A    Not a complete understanding.  I have
0114
 1 somewhat of an understanding of it, yes.
 2      Q    Did you ask him what he said, what he
 3 discussed with them?
 4      A    I'm sure that I have.  I can't remember a
 5 specific occasion where I did.
 6      Q    Did you specifically ask him what he
 7 discussed with Mr. Capute when he met with him two
 8 years later?
 9      A    I can't recall if I specifically asked him
10 that or not.
11      Q    Do you recall, as you sit here today, what
12 he specifically said to you in that regard?
13      A    Not if I don't recall specifically asking
14 him.
15      Q    Would it surprise you if I told you that
16 Mr. Ayers testified under oath that he doesn't
17 remember what he discussed with Mr. Capute?
18      A    No, not necessarily.
19      Q    Would it surprise you if I told you that
20 Mr. Ayers testified that he didn't have any meetings
21 with Judge Graves, and that Judge Graves got in a
0115
 1 deposition and swore under oat that he had a meeting
 2 with the man and that he drafted an agreement for
 3 him?  Would that surprise you?
 4      A    No.  It wouldn't surprise me, as I said
 5 earlier.
 6      Q    Do you think Mr. Ayers has a good memory of
 7 things that occurred ten, 12 years ago --
 8      A    No.
 9      Q    -- based on your dealings with him?
10      A    Does he have -- good is relative.  To me, a
11 good -- he has recollection of themes and things, but
12 does he have a precise recollection of everything
13 from ten years ago, I would doubt it.
14      Q    How can you, as a lawyer, stand in judgment
15 of Mr. Capute if you don't know what Mr. Capute and
16 Mr. Ayers actually discussed when they met regarding
17 the antenuptial agreement?
18      A    No one, no attorney wants to stand in
19 judgment of another attorney, first of all.  Very few
20 do.  I certainly don't want to.  And I remember the
21 specific feeling in my gut in reading this prenuptial
0116
```

```
 1   agreement the first time and my ethical duties to
 2   explain to Mr. Ayers that at least he needs to look
 3   to the remedy of malpractice because this did not
 4   accomplish any of the things that he thought it
 5   accomplished.
 6            I am not necessarily standing in judgment
 7   of Mr. -- I mean, I guess I am to some extent.  I'm
 8   here to express my opinion as to what the standard --
 9   what breaches of the standard of care I believe
10   happened in the drafting of this agreement.
11       Q    How do you know what Mr. Capute did, said
12   or didn't do or didn't say, and how can you express
13   an opinion of what the standard of care is and
14   whether he met it if you don't know those essential
15   facts?
16       A    Well, nobody, no judge knows a hundred
17   percent sure with a crystal ball exactly what
18   happened in -- not nobody.  But it's rare that you
19   have a crystal ball that tells you exactly what
20   happened without the slant of either party's
21   recollection.
0117
 1       Q    Mr. Ayers doesn't have a recollection.
 2   He's already testified under oath that he has no
 3   recollection at all.  How can you -- if the man says
 4   he doesn't know what he discussed with his lawyer,
 5   and you can only rely on what he actually said, he,
 6   the client, Mr. Ayers, how is it that you can rely on
 7   something that Mr. Ayers can't remember for purposes
 8   of forming an opinion as to whether Mr. Capute met
 9   the standard of care?
10       A    Because Mr. Ayers -- he might not
11   remember -- I don't know how you worded the question.
12   He might not remember the specific recollection.  But
13   Mr. Ayers believed that this agreement protected him
14   in certain areas and this agreement doesn't.  That
15   coupled with the drafting of this agreement, that
16   coupled with the fact that he, at his age, marrying a
17   younger person, his financial resources versus her
18   financial resources, what's the purpose of coming
19   into a prenup, the circumstances and what an attorney
20   presenting a prenup to a client would have a duty to
21   explain to the client in regard to what happens when
0118
 1   you get married.  It's all of those factors together.
 2       Q    Do you have any other points that you want
 3   to make about what your opinions are because I want
 4   to try to move on?
 5       A    No.
 6       Q    Are you finished telling me all the
 7   opinions you have today in Mr. Capute's case?
 8       A    To the best of my recollection.
 9            MR. SHAFFER:  I want to show you, if I can,
10   what's been marked as Exhibit 2, which is --
11   Kevin, do you have this?
12            MR. GIBSON:  Yes.
13   BY MR. SHAFFER:
```

*EXHIBIT "G"*

*Law Office of Edward C. Gill, P.A.*

16 N. BEDFORD STREET
P.O. BOX 824
GEORGETOWN, DELAWARE 19947-0824

EDWARD C. GILL
THERESA McQUAID HAYES
LORRAINE K. PHILLIPS

PHONE: 302-854-5400
FAX: 302-854-5409

June 27, 2003

RECEIVED
JUN 3 0 2003
KEVIN W. GIBSON, ESQ.

## VIA FACSIMILE (610) 565-4358

Kevin William Gibson, Esquire
Gibson & Perkins P.C.
200 East State Street
Media PA 19063

      Re: Ayers v Capute

Dear Mr. Gibson:

      I understand that Mr. Shaffer has used my deposition testimony in his Motion For Summary Judgment where I testified that I didn't read the Plaintiff's Rule 26 Disclosures until the night before my deposition to infer that I was not cognizant of what was contained in the Disclosures. This inference is a distortion of the actual facts. As you know, you and I had a number of conversations at the time you were preparing the Disclosures concerning what my opinion would be comprised of. In fact, we reviewed at length the fact that my opinions had already been framed in large part in my letter to you dated July 25, 2001, a letter that I produced to Mr. Shaffer in discovery said letter being attached hereto and incorporated herein by reference.

      Mr. Shaffer did not include that portion of my testimony where on pages 6 –7 I stated regarding my receipt of the disclosures: "I know I got -- see, I received them the first time a while ago, and I had trouble downloading it. Actually reading these, I didn't read them until last night." Just because I did not see the disclosures in final written form does not mean that I had no knowledge what the disclosures were. As stated above I had intimate knowledge what the disclosures consisted of in that you prepared them consistent with the opinions I provided to you in our discussions as to what my expert opinion would consist of.

      If you need anything further please call.

Very truly yours,

Theresa M. Hayes, Esquire

TMH/jkg
cc:   Tim Ayers

*Law Office of Edward C. Gill, P.A.*

16 N. BEDFORD STREET
P.O. BOX 824
GEORGETOWN, DELAWARE 19947-0824

EDWARD C. GILL
THERESA McQUAID HAYES

PHONE: 302-854-5400
FAX: 302-854-5409
EMAIL: egill@dmv.com

## THIS DOCUMENT CONTAINS INFORMATION WHICH IS PROTECTED BY ATTORNEY-CLIENT PRIVILEGE

July 25, 2001

**FAX: 610-565-4358**

Kevin Gibson, Esquire
Gibson & Perkins, P.C.
200 East State Street, Suite 105
Media, PA 19063



        Re:    **Timothy E. Ayers**

Dear Mr. Gibson,

        I am writing in regard to our mutual client, Timothy Ayers. As you know, I represent Mr. Ayers in regard to a pending divorce with ancillary matters in the Family Court.

        During our initial consultation, Mr. Ayers informed me that he was interested in seeking a divorce. He then presented me with the attached "Antenuptial Agreement" and advised that he did not think there would be property division issues because he and Lisa had executed said document. Mr. Ayers continued by stating that he and his wife had always had an understanding that any assets derived from his businesses were his and whatever Wife saved and earned from her two weekly checks was hers to invest and spend as she desired.

        I then read the prenuptial. Frankly, in my opinion, the agreement protects very little. First, there is no protection from alimony. Under Delaware Law, Ms. Ayers may be entitled to alimony for up to one half the length of the marriage. Mr. Ayers thought that paragraph seven (7) protected him from the potential of alimony as well as any property division exposure. Since there is no specific waiver of alimony in paragraph seven (7), any argument that it waives alimony or further property division would be woefully week.

July 25, 2001
Page 2

In light of Mr. Ayers' approximately $800,000.00 per year income, he faces the possibility of a very high monthly amount of alimony. In fact, Lisa Ayers' attorney, Thomas E. Gay, Esquire, has specifically stated to me that he believes he can secure a $10,000.00 to 15, 000.00 per month award. Mr. Gay is actually excited at the potential of such an award. I have been told on numerous occasions by Mr. Gay that any potential settlement must include a substantial monthly amount for alimony. Even though Ms. Ayers is no longer doing work for Mr. Ayers, he has been forced to continue the paychecks in fear of retaliation (the filing of a Motion for Interim Alimony) if he were to stop the same. This costs Mr. Ayers approximately $840.00 per week or $3,640.00 per month.

After evaluation of the respective incomes of Mr. Ayers and Ms. Ayers and a review of the lifestyle the parties experienced during the marriage, Mr. Ayers may face one of the highest alimony awards I have seen in my practice. I believe Mr. Ayers is fortunate to only be paying $3,640.00 per month. If we could reach an agreement to continue this amount for the five (5) years it would be my strong advice to Mr. Ayers to accept the same. Unfortunately, I believe this to be unrealistic. If I were Ms. Ayers' attorney, I would demand between $6,000.00 and $10,000.00 per month.

The agreement also does very little to protect his businesses. In my opinion, the businesses needed to be specifically addressed as separate property, including any increase in the value of the businesses over the course of the marriage. Arguably, paragraph five (5) attempts to address this. However, I believe Mr. Gay has a strong argument that paragraph five (5) only protects gifts, inheritances, or stock purchase agreements. The increased value of the business isn't addressed. This is particularly dangerous in light of the Albanese case. Mr. Gay has already pointed out the agreement's weaknesses to me on several occasions. He is particularly interested in the failure of the agreement to protect from alimony, the increased value of the business, and the income received from the business.

Normally, all income received during the course of the marriage is marital property. This prenuptial does not even attempt to protect the income Mr. Ayers has received during the marriage or the property purchased with said income.

July 25, 2001
Page 3

Under Delaware law, any property purchased or acquired during the course of the marriage is marital.  Therefore, Mr. Ayers risks loosing the real property he purchased during the marriage that is adjacent to his premarital residence.  In addition, Mr. Ayers has other accounts in his name alone that were accumulated during the marriage.  These accounts exceed $100,000.00 and may be subject to division.

Mr. Ayers also told me that his attorney did not explain to him that whenever he put his Wife's name on any of his accounts, he was essentially gifting that property to her even if it would have been "separate" property otherwise.  Therefore, an approximately $500,000.00 account that was derived solely from the proceeds of his businesses, and an approximately $65,000.00 account would now be marital property.

In light of the substantial risks that Mr. Ayers would face in a full ancillary hearing, I believe it is in his best interests to make the offer that I have attached to this letter.  At the present time, Ms. Ayers is anxious to purchase a home and needs cash.  It is my strong belief that I should make this offer as soon as possible.

If you have any questions or further concerns, please do not hesitate to contact me.

Very truly yours,

Theresa M. Hayes

TMH/csw

Enclosure

cc: Timothy Ayers

*EXHIBIT "H"*

MAY-02-2003 FRI 12:49 PM                    FAX NO.                    P. 12

MAR 1 4 2003

# IN THE FAMILY COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

In Re the Marriage of                        )
                                             )
JOYCE A. HARMON,                             )
                                             )        File No.  CN87-1153
        Petitioner,                          )
                                             )        Petition No. 02-11641
        v.                                   )
                                             )
RONALD W. HARMON,                            )
                                             )
        Respondent.                          )
                                             )

In Re:  **PRENUPTIAL AGREEMENT**
        **ENFORCED IN PART**
        **INVALIDATED IN PART**

Date Submitted:        January 28, 2003
Date Decided:          March 13, 2003

Christine K. Demsey, Esquire for Petitioner
Respondent, *pro se*

Kuhn,

The issue before the Court involves the validity of a prenuptial agreement ("Agreement") entered into on August 13, 1984 by Ronald W. Harmon ("Husband") and Joyce A. Harmon ("Wife"). The Court held a preliminary hearing on January 16, 2003 regarding the validity of the Agreement. Wife, represented by Christine K. Demsey, Esquire and Husband, *pro se*, appeared at the hearing. Testimony and evidence was presented by the parties relating to the validity of the Agreement, including testimony from Melvin Woloshin, Esquire, whom drafted the Agreement. Pursuant to Court order, Husband submitted a memorandum of law in support of his position on January 20, 2003 and Wife submitted hers on January 28, 2003.

## BACKGROUND FACTS

Husband and Wife married on August 24, 1984. A few weeks prior to the signing of the Agreement, Husband and Wife discussed entering into a prenuptial agreement. Wife hired Melvin Woloshin, Esquire to draft the Agreement and the parties met with him on August 13, 1984 and executed the Agreement. Husband did not obtain independent counsel.

The parties separated on December 22, 2001 and divorced on August 15, 2002. In the course of the divorce proceedings, Husband questioned the validity of the Agreement based upon his allegation that he did not understand the Agreement's effect and that he did not read the document before signing it, but rather relied upon Wife's counsel's recitation of the terms.

2

## TESTIMONY

### *Mr. Woloshin, Esquire's Testimony*

Mr. Woloshin testified that he has been an attorney in the State of Delaware since December 20, 1965. He testified that although he recognized the Agreement in this case, he had no independent recollection of drafting the agreement, or of the meeting in which the parties executed the Agreement. He testified that he practiced a "little bit" of family law in 1984, but that he has only drafted five or six pre or antenuptial agreements throughout his career. He follows a routine for any document which is to be executed. Such routine includes sending a copy of the document to the parties involved prior to the execution of the document. He testified that he would not have given Husband the Agreement for the first time on the day it was signed and that he would have required Husband to read the Agreement prior to signing it. He admitted, however, that he is unsure as to whether or not he drafted a list of the parties assets, as he no longer has the file. He is certain that he advised his client, Wife, of the prenuptial laws prior to signing but is unsure if he so advised Husband. He further explained the he does not generally sit down with the parties and explain the document verbatim, unless this is asked of him. He will answer questions, but admits that he does not go through the document and advise the opposing party of their rights.

### *Wife's Testimony*

Wife testified that she was represented by Mr. Woloshin. Wife asked Husband if he wanted legal counsel but he declined. She testified that it was her idea to have the agreement signed. She testified that while she received a copy of the agreement prior to signing it, she is unsure if Husband received a copy. She stated that the parties went

3

together to Mr. Woloshin's office to sign the document. She recalled that initially neither party understood the agreement completely, but that Mr. Woloshin then read the agreement to them and explained it in layman's terms. Wife asserts that she disclosed all of her assets to Husband at the time of signing. She avers that the parties lived together in her home for a year prior to signing the document and that Husband was familiar with all of her assets. Wife admits that there was no discussion between Mr. Woloshin and Husband about what rights Husband was giving up if the parties eventually got divorced. Wife finally testified that she would not have married Husband if he had not signed the Agreement.

### Husband's Testimony

Husband admits that it is his signature on the Agreement, but insists that the document that was presented by Wife subsequent to his filing for divorce is not the document that was explained to him in Mr. Woloshin's office. Essentially Husband avers that the agreement, as explained to him by Mr. Woloshin, merely protected the parties' premarital assets and that any property which was purchased during the marriage would be considered marital property. Husband avers that he did not read the agreement prior to signing it, but rather relied upon Mr. Woloshin's explanation of the terms.

Husband also avers that he was not given the opportunity to consult independent counsel prior to the signing of the agreement. He further alleges that had he been given such an opportunity, he never would have signed the agreement.

Husband further alleges that he made weekly contributions to a jointly held account, which was maintained by Wife. Husband claims that Wife also prepared and maintained all of the parties' income tax information. Husband states that he did not have

4

access to the parties financial information during the marriage. Husband also alleges that he signed his rights in a former marital home over to Wife in 1995 after she requested that he do so. He testified that this was done due to concerns over Husband's credit situation. Wife then allegedly sold the home in 2000 and kept all of the proceeds.

## BURDEN OF PROOF

When the validity of a prenuptial agreement is challenged, the burden of proof falls upon the proponent of the agreement if it is established that the proponent played the dominant role in the parties' relationship[1]. Failing such proof, all property acquired by either party during the marriage is marital property under Delaware law[2]. The Court finds that Wife has the burden of demonstrating that the Agreement is valid, because Wife is the proponent of the Agreement and because the evidence presented in this case shows that Wife was represented by counsel at the time the Agreement was signed and was the dominant spouse throughout the parties' marriage.

## APPLICABLE LAW

The parties executed the Agreement on August 13, 1984. As such, the Agreement is governed in part by 13 Del.C. §301 which provided:

> "A man and woman in contemplation of matrimony, by a marriage contract executed in the presence of 2 witnesses at least 10 days before the solemnization of the marriage, may determine what rights each shall have in the other's estate during the marriage and after its dissolution by death and may bar each other of all rights in their respective estates not so secured to them and any such contract duly acknowledged before any officer authorized to take acknowledgments may be recorded in the deed records in the office of the recorder in any and all counties of the State."

---

[1] See Coulbourn v. Lambert, Del. Fam., File No. CN96-07754, Crowell, J. (December 19, 1996), Cynthia J. v. Albert J., Del. Fam., File No. CN93-09971, Ableman, J. (May 18, 1995), Search v. Search, Del. Supr., 508 A.2d 73 (1986).

[2] See 13 Del.C. §1513.

5

Although not controlling as a matter of law, the Uniform Premarital Agreement Act is useful as a guide to policy goals. Specifically, 13 Del.C. §326 encompasses the standards to apply to prenuptial agreements utilizing contract based principles[3].

Therefore, in applying the appropriate statute to determine the validity of a prenuptial agreement, this Court will look to prior case law as well as the current statute and case law interpreting it.

## THE EFFECT OF A TECHNICAL DEFECT ON THE VALIDITY OF THE AGREEMENT

Although Wife asserts that the Agreement is valid and meets all of the legal requirements, the Court notes that there is a technical defect inherent in the Agreement in that it was not executed pursuant to the procedures outlined in the 1984 version of 13 Del.C. §301. Specifically, there were not two witnesses present at the time the Agreement was executed. Non-compliance with the formalities outlined in 13 Del.C. §301, however, does not render a prenuptial agreement automatically void. In the absence of other evidence that may undermine an agreement's validity, such a technical defect will not defeat the Agreement[4].

In Tyre v. Lewis, the petitioner sought to invalidate a prenuptial agreement based on the fact that it was signed by only one witness instead of two as prescribed by 13 Del.C. §301. The Court held that the agreement was valid and stated that it "...should not permit plaintiff to repudiate her clear undertaking ... on the basis of the technical point now relied upon. Plaintiff does not allege fraud, undue influence, or mistake, and there is

---

[3] The Uniform Prenuptial Agreement Act, codified at 13 Del.C. §§321-328 applies to prenuptial agreements executed after September 1, 1996 and essentially legislates the prior application of common law principles used to determine a prenuptial agreement's validity.

no evidence of record that she at any time from the date of execution of the agreement up to the time of her husband's death ever complained about the terms of the agreement in issue."[5]

In Porter v. Sugalski, the Court upheld a prenuptial agreement that was challenged on the basis of a technical defect in its execution under the statute.[6] However, the Court conditioned the agreement's validity on "the absence of a specific controversy between the parties as to its meaning or construction, none of which had been brought to the Court's attention by either party."[7]

Under Delaware law, a technical procedural defect is not fatal to a prenuptial agreement absent some sort of controversy regarding its meaning or effect. The Court finds, therefore, that the Agreement that Husband and Wife entered into on August 13, 1984 is not invalid based solely upon that technical defect.

## WHETHER THE AGREEMENT MEETS THE SUBSTANTIVE STANDARDS OF VALIDITY

The Court must determine whether the Agreement satisfies certain standards in order for it to be valid and enforceable. Moreover, the Court may strike certain provisions of a prenuptial agreement while enforcing others[8]. The validity turns on the specific facts of the case. Because of the unique relationship between parties who are about to be married, courts generally review a prenuptial agreement for both procedural

---

[4] See Tyre v. Lewis, Del. Ch., 276 A 2d 747 (1971), Porter v. Sugalski, Del. Fam., C.A. No. 1255-82, Arsht, J. (June 20, 1983).
[5] Id.
[6] Porter v. Sugalski, Del. Fam., C.A. No. 1255-82, Arsht, J. (June 20, 1983).
[7] Id.
[8] See Coulbourn v. Lambert, Del. Fam., File No. CN96-07754, Crowell, J. (December 19, 1996).

7

and substantive fairness.[9] An agreement is inequitable if it fails to satisfy any one of the following requirements: (1) each spouse has made a fair and reasonable disclosure to the other of his or her financial status, (2) each spouse has entered into the agreement voluntarily and freely; and (3) the substantive provisions of the agreement dividing the property upon divorce are fair to each spouse at the time of the execution of the agreement and, if circumstances significantly changed since the agreement, then also at the time of the divorce.

### Was there fair and reasonable disclosure?

Fair and reasonable disclosure is necessary in order for the proponent of the agreement to establish that the other party had full knowledge of all the facts and circumstances materially affecting the contract.[10] Such disclosure does not entail that specific values for each asset be provided.[11] Mr. Woloshin testified that although there were no exhibits attached to the Agreement as to what each party owned, it was his practice to read through the Agreement with the parties and answer any questions. Mr. Woloshin admitted, however, that he would not have advised Husband of the prenuptial laws at the time, nor would he have gone through the document and explained to Husband his rights. Although Wife testified that Husband was aware of her assets at the time the Agreement was executed, there is no independent evidence that any such disclosure took place. Husband's testimony was somewhat inconsistent as to whether he was aware of Wife's assets at the time the Agreement was signed. The Court finds that whether their was fair and reasonable disclosure in this case is questionable. The only

---

[9] See Coulbourn v. Lambert, Del. Fam., File No. CN96-07754, Crowell, J. (December 19, 1996), Cynthia J. v. Albert J., Del. Fam., File No. CN93-09971, Ableman, J. (May 18, 1995).
[10] Donna L. S. v. Christopher A.P., Del. Fam., File No. CN97-08316, Crowell, J. (Sept. 1, 1998).
[11] Id.

8

fact that the Court is confident of is that Husband was never advised of exactly what he was giving up by signing the document, nor was he explained his legal rights at the time the Agreement was executed. Accordingly, the Court finds that Wife has failed to meet her burden to show that their was full and fair disclosure of each parties' assets prior to the execution of the Agreement.

## Was the Agreement entered into knowingly and voluntarily?

In addition to requiring fair and reasonable disclosure, the Court must conclude that the agreement was entered into freely and voluntarily, without fraud, force, or coercion. In Coulbourn, the Court found that a prenuptial agreement was not the result of coercion or duress based on the fact that the wife raised no objection to signing the agreement and no evidence was introduced to establish that the husband threatened he would not have married the wife in the absence of a signed agreement. In the present case, Husband did not object to signing a prenuptial agreement. Husband testified that he did not feel forced to sign the Agreement because he thought that the purpose of the Agreement was to protect the parties' premarital property. It was a purpose with which he concurred. The Court finds that the execution of the Agreement did not result from fraud, duress, or coercion, but rather was voluntary.

The Court is concerned, however, that Husband declined to obtain independent legal advice, although the refusal of a party to obtain independent legal advice does not preclude a showing that the agreement was voluntarily made. In the Coulbourn case, the Court questioned whether the wife realistically had an opportunity to obtain the advice of independent counsel, had she so desired, because the issue of a prenuptial agreement was raised only one to two weeks prior to the wedding. In the instant case, Husband did not

9

obtain independent counsel to review the Agreement. Husband further testified that he was never given the opportunity to do so. Wife, however, testified that Husband was given the opportunity to hire independent counsel, but declined to do so. The Court finds that Husband's failure to obtain the services of an attorney to review the Agreement by itself does not show that the Agreement was not entered into freely and voluntarily.

Not only must the proponent of the agreement demonstrate that it is fair to both parties and entered into without fraud, force or coercion, but the proponent must also demonstrate that the agreement was entered into knowingly. The Court finds that Husband did not knowingly enter into the Agreement as he had no understanding of what his rights were, either with or without the Agreement.

The Court in Coulbourn, having found that the wife understood the provisions relating to premarital property, enforced those provisions. The Court refused to enforce certain provisions of the prenuptial agreement in Coulbourn, in part due to strong evidence that the wife did not understand the provisions of the agreement as they related to alimony and the acquisition of future assets. The circumstances that the Court relied upon in making its determination included the fact that the wife did not have independent counsel; the wife did not engage in negotiations over the Agreement; the wife's legal rights were not sufficiently explained to her; the wife's naivete about financial matters; and the close proximity of the signing of the agreement to the marriage. The most important factor to the Court, however, was that neither party intended that the prenuptial agreement waive alimony or address future assets. The parties' intent in signing the agreement was to protect the assets each owned at the time of the marriage.

10

The Supreme Court of Delaware has also affirmed a Family Court decision to invalidate a prenuptial agreement because the Court found that wife had "no real understanding" of its terms[12]. The Court explained that:

> Wife's limited understanding was that the agreement simply permitted each party to retain his or her previously acquired property. However, as written, the agreement excluded all property acquired during (as well as before) the marriage from treatment as marital property and barred wife from asserting any statutory claims against husband's estate.[13]

In support of it decision, the Court found that a confidential relationship existed between husband and wife, husband was the dominant party in the relationship at the time of the execution of the agreement, wife was "relatively unsophisticated" and had a limited education and as such "reasonably believed that the agreement would have no bearing on the future acquisition of assets during the marriage."[14]

The evidence in this case leads the Court to find that Husband did not understand the provisions of the Agreement as they related to after-acquired property[15]. Husband believed the purpose of the Agreement was to protect each parties' premarital property, but believed that any property purchased after the marriage would be considered marital property.

In addition, Husband was not involved in the negotiations surrounding the drafting of the Agreement. The testimony surrounding the Agreement as it relates to

---

[12] Search v. Search, Del. Supr., 508 A.2d 73 (1986).
[13] Id.
[14] Id.
[15] The provision states: III. Property to be Separately Owned: After the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, (including the income derived therefrom) whether now owned or hereinafter acquired, by gift, deed or bequest, and each of them shall have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made by the other by reason of the marriage, and with the same effect as if no marriage had been consummated between them. IV Joint Rights and Obligations: Notwithstanding the provisions of this Agreement, the parties have the right to purchase any property jointly and if joint funds are to be

11

after acquired property is further evidence to the Court that Husband did not have a full and complete understanding of the language and effect of certain provisions of the Agreement.

The testimony showed that Husband understood that he would not be entitled to any portion of Wife's premarital property. Therefore, the Court finds that those provisions are valid and enforceable. The Court finds, however, that Clauses III and IV of the Agreement relating to after-acquired property are unenforceable due to Husband's failure to understand their effect.

### Are the substantive provisions of the Agreement fair?

Finally, the Court must determine whether the substantive provisions of a prenuptial agreement were fair at the time of execution and, if circumstances have changed significantly, at the time of divorce. In doing so, the Court will consider whether the parties have been married before and have gone through property divisions with former spouses, whether the parties were aware of the purpose and reason for entering into the prenuptial agreement, whether the facts were fully disclosed to the parties, and whether there was fraud, duress, or overreaching occurred in determining if the substantive provisions were fair at the time of execution and divorce.[16] Although this was Wife's first marriage, Husband was previously married and therefore has been through a property division in the past. However, the Court concludes that Husband's belief as to the purpose and effect of the Agreement was misguided. As such, the Court finds that the provision of the Agreement relating to after-acquired property is

---

used, then said property shall become jointly owned and a record of jointly owned property shall be maintained."

[16] See Cynthia James v. Albert W. James, Del. Fam., File No. CN93-09971, Ableman, J. (May 18, 1995).

12

substantively unfair due to the fact that Husband did not have an understanding of its meaning.

## CONCLUSION

Based on the facts and circumstances of this case, the Court concludes that Clauses III and IV of the Agreement as they relates to after-acquired property are unenforceable. Husband did not knowingly and voluntarily waive his right to after-acquired property and those provisions are substantively unfair to Husband. Therefore, the Court retains ancillary jurisdiction in this case to resolve the distribution of the parties' marital estate.

The Court's decision to invalidate Clauses III and IV of the Agreement as they relate to after-acquired property will result in the Court holding an ancillary hearing to distribute any after-acquired property pursuant to 13 Del.C. §1513. A pretrial conference has previously been scheduled for April 16, 2003 at 2:30 p.m. and the ancillary hearing has been scheduled for May 19, 2003 at 9:30 a.m.

**IT IS SO ORDERED.**

Chandlee Johnson Kuhn
Judge

CJK/csw 03/13/03

Cc:    Counsel & Party
       File

Date Mailed: 3/14/03

13

CERTIFICATE OF SERVICE

I hereby certify that on this 30th Day of June, 2003, I served a true and correct copy

of the Plaintiff's Answer to Defendant's Motion For Summary   upon the following by

Electronic Mail:

Robert T. Shaffer, III, Esquire
Suite 1400, 36 S. Charles Street
Baltimore, MD   21201-3109
RShaffer@MurphyShaffer.com

GIBSON & PERKINS P.C.

BY: KEVIN WILLIAM GIBSON
Suite 105
200 East State Street
Media PA 19063
610.565.1708
kevingibson@gibperk.com

17